UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-60297-CIV-ALTMAN/Hunt

BERNARD MCDONALD,

       *Plaintiff,*

*v.*

CITY OF POMPANO BEACH,
FLORIDA,

       *Defendant.*

_____/

## ORDER

       The City of Pompano Beach's new ordinance prohibits sitting or standing on medians that (1) divide roads with at least three lanes "in any one direction" and (2) are between three and five feet wide. The question presented in this case is whether that ordinance violates the First Amendment— both facially and as applied to our Plaintiff, Bernard McDonald, who uses these medians to panhandle for his subsistence.

       The parties, who have filed cross-motions for summary judgment, mostly agree on the facts and the law. But the case is hard anyway because it sits uncomfortably at the murky intersection between two competing interests: the government's power to promote public safety on the one hand and the individual's freedom of speech on the other.[1] To understand just how close this case is, consider this: the City appears to concede that its ordinance would be unconstitutional as to medians that are wider than five feet, while McDonald (implicitly) admits that the ordinance is constitutional as applied to medians that are narrower than three feet; the City concedes that its ordinance would be unconstitutional as applied to the sidewalks that are just a few feet from the medians at issue here, and

---

[1] *Cf. Kovacs v. Cooper*, 336 U.S. 77, 89 (1949) (Frankfurter, J., concurring) ("Wise accommodation between liberty and order always has been, and ever will be, indispensable for a democratic society.").

McDonald doesn't seem to dispute the commonsense proposition that the ordinance would be constitutional as applied, say, to a light pole that, though erected on the very same median in question here, bears a sign prohibiting panhandlers from climbing it. There's also, buried beneath the briefs, a still more difficult question, one the parties never address: whether the ordinance, as a law that purports to regulate *only* conduct, even implicates the First Amendment at all. In end, because the record is underdeveloped on certain key issues, we'll **DENY** the motions for summary judgment and proceed to trial.

### THE FACTS[2]

### I.   BACKGROUND

Bernard McDonald lives in Pompano Beach, Florida, where he panhandles to survive. *See* Pl.'s SOMF ¶ 13. When he solicits from motorists, McDonald stands either on street medians or along adjacent sidewalks and road shoulders, and he displays a sign that reads "Homeless, please help me if you can." *Id.* ¶ 15. When a motorist offers him a donation, he walks towards the donor's car by stepping between the vehicles that are stopped at the light. Def.'s SOMF ¶ 7. If another motorist signals him, he'll stay in the roadway—but only if it's safe to do so. *Id.* ¶ 8; Pl.'s SOMF Opp. ¶ 8. Otherwise, after collecting the donation, he returns to the sidewalk or to the median—whichever is closer. Def.'s SOMF ¶ 9.

---

[2] We draw these variously from the parties' statements of material facts, their oppositions to each other's statements of material facts, and their reply statements of material facts. *See* Plaintiff's Statement of Material Facts in Support of Plaintiff's Motion for Partial Summary Judgment ("Pl.'s SOMF") [ECF No. 76]; Defendant's Statement of Material Facts in Opposition to the Plaintiff's Statement of Material Facts ("Def.'s SOMF Opp.") [ECF No. 83]; Plaintiff's Reply Statement of Material Facts ("Pl.'s SOMF Reply") [ECF No. 87]; *see also* Defendant's Statement of Material Facts in Support of Motion for Summary Judgment ("Def.'s SOMF") [ECF No. 96]; Plaintiff's Statement of Material Facts in Response to Defendant's Statement of Material Facts ("Pl.'s SOMF Opp.") [ECF No. 110]. When it comes to the facts, the parties largely agree—though, of course, we'll indicate when they don't. We also, consistent with the Rules, cite some record evidence the parties *didn't* reference. *See* FED. R. CIV. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

McDonald has panhandled throughout the City, but he prefers major intersections because that's where he can communicate his message to the largest audiences—and, as a consequence, receive more donations. Pl.'s SOMF ¶ 16. The intersections he frequents the most have at least three lanes of traffic on either side, and the medians at those intersections are about four to five feet wide. *Id.* Apparently, the size of the median doesn't affect McDonald's choice of intersection. Def.'s SOMF ¶ 10. But he selects medians generally because he thinks they allow him—standing there in the middle of the street—to be seen by the greatest number of people: small in physical stature, McDonald says that he can sometimes get lost in the crowds that tend to congregate on the sidewalks, particularly near bus stops or at crosswalks. Pl.'s SOMF ¶ 18.

## II.   THE LAWSUIT

In 2003, the City enacted Ordinance 2003-71, codified at § 100.41 of the City Code. *Id.* ¶ 12.[3] The law imposed 21 different regulations and requirements on "street solicitors," § 100.41(B), which it defined as any "person who stands or goes upon any portion of a public street, roadway, or neutral ground" for the purpose of (1) soliciting donations, business, or employment from the occupant of any vehicle, or (2) selling anything or distributing any tangible object to the occupant of any vehicle, § 100.41(A) ("Definitions"). The ordinance defined "[n]eutral ground" as "any area that divides a roadway or divides the roadway for vehicles driving in opposite directions including, but not limited to, paved or unpaved medians." *Id.*

In August of 2018, McDonald was arrested for violating § 100.41. Pl.'s SOMF ¶ 13. He was held overnight and, the next morning, sentenced to time served. *Id.* A year-and-a-half later, in February of 2020, McDonald sued the City in this Court, alleging that § 100.41 was a content-based restriction

---

[3] A copy of Ordinance 2003-71 is attached as Exhibit 1 to McDonald's First Motion for Preliminary Injunction [ECF No. 4-1].

that violated the First and Fourteenth Amendments to the U.S. Constitution—both facially and as applied to him. *See generally* Initial Complaint [ECF No. 1].

Soon after filing this lawsuit, McDonald moved for a preliminary injunction. *See* First Motion for Preliminary Injunction [ECF No. 4]. At a hearing on April 29, 2020, we denied the First Preliminary Injunction *as moot* after the City promised to amend (and stop enforcing) § 100.41. *See* Order Denying First Motion for Preliminary Injunction [ECF No. 24]. On June 23, 2020, the City amended § 100.41 at a meeting of the City Commission. Pl.'s SOMF ¶ 2. These amendments, the parties now stipulate, rendered § 100.41 content-neutral and (thus) constitutional. *Id.*

But that didn't end the lawsuit. At the same meeting on July 23, 2020, the Commission enacted Ordinance 2020-59, which amended § 100.35 of the City Code. After reviewing these amendments, McDonald filed an amended complaint, arguing that two of § 100.35's subsections violate the First Amendment, both facially and as applied to him. Those subsections—now challenged here—are § 100.35(C)(1)(b) (the "Median Provision"), which prohibits sitting or standing on medians that divide three-lane roads and are less than five feet wide; and § 100.35(C)(2) (the "Hand-to-Hand Transmission Ban"), which prohibits hand-to-hand exchanges between pedestrians and motorists. *See* Verified Amended Complaint [ECF No. 38] ¶¶ 81–89. As redress, McDonald seeks declaratory relief, injunctive relief, and damages. *See id.* at 20. Specifically, he alleges that his 2018 arrest under § 100.41 and the subsequent amendments to § 100.35 "chill[ed]" his willingness to engage in protected speech. *Id.* ¶ 63.

In its answer to the Verified Amended Complaint, the City represented that it was in the process of "deleting subsection (C)(2) of Section 100.35 of the City Code." Answer to Verified Amended Complaint [ECF No. 53] ¶ 81; *see also* Response to Second Motion for Preliminary Injunction [ECF No. 52] ¶ 9 (explaining that the City had included the provision "inadvertently" and was deleting it). On October 27, 2020, the City enacted Ordinance 2021-05, which repealed §

100.35(C)(2). *See* Ordinance 2021-05 [ECF No. 75-3]. We'll separately address the City's contention that this second emendation rendered McDonald's claim under that subsection moot. Otherwise, though, we'll focus our attention on the Median Provision, § 100.35(C)(1)(b).

### III.   THE MEDIAN PROVISION: HISTORY AND TEXT

On May 26, 2020, the City held an exploratory meeting on the proposed Ordinance 2020-59.[4] Def.'s SOMF ¶ 16. At that meeting, the City Attorney, Mark Berman, read the text of Ordinance 2020-59, explained its purpose, and referred to some data and reports on which the Commission had relied in reaching its conclusions. *Id.* The purpose of the regulation, the City Attorney said, was to promote traffic and pedestrian safety. *Id.*

In assessing traffic safety, the Commission had reviewed a one-page data chart listing the number of accidents at 24 intersections in Pompano Beach over a two-year span—from February 1, 2018 to February 1, 2020. *See* Verified Amended Complaint [ECF No. 38-3], Ex. 3 ("Occurrence Chart"). The Occurrence Chart identified 1,394 incidents at those 24 intersections—25 of which involved pedestrians. *See generally id.*

The Commission also considered a 117-page report, published by the Florida Highway Safety and Motor Vehicle Department, which included several statistical charts showing the number of traffic accidents that had occurred in 2018. *See* Notice of Exhibits [ECF No. 75-2], Ex. 2 (the FLORIDA HIGHWAY SAFETY AND MOTOR VEHICLE DEPARTMENT, TRAFFIC CRASH FACTS: ANNUAL REPORT (2018) ("FHSMV Report")). The FHSMV Report shows seven accidents in which "cross median" was the "First Harmful Event,"[5] none of which resulted in injury. *Id.* at 35. Other First Harmful events included "Concrete Traffic Barrier" (6,089 accidents), "Curb" (6,003 accidents), and "Pedestrian"

---

[4] A video recording of that meeting (the "May 26, 2020 Meeting") is available at: http://pompano.granicus.com/player/clip/1571?meta_id=164034&redirect=true.
[5] The "First Harmful Event" identifies "the first action causing injury or damage events in the crash." FHSMV Report at 5.

(17,427 accidents). *Id.* at 35–36. The Report also included statistics for intersection crashes—which showed that 873 resulted in fatal injuries; 7,219 in incapacitating injuries; 27,885 in non-incapacitating injuries; 60,002 in possible injuries; and 221,976 in no injuries. *Id.* at 118.

In presenting Ordinance 2020-59, the City Attorney explained that smaller medians—those less than five feet wide—aren't safe for pedestrians because, if a pedestrian were to fall while standing on such a median, he would very likely end up falling into moving traffic. *See* May 26, 2020 Meeting (starting at 2:09:30). He also pointed out that roads with more lanes create greater opportunities for accidents between motorists and pedestrians. *Id.* After the City Attorney wrapped up, the City Mayor, Rex Hardin, spoke briefly, describing his own "close calls" and "near misses" while driving by pedestrians who were standing on or beside the roadway. *Id.* The City Commission then unanimously approved the measure. *Id.*

Ordinance 2020-59[6] begins with a series of prefatory clauses, which suggest that, in passing the law, the City intended to improve traffic safety for the City's pedestrians and motorists. *See* Ordinance 2020-59 at 1. The prefatory clauses also announce the City's purported findings: that "congestion on [the City's] streets and sidewalks continues to increase," and that, while medians "provide a measure of safety to pedestrians in the roadway[,] narrow and unpaved medians do not offer the same level of safety as larger, paved medians." *Id.* at 2. Although medians that are wider than three feet sometimes suffice, the City concluded that pedestrians "are at greater risk when the number of [adjacent] traffic lanes increase." *Id.* When a median is adjacent to a road with three or more traffic lanes (including turning lanes), the City determined that "increased risk to pedestrians warrants the need to further limit pedestrian occupancy in medians to reduce the likelihood of interaction with vehicular traffic in the event of a fall." *Id.* By contrast, a median that's five feet or wider on this type

[6] A copy of Ordinance 2020-59 is attached as Exhibit 2 to the Verified Amended Complaint [ECF No. 38-2].

6

of road, the City found, "would significantly increase the likelihood that should a pedestrian fall on the median, he or she would remain in the median as opposed to in the adjacent roadway itself." *Id.* Finally, the prefatory clauses invoke *Evans v. Sandy City*, 944 F.3d 847 (10th Cir. 2019), a recent Tenth Circuit opinion the Commission relied on for "guidance on the constitutionality of restrictions on the use of medians of a certain size and manner of construction." *Id.*

Ordinance 2020-59 amends § 100.35, a provision of the City Code that deals with obstructions on public streets, sidewalks, and right-of-way swales. As relevant here, Ordinance 2020-59 adds a subsection (C), which governs pedestrian activities on roads, medians, and sidewalks. For example, § 100.35(C)(1)(a) makes it unlawful to, "[f]or any period of time, sit or stand, in or on . . . any unpaved median, or any median of less than three feet." Other subsections, § 100.35(C)(3)–(11), regulate certain traffic or pedestrian activities—such as occupying a paved travel lane while traffic is flowing; jaywalking; altering or impeding traffic; crossing intersections; and touching or throwing objects at vehicles. And § 100.35(C)(2), now repealed, prevented people from exchanging things by hand with motorists who were temporarily stopped on three-lane roads.

The Median Provision at issue here, § 100.35(C)(1)(b), provides that:

> It shall be unlawful for any person to: . . . For any period of time, sit or stand, in or on . . . any median less than five feet where the adjacent roadway has three or more vehicular travel lanes in any one direction at the point of intersection (including turning lanes), except that pedestrians may use median strips only in the course of lawfully crossing from one side of the street to the other.

Violations of some of § 100.35's subsections constitute "non-criminal infractions," while violations of others—including § 100.35(C)(1) and § 100.35(C)(2)—are punishable by a fine and imprisonment of up to 60 days. *See* § 100.35(13)(a); *see also* Pl.'s SOMF ¶ 4 n.1.

## IV.   MEDIANS IN THE CITY

As its text makes plain, the Median Provision, § 100.35(C)(1)(b), governs only a subset of traffic medians in the City: scilicet, those that (1) are less than five feet wide and (2) are set between

roads that have three or more travel lanes (including turning lanes) on either side. Because McDonald doesn't challenge the constitutionality of § 100.35(C)(1)(a)'s prohibition on sitting or standing on medians that are *less* than *three* feet wide, the medians at issue here comprise only a subset of the medians targeted by the Median Provision. For ease of analysis, then, we'll refer to the medians McDonald attacks here—*i.e.*, those medians that (1) are between three and five feet wide and (2) divide roads with three or more travel lanes on either side—as the "Challenged Medians."

Unfortunately, we have very little evidence about the Challenged Medians. Most of what we do have came into evidence at a hearing on McDonald's Second Motion for Preliminary Injunction [ECF No. 42]. *See* Nov. 18, 2020 Hr'g [ECF No. 67]; Joint Exhibit List [ECF No. 65-1]. At that hearing, the City introduced three photographs of the intersection at Sample Road and Federal Highway, where McDonald had been arrested in 2018. *See* Nov. 18, 2020 Hr'g. The parties agreed, though, that the median at that intersection had since been renovated and that the photographs no longer accurately depicted the location. *See id.*; *see also* Declaration of Bernard McDonald [ECF No. 57-1] ¶ 6 (describing the renovations). When we indicated that we'd admit the three photographs only if the parties supplemented the record with up-to-date pictures, McDonald's lawyer said that supplemental photographs were unnecessary. *See* Nov. 18, 2020 Hr'g. He had visited the intersection recently and represented that the median had been reduced to a "cement triangular curb" about 18 to 20 inches wide. *Id.* He also stipulated that the other Challenged Medians would resemble the one at Federal and Sample, in that none of them would have any special amenities or features—like grassy areas, benches, bathrooms, water fountains, plaques, commemorations, trees, etc. *Id.* Although he

couldn't definitively say that all the medians at busy intersections in the City were of a certain width, he surmised, "anecdotally," that some were between three and five feet wide. *Id.*[7]

The Florida Department of Transportation recommends that pedestrian medians be eight feet wide—or, at the very least, six. *See* Def.'s SOMF ¶ 20; *see also* Declaration of City Engineer John Sfiropolous, P.E. [ECF No. 83-1], Ex. 1 (FLORIDA DEPARTMENT OF TRANSPORTATION, MANUAL OF UNIFORM MINIMUM STANDARDS FOR DESIGN, CONSTRUCTION AND MAINTENANCE FOR STREETS AND HIGHWAYS (2016) ("FDOT Manual")).

McDonald has also offered the following observation about major intersections in the City: "For many years and as long as I can remember, people have stood out at intersections on all the major roads and streets in Pompano Beach and have done so to ask people for money and donations; sold newspapers and water bottles; passed out fliers; and held signs for local businesses." Declaration of Bernard McDonald ¶ 3.

## V.    MCDONALD'S SEPTEMBER 26, 2020 ARREST

On September 26, 2020, McDonald was arrested in the City for violating three provisions of the City Code, one of which was § 100.35. *See* Def.'s SOMF ¶ 26. The City contends that the arrest was effectuated pursuant to § 100.35(C)(4), *id.*, though McDonald disputes that assertion, and the Booking Report doesn't specify, *see* Pl.'s SOMF Opp. ¶ 26. The Booking Report [ECF No. 96-2] indicates that the arrest was for "obstruction of a right-of-way," *id.* at 2. The arresting officer reported that he saw McDonald walking through traffic holding a sign and asking for money. *Id.* According to

---

[7] We deferred ruling on the Second Motion for Preliminary Injunction and consolidated it with a bench trial on the merits. *See* Consolidation Order [ECF No. 72]; *see also* FED. R. CIV. P. 65(a)(2). At the evidentiary hearing, the parties hinted that they'd fully presented their cases and that a trial on the merits would involve, at most, slightly more evidence. *See* Nov. 18, 2020 Hr'g. We therefore recommended consolidation as a way of avoiding the unnecessary, confusing, and time-consuming task of ruling twice on the same evidence under different standards—once under the standard that applies to preliminary injunctions and a second time after a trial on the merits. *See* Nov. 19, 2020 Hr'g [ECF No. 69]. The parties agreed, *id.*, and consented to a bench trial, *see* Stipulation as to Waiver of Jury Trial [ECF No. 71].

the Booking Report, McDonald had walked in front of traffic *even after* the light had turned green. *Id.* The officer claimed to have witnessed McDonald doing this several times. *Id.* at 2–3. Since this arrest occurred one day after he filed his Verified Amended Complaint, McDonald hasn't asserted *any* causes of action relating to it. *See generally* Verified Amended Complaint (filed on September 25, 2020).

### VI.   CROSS-MOTIONS FOR SUMMARY JUDGMENT

The parties have filed cross-motions for summary judgment, which are now ripe for adjudication.[8]

In his Partial MSJ as to Count III of the Verified Amended Complaint,[9] McDonald argues that the Challenged Medians are a type of "traditional public forum," in which the City has very little authority to limit free speech. *See* Pl.'s Partial MSJ at 5–13. The Median Provision is unconstitutional, he says—both facially and as applied to him—because (1) the City failed to consider sufficient evidence on the measure's likely effects on public safety, (2) the provision isn't narrowly tailored to advance a significant governmental interest, and (3) the law fails to provide ample alternative channels of communication. *See id.* McDonald also contends that the now-repealed § 100.35(C)(2) was unconstitutional and that, despite the repeal, his damages claim for that law's "chilling effect" isn't moot. *Id.* at 13–14.

In its MSJ, the City maintains that McDonald cannot sustain an as-applied challenge because neither § 100.35(C)(1)(b) nor § 100.35(C)(2) were ever enforced against him. *See* Def.'s MSJ at 2–4. It

---

[8] *See* Plaintiff's Motion for Partial Summary Judgment as to Count III ("Pl.'s Partial MSJ") [ECF No. 77]; City's Response to Plaintiff's Motion for Partial Summary Judgment as to Count III ("Def.'s Partial MSJ Opp.") [ECF No. 82]; Plaintiff's Reply in Support of Motion for Partial Summary Judgment as to Count III ("Pl.'s Partial MSJ Reply") [ECF No. 87]; *see also* Defendant's Motion for Summary Judgment ("Def.'s MSJ") [ECF No. 95]; Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment ("Pl.'s MSJ Opp.") [ECF No. 111]; Defendant's Reply in Support of Motion for Summary Judgment ("Def.'s MSJ Reply") [ECF No. 119].

[9] Counts I and II challenged the now-repealed § 100.41, and the parties settled those claims before filing their cross-motions for summary judgment. *See* Notice of Voluntary Dismissal as to Counts 1 and 2 [ECF No. 70].

also says that the Median Provision, § 100.35(C)(1)(b), is constitutional on its face as *either* (1) a reasonable and viewpoint-neutral regulation of a non-public forum *or* (2) a content-neutral, narrowly tailored regulation that leaves open ample alternative channels of communication, *see* Def.'s MSJ at 2–4. Finally, the City contends that McDonald's claim under § 100.35(C)(2) (the Hand-to-Hand Transmission Ban) is moot because that provision has been repealed. *Id.* at 2; *see also* Def.'s Partial MSJ Opp. at 20 (arguing that McDonald's § 100.35(C)(2) claim is moot because it isn't "viable").

SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); FED. R. CIV. P. 56(a). In determining whether to grant summary judgment, the Court must consider "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *Id.* at 248. A dispute about a material fact is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *Id.*

At summary judgment, the movant bears the burden of proving the absence of a genuine issue of material fact, with all factual inferences drawn in favor of the non-movant. *See e.g.*, *Allen v. Tyson Foods Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). Once the movant satisfies its initial burden, the burden shifts to the non-movant to come forward with evidence that a genuine issue of material fact precludes summary judgment. *See Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002); FED. R. CIV. P. 56(e).

The non-movant, however, "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). It must come forward with some affirmative evidence to support its claim. *See Anderson*, 477 U.S. at 257. "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990). If the evidence advanced by the non-movant "is merely colorable, or is not significantly probative, then summary judgment may be granted." *Anderson*, 477 U.S. 242, 249–50 (internal citations omitted).

"Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (cleaned up). In other words, we must consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration. *See Am. Bankers Ins. Grp. V. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005).

**ANALYSIS**

## I.   ARTICLE III STANDING

The City argues that McDonald cannot assert an as-applied[10] challenge because the two provisions he attacks haven't been enforced against him—and, therefore, haven't "chilled" his speech.

---

[10] This distinction between facial and as-applied challenges may not matter in this case because, as we discuss in more detail below, the Median Provision *arguably* regulates mainly conduct. *See Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973) ("Such claims of facial overbreadth have been entertained in cases involving statutes which, by their terms, seek to regulate 'only spoken words.'"). In other words, to the extent that the Median Provision regulates *where* a person can sit or stand—not *how* he sits or stands or *whether* he can speak while sitting or standing—McDonald may have a hard time distinguishing between the law's application to him and its application facially (*i.e.*, to others). *See Hill v. Colorado*, 530 U.S. 703, 731 (2000) (holding that, because the challenged statute "does not 'ban' any messages, [or] any signs, literature, or oral statements," and "merely regulates the places where communications may

*See* Def.'s MSJ at 3 (insisting that "[t]he evidence . . . does not support any legitimate contention that [§] 100.35(C)(1)(b) or [§] 100.35(C)(2) chilled the Plaintiff's First Amendment activities"). For two reasons, we construe this argument as an oblique assault on McDonald's Article III standing.

*For one*, we're not aware of any authority for the proposition that an as-applied challenge to a statute must fail *on the merits* when the statute hasn't been enforced against the plaintiff. Quite the contrary: although pre-enforcement suits regularly face standing challenges, courts universally recognize that plaintiffs *can*, consistent with Article III, advance pre-enforcement claims. *See, e.g., Robinson v. Att'y Gen.*, 957 F.3d 1171, 1177 (11th Cir. 2020) (holding that "a plaintiff may establish standing to bring an as-applied/pre-enforcement challenge by showing that either (1) she was threatened with prosecution; (2) prosecution is likely; or (3) there is a credible threat of prosecution" (cleaned up)). And, of course, this question—whether McDonald has standing to assert a pre-

---

occur," the plaintiffs couldn't show that "the impact of the statute on the conduct of other speakers will differ from its impact on their own [speech activities]").

Put it this way: if the statute legitimately prevents McDonald from standing on these medians *and* holding his sign to panhandle, then it legitimately prevents protestors, political candidates, business advertisers, and religious preachers from expressing *their* messages at the same medians. Nor could we "interpret" the Median Provision as applying only to people who, while standing on these medians, elect *not* to speak. That would require us to rewrite the Median Provision or ignore the plain meaning of its words—two things we aren't permitted to do. *See Borden v. United States*, 141 S. Ct. 1817, 1829 (2021) ("[S]tatutory construction does not work that way: A court does not get to delete inconvenient language and insert convenient language to yield the court's preferred meaning."); *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 397 (1988) ("[W]e will not rewrite a state law to conform it to constitutional requirements.").

In any event, we needn't burden ourselves with the distinction because McDonald makes no effort to sustain his facial-overbreadth challenge. He, after all, offers no evidence and advances no argument for the proposition that the Median Provision prohibits substantial amounts of *other* people's protected speech. *See generally* Pl.'s Partial MSJ; Pl.'s MSJ Opp.; *see also Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998) (noting that, in a First Amendment facial-overbreadth challenge, the plaintiff confronts "a heavy burden" to demonstrate "a substantial risk that application of the provision will lead to the suppression of speech"); *United States v. Williams*, 553 U.S. 285, 292 (2008) (explaining that the plaintiff has the burden to prove that the challenged statute prohibits a "substantial amount" of protected speech, "not only in an absolute sense, but also relative to the statute's plainly legitimate sweep"). Of course, since we're headed for a bench trial anyway, the parties may wish to address this issue in their proposed conclusions of law.

enforcement speech claim—is separate from, and will often have very little to do with, the viability of his claim on the merits.

*Second*, when it comes to the freedom of speech, "chilling" is generally understood to be the First Amendment injury-in-fact. *See, e.g.*, *Pittman v. Cole*, 267 F.3d 1269, 1284 (11th Cir. 2001) ("If no credible threat of prosecution looms, the chill is insufficient to sustain the burden that Article III imposes. A party's subjective fear that she may be prosecuted for engaging in expressive activity will not be held to constitute an injury for standing purposes unless that fear is objectively reasonable." (cleaned up)); *New Hampshire Right to Life Pol. Action Comm. v. Gardner*, 99 F.3d 8, 13 (1st Cir. 1996) (explaining that, in First Amendment cases, "an actual injury can exist when the plaintiff is chilled from exercising her right to free expression or forgoes expression in order to avoid enforcement consequences"). An attack on the degree to which one's speech was "chilled" is thus often—though not always[11]—euphemism for an assault on one's Article III standing.

Whether or not we construe the City's argument as challenging McDonald's standing, we must ensure that we have subject-matter jurisdiction over this case. To assert his standing to advance a pre-enforcement speech claim *at the summary-judgment stage*, McDonald must submit evidence of (1) his intent to engage in proscribed speech and (2) a credible threat of prosecution. *See, e.g.*, *Wilson v. State Bar of Ga.*, 132 F.3d 1422, 1428 (11th Cir. 1998) ("When a plaintiff brings a pre-enforcement challenge to a sanctioning statute, regulation or ordinance, standing exists at the summary judgment stage when the plaintiff has submitted evidence indicating an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution." (cleaned up)).

---

[11] After all, if your speech wasn't chilled, you aren't likely to prevail on the merits either.

McDonald satisfies both requirements—at least for now. He has standing to challenge the Median Provision because it's undisputed that he panhandles on the Challenged Medians. *See* Pl.'s SOMF ¶¶ 16, 17.[12] And, when he finds himself standing on a Challenged Median, his conduct falls squarely within the scope of the Median Provision—which exposes him to a credible threat of arrest. *See Leverett v. City of Pinellas Park*, 775 F.2d 1536, 1539 (11th Cir. 1985) ("[I]n some cases, the authentic interest of the plaintiff in engaging in the prohibited conduct can establish standing even though the only threat of enforcement comes from the very existence of the statute."). As for the Hand-to-Hand Transmission Ban, McDonald has always solicited donations from drivers—which required him to engage in *precisely* the type of hand-to-hand exchange § 100.35(C)(2) prohibited. To the extent the Hand-to-Hand Transmission Ban caused his injuries—*i.e.*, to the extent it impelled him to stop soliciting drivers and, therefore, to miss out on donations—he has standing to pursue his money-damages claim for the months during which § 100.35(C)(2) was in effect.

The City also suggests that McDonald's speech wasn't chilled at all because, as his September 26, 2020 arrest makes plain, he continued to panhandle even *after* § 100.35 was amended. *See* Def.'s MSJ at 3. As we've explained, however, a man's decision to persist in prohibited speech doesn't vitiate his Article III injury, where, but for the offensive regulation, he "would have engaged in *more* of the [speech] the ordinance proscribes." *Messina v. City of Fort Lauderdale*, 2021 WL 2567709, at *18 (S.D. Fla. June 23, 2021) (Altman, J.) (emphasis added) (holding that a person's "reticence" to engage in speech constitutes an irreparable injury for purposes of a preliminary injunction). McDonald unambiguously attests that, because of § 100.35, he "significantly curtailed his soliciting for donations in Pompano Beach." Verified Amended Complaint ¶ 58. And the City offers no proof for its view that McDonald has continued to panhandle with the same frequency—and in the same places—as he

---

[12] The City disputes McDonald's contentions in paragraph 17—but only to the extent he suggests that sidewalks aren't sufficient alternatives. *See* Def.'s SOMF Opp. ¶ 17.

did before § 100.35 was amended. The City thus hasn't shown—nor, really, has it tried to show—that McDonald's speech wasn't chilled at all. *See Leverett*, 775 F.2d at 1539 (noting that a plaintiff has standing when an "allegedly unconstitutional statute interferes with the way the plaintiff would normally conduct his or her affairs").

Although we've satisfied ourselves of McDonald's standing to challenge these two subsections of § 100.35 at *the summary-judgment stage*, we remind the parties that each element of standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

## II.   THE MEDIAN PROVISION

### A.   The First Amendment's Application

The First Amendment guarantees "all people [ ] the right to engage not only in 'pure speech,' but 'expressive conduct' as well." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1270 (11th Cir. 2004) (quoting *United States v. O'Brien*, 391 U.S. 367, 376–77 (1968)). But not all conduct is *expressive* to the point of triggering the First Amendment's protections. *See, e.g.*, *City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989) ("It is possible to find some kernel of expression in almost every activity a person undertakes—for example, walking down the street or meeting one's friends at a shopping mall—but such a kernel is not sufficient to bring the activity within the protection of the First Amendment."); 1 SMOLLA & NIMMER ON FREEDOM OF SPEECH § 11:3 (updated Mar. 2021) ("[W]hile freedom of speech 'means more than simply the right to talk and to write,' it does not embrace all human activity." (quoting *Stanglin*, 490 U.S. at 25)).

The parties don't address this important threshold question. *See generally* Pl.'s Partial MSJ; Def.'s MSJ; *see also Texas v. Johnson*, 491 U.S. 397, 403 (1989) ("We must first determine whether Johnson's burning of the flag constituted expressive conduct, permitting him to invoke the First

Amendment in challenging his conviction."); *Burns v. Town of Palm Beach*, 999 F.3d 1317, 1336 (11th Cir. 2021) ("In determining whether the government has violated free speech rights, the initial inquiry is whether the speech or conduct affected by the government action comes within the ambit of the First Amendment." (citation omitted)). They simply assume that the First Amendment applies here—an assumption that, for several reasons, we'll take a moment to question.

*First*, in determining whether conduct implicates the First Amendment, courts ask two questions: (1) whether "[a]n intent to convey a particularized message was present"; and (2) whether "in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it." *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1240 (11th Cir. 2018) (quoting *Spence v. Washington*, 418 U.S. 405, 410–11 (1974)). McDonald bears the burden of demonstrating that it is. *See Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984) ("[I]t is the obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment even applies."). It's possible—though, since neither party has briefed the issue, we can only speculate—that McDonald has failed to satisfy either element.

Starting with the first element, the Median Provision arguably burdens McDonald's speech only *indirectly*, because (at least facially) it applies to non-expressive conduct. McDonald doesn't communicate through the act of sitting or standing generally (as one may communicate, say, by waving a flag or burning a draft card) or by sitting or standing on the Challenged Medians *specifically* (as one might by standing in Tiananmen Square). Nor has he claimed that the act of sitting or standing on a median comprises a significant—or, really, any—part of his overall message. To the contrary, he conveys his message primarily (perhaps exclusively) by holding a sign and speaking to motorists who stop for him. *See* Pl.'s SOMF ¶ 15 (explaining that, when McDonald panhandles, he "display[s] a sign that state[s], 'Homeless, please help me if you can'"). And there doesn't appear to be anything special or unique about the specific medians he frequents or the audiences he targets. *See id.* ¶ 16 ("To

panhandle in Pompano Beach, Plaintiff McDonald would go to several different locations and major intersections throughout the city to ask people in cars for money."). He simply "*prefer[s]* to stand in the medians because they allow[ ] him to be seen by more people." *Id.* ¶ 17 (emphasis added).

McDonald's claim might also fail the second (*i.e.*, "objective") element of the test the Supreme Court outlined in *Spence v. Washington* because the act of sitting or standing on the Challenged Medians doesn't seem to be "inherently expressive." *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 66 (2006) ("[W]e have extended First Amendment protection only to conduct that is inherently expressive."). Conduct is inherently expressive when it "comprehensively communicate[s] its own message without additional speech"—or, put slightly differently, when the conduct "*itself* . . . convey[s] a message that can be readily 'understood by those who view it.'" *Tagami v. City of Chicago*, 875 F.3d 375, 378 (7th Cir. 2017) (quoting *Johnson*, 491 U.S. at 404)). But the act of sitting or standing on medians generally (or on the Challenged Medians specifically) isn't *by itself* communicative. On the contrary: to be communicative, the act of sitting or standing on a median must be *combined with* some explanatory speech—*e.g.*, shouting through a bullhorn, wearing symbolic clothing, or (as in our case) holding up a sign. And "[t]he fact that such explanatory speech is necessary is strong evidence that the conduct at issue here is not so inherently expressive that it warrants protection." *Rumsfeld*, 547 U.S. at 66.[13]

---

[13] Sitting or standing silently *can be* communicative, to be sure—but only in the right context. *See Food Not Bombs*, 901 F.3d at 1241 ("Context also differentiates the act of sitting down—*ordinarily not expressive*—from the sit-in by African Americans at a Louisiana library which was understood as a protest against segregation." (emphasis added)). There's no evidence that the Challenged Medians feature the kinds of extrinsic clues or signs that would allow reasonable observers to understand that McDonald, by sitting or standing there, was communicating "*some* sort of message." *Id.* at 1240 (cleaned up); *id.* at 1242–43 (holding that a food-sharing event was expressive because of its context and setting). Nor is there any suggestion that the Challenged Medians bear the kind of historical significance that would imbue the act of sitting or standing on them with expressive meaning. *See id.* at 1243 (discussing the history of food-sharing); *cf. Burns*, 999 F.3d at 1337 (to satisfy the objective prong of the *Johnson* test, a plaintiff must establish "a *great likelihood* that the expressive conduct will be understood by those who view it" (emphasis added)).

The Median Provision therefore doesn't seem to target McDonald's speech or require him to change his message. Nor does it appear to foreclose an *essential* avenue of communication or block him from reaching his target audience. *See* Nov. 18, 2020 Hr'g (McDonald admitting that, while standing on the median, he can only receive donations from motorists driving southbound because cars going northbound cannot stop next to the median); *see also* Def.'s SOMF ¶ 10 ("[T]he size of the median has no impact on whether McDonald utilizes it while soliciting."). It may be, in short, that the law only burdens his speech incidentally, insofar as it requires him to move from his *preferred* location to others—the sidewalk, for example. But it's not clear that this burden is *substantial* or that it's otherwise "disproportionate" enough to trigger the panoply of doctrinal rules and protections we've invented in our endless (and, unfortunately, evolving) exegesis of the First Amendment. *See Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 704 *(1986)* (laws regulating non-expressive conduct aren't subject to First Amendment protection unless they "impose a *disproportionate* burden upon those engaged in protected First Amendment activities" (emphasis added)); *id.* at 708 (O'Connor, J., concurring) (explaining that subjecting every incidental impact on speech to First Amendment scrutiny "would lead to the absurd result that any government action that had some conceivable speech-inhibiting consequences, such as the arrest of a newscaster for a traffic violation, would require analysis under the First Amendment").[14]

All that said, we think it fair to infer that most people who stand on a median for an extended period of time—especially a narrow median like ours—will be there holding a sign, a leaflet, a bullhorn,

---

[14] *See also Wright v. City of St. Petersburg, Fla.*, 833 F.3d 1291, 1296 (11th Cir. 2016) ("Simply because the trespass warning incidentally burdened Wright's First Amendment activities does not mean that [the challenged ordinance] is subject to First Amendment scrutiny, since 'every civil and criminal remedy imposes some conceivable burden on First Amendment protected activities.'" (quoting *Arcara*, 478 U.S. at 706)); Michael C. Dorf, *Incidental Burdens on Fundamental Rights*, 109 HARV. L. REV. 1175, 1209–10 (1996) ("[F]ree speech doctrine requires close scrutiny of an incidental burden on speech only when the burden forecloses an essential avenue of communication. In short, only substantial incidental burdens trigger heightened scrutiny.").

or some other mechanism for the expression of a message. And it's this practical reality that may well distinguish our facts from Justice O'Connor's example in *Arcara*—of the newscaster who runs the red light.[15] But query where precisely we should draw that evanescent line between laws that regulate non-expressive conduct and those that, though similar in scope and effect, are deemed to govern communicative expression. *See, e.g.*, Geoffrey R. Stone, *Content-Neutral Restrictions*, 54 U. Chi. L. Rev. 46, 105 (1987) (noting the difficulties that arise when we compare "[a] law that prohibits all bookstores in a certain area" with "a law that zones that area for residential use only"). This evanescence, in turn, could raise material questions of fact—for instance, about the "the inevitable effect" of the statute, *Arcara*, 478 U.S. at 706–07, or its "disproportionate[ness]," *id.* at 708 (O'Connor, J., concurring)—that may be best left for trial.[16]

_____

[15] McDonald (notably) doesn't suggest that the Median Provision was promulgated as a "pretext" to target certain kinds of speech or speakers—a circumstance that, Justice O'Connor suggested, *would* implicate the First Amendment. *See Arcara*, 478 U.S. at 708 (O'Connor, J., concurring).

[16] *Compare McCullen v. Coakley*, 573 U.S. 464, 471–72 (2014) (holding that a "buffer zone" law implicated the First Amendment because, "[b]y its very terms," it "regulate[d] access to 'public way[s]' and sidewalk[s]," and finding that, "even though the Act says nothing about speech on its face, there is no doubt—and respondents do not dispute—that it restricts access to traditional public fora and is therefore subject to First Amendment scrutiny"), *with Wright*, 833 F.3d at 1292, 1296–97 (holding that an ordinance allowing police officers to prohibit people who had violated municipal ordinances from re-entering parks did not trigger the First Amendment because (1) the law facially "applies not just to people who are entering a city park to exercise their First Amendment rights but also to every other person who enters city property for any reason—runners, picnic-lunchers, and drug dealers"; (2) there was "no evidence that the ordinance had the 'inevitable effect of singling out' [the plaintiff, a minister who counseled people at the park] or anyone else engaged in expressive activities"; and (3) the plaintiff was free to use the sidewalk near the park or any of the 141 other parks in the city), *Wong v. Bush*, 542 F.3d 732, 735 (9th Cir. 2008) (holding that protestors trying to blockade a ferry were not likely to prevail on their First Amendment challenge to the U.S. Coast Guard's "security zone" around a ferry route, in part, because, "if [the plaintiffs'] blockade is conduct that does not constitute symbolic speech, it is not protected by the First Amendment"), *Roulette v. City of Seattle*, 97 F.3d 300, 304–05 (9th Cir. 1996) (ordinance that "generally prohibit[ed] people from sitting or lying on public sidewalks in certain commercial areas between seven in the morning and nine in the evening" survived a facial-overbreadth challenge under the First Amendment because the ordinance "prohibit[ed] only sitting or lying on the sidewalk, neither of which is integral to, or commonly associated with, expression"), *Whiting v. Town of Westerly*, 942 F.2d 18, 21 (1st Cir. 1991) ("The act of sleeping in a public place, absent expressive content, is not constitutionally-protected conduct."), and *Uptown Tent City Organizers v. City*

Having raised our doubts about the First Amendment's application to the Median Provision, we turn to the questions the parties have squarely presented: whether the Challenged Medians constitute a traditional public forum; and, if they do, whether the Median Provision survives intermediate scrutiny.

### B.   Traditional Public Forum

Even assuming, as the parties do, that the Median Provision implicates the First Amendment, McDonald still isn't entitled to unrestricted access to the Challenged Medians. *See, e.g.*, *Keister v. Bell*, 879 F.3d 1282, 1288 (11th Cir. 2018) ("The First Amendment does not guarantee access to property merely because the government owns it." (citing *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 803 (1985)); *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981) ("[T]he First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired."). The government may restrict private speech on public property—though its latitude for doing so depends on the kind of "forum" it's regulating. Accordingly, the "critical first step" in our First Amendment analysis is to "discern the nature of the forum at issue." *Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n, Inc.*, 942 F.3d 1215, 1236 (11th Cir. 2019). The "nature of the forum" will, in turn, dictate the level of scrutiny to which we subject the law. *See United States v. Kokinda*, 497 U.S. 720, 726–27 (1990) (plurality op.) ("[T]he extent to which the Government can control access [to government property] depends on the nature of the relevant forum."); *Bloedorn v. Grube*, 631 F.3d 1218, 1230 (11th Cir. 2011) ("[T]he degree of scrutiny

---

*of Chicago Dep't of Admin. Hearings*, 2018 WL 2709431, at *9–10 (N.D. Ill. June 5, 2018) (the act of denying permits for the homeless to set up a "tent city" didn't implicate the First Amendment—even though the plaintiffs alleged that the purpose of the tent city was, in part, "to protest the lack of affordable housing in the City of Chicago"—because "the need for additional explanatory speech was strong evidence that erecting the tents was not so inherently expressive that it warrants First Amendment protection").

we place on a government's restraint of speech is largely governed by the kind of forum the government is attempting to regulate.").

Broadly speaking, the Supreme Court has recognized four categories of government fora: the traditional public forum, the designated public forum, the limited public forum, and the nonpublic forum. *See, e.g.*, *Keister*, 879 F.3d at 1288.[17] Although we briefly touch on all four, we focus on the distinction between public and non-public fora because the parties don't suggest (and we don't believe) that the Challenged Medians constitute either designated or limited public fora.

The *first* category of government property, the "traditional public forum," encompasses areas that have "traditionally been available for public expression," *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992), and that have as "a principal purpose . . . the free exchange of ideas," *Cornelius*, 473 U.S. at 800. The quintessential examples of traditional public fora are streets, sidewalks, and parks, because those settings "have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. CIO*, 307 U.S. 496, 515 (1939). In a traditional public forum, content-based restrictions on speech are subjected to strict scrutiny. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). Still, the government may impose reasonable time, place, and manner restrictions on speech in a traditional public forum—so long as those restrictions "(1) are content-neutral, (2) are narrowly tailored to serve a significant government interest,

---

[17] At times, the Supreme Court has omitted the limited public forum—thus suggesting that there are really only three kinds of fora. *See, e.g.*, *Minnesota Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018) ("Generally speaking, our cases recognize three types of government-controlled spaces."). But lower courts haven't understood "these general statements to imply that the concept of a limited public forum—which the Supreme Court has invoked in recent cases that have not been overruled or abrogated—is no longer good law." *Cambridge Christian*, 942 F.3d at 1237 n.5. Some courts have also referred to the limited public forum as a "subset" of the designated public forum. *See Hotel Emps. & Rest. Emps. Union, Loc. 100 of New York, N.Y. & Vicinity, AFL CIO v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 545 (2d Cir. 2002).

and (3) leave open ample alternative channels of communication." *Smith v. City of Fort Lauderdale*, 177 F.3d 954, 956 (11th Cir. 1999); *see also Mansky*, 138 S. Ct. at 1885 ("In a traditional public forum—parks, streets, sidewalks, and the like—the government may impose reasonable time, place, and manner restrictions on private speech, but restrictions based on content must satisfy strict scrutiny, and those based on viewpoint are prohibited.").

The *second* category of government-owned fora is the "designated public forum," which is "government property that has not traditionally been regarded as a public forum"—even though it has been "intentionally opened up for that purpose." *Bloedorn*, 631 F.3d at 1231 (cleaned up). To create a designated public forum, the government must intentionally open a location for use by the public at large. *See Cornelius*, 473 U.S. at 802. As with a traditional public forum, the government can impose time, place, and manner restrictions in a designated public forum so long as the regulations are content-neutral, narrowly tailored to achieve a significant government interest, and "leave open ample alternative channels of communication." *Perry*, 460 U.S. at 45–46.

The *third* category, the "limited public forum," consists of places in which "a government has reserved a forum for certain groups or for the discussion of certain topics." *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 215 (2015) (cleaned up). Unlike a designated public forum, which "grants general access to the designated class," a limited public forum "can be set up to grant only selective access to that class." *Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209, 1224 (11th Cir. 2017) (cleaned up).

The *fourth* and final category encompasses all other government-owned property that hasn't been opened to the public for expressive activity. *See Lee*, 505 U.S. at 678–79. Non-public fora include (but are not limited to) airport terminals, *see id.* at 685; military bases, *see Greer v. Spock*, 424 U.S. 828, 838 (1976); and jails, *see Adderley v. State of Florida*, 385 U.S. 39, 45, 47–48 (1966). The government's

authority to restrict speech in these types of property is subject only to the requirements of reasonableness and viewpoint neutrality. *See Cornelius*, 473 U.S. at 800.

To determine where a particular kind of public property fits within this taxonomy (or along this spectrum), we don't just look at the property's label; instead, we try to understand "what *purpose* it serves, either by tradition or specific designation." *Boardley v. U.S. Dep't of Interior*, 615 F.3d 508, 515 (D.C. Cir. 2010); *see also Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677 (1998) ("Traditional public fora are defined by the objective characteristics of the property, such as whether, 'by long tradition or by government fiat,' the property has been 'devoted to assembly and debate.'" (quoting *Perry*, 460 U.S. at 45)); *Greer*, 424 U.S. at 837–38 (explaining that "the business" of a military installation is "to train soldiers, not to provide a public forum"). To understand the intrinsic nature and purpose of the location, we must (of course) consider extrinsic and contextual clues—things like the property's physical characteristics, its use over time, and its overall compatibility with free expression. In doing so, however, we must remain mindful that an over-emphasis on any one of these factors can be misleading. So, for example, while a park *is* the archetypal public forum, not all places that are called parks or that *look like* parks will necessarily qualify as traditional public fora. *See Boardley*, 615 F.3d at 515 ("What makes a park a traditional public forum is not its grass and trees, but the fact that it has 'immemorially been held in trust for the use of the public and, time out of mind, ha[s] been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" (quoting *Perry*, 460 U.S. at 45); *see also Kokinda*, 497 U.S. at 727 (plurality op.) (cautioning that "[t]he mere physical characteristics of the property cannot dictate forum analysis" and holding that a sidewalk abutting a post office was not a public forum).

With this legal framework in mind, we turn to the physical attributes of the Challenged Medians.[18] As McDonald has stipulated, the Challenged Medians are nothing more than narrow (less than five feet) "cement triangle curb[s]" that divide oncoming traffic in streets with *at least* three lanes on either side. *See* Nov. 18, 2020 Hr'g. These medians don't feature benches, grass, trees, bathrooms, garbage cans, informational plaques, memorials, art exhibits, food stands, or anything else. *Id.* Although the "physical characteristics of the property alone cannot dictate forum analysis," *Keister*, 879 F.3d at 1289, the absence of those items is important here. That's because those features— benches and so forth—are objective indications that the government, by opening that space and installing (or allowing) those features, intended for citizens to assemble there. The absence of these features, by contrast, indicates that people weren't meant—and probably wouldn't think—to gather there. Recall that the "quintessential" public forum is *conducive* to "assembly and debate." *Cornelius*, 473 U.S. at 802; *see also Hague*, 307 U.S. at 515 (noting that traditional public fora are used for "assembly, communicating thoughts between citizens, and discussing public questions"); OXFORD ENGLISH DICTIONARY (3d ed. 2007) (defining "forum" as "[t]he public place or marketplace of a city" and adding that "[i]n ancient Rome the place of assembly for judicial and other public business" was called the "forum").

Nor can we ignore the Florida Department of Transportation's recommendation that pedestrian medians be eight feet wide—or, at *the very least*, six feet. *See* Def.'s SOMF ¶ 20; *see also* FDOT Manual. Although this evidence will become important to our narrow-tailoring analysis, it's also relevant here because it speaks directly to the "nature" of the forum. That transportation officials

---

[18] It's important that we limit our analysis to those medians specifically—without considering any surrounding streets or sidewalks. *See Bloedorn*, 631 F.3d at 1232 ("[T]he scope of the relevant forum is defined by the access sought by the speaker, meaning that if a speaker seeks access only to a limited area of government property, we must tailor our approach to the perimeters of a forum within the confines of the government property." (cleaned up)).

consider six feet as the *bare minimum* for pedestrian safety suggests that the Challenged Medians not only weren't *meant* for speech or assembly but (if we're being realistic) are *incompatible* with it. And, while it's true that people are free to pass through the Challenged Medians *temporarily* while crossing the street, this fact alone doesn't magically convert these cement barriers into traditional public fora. *See Keister*, 879 F.3d at 1291 ("[T]he government permitting its citizenry to access its land via sidewalks and streets does not automatically convert a nonpublic forum to a public one." (citing *Greer*, 424 U.S. at 830, 835–38)); *see also Bloedorn*, 631 F.3d at 1233 ("Publicly owned or operated property does not become a 'public forum' simply because members of the public are permitted to come and go at will.").

To overcome the medians' physical attributes—and their manifest purpose—McDonald argues that, by enacting Ordinance 2003-71 in 2003,[19] the City has *already* acknowledged that the Challenged Medians are a kind of traditional public forum. *See* Pl.'s MSJ Opp. at 6. That's quite a stretch. The 2003 ordinance (it's true) regulated solicitations in "*any* area that divides a roadway." § 100.41(A) (emphasis added). It thus targeted, among many others, the Challenged Medians, as McDonald points out. So what? That the City elected, 18 years ago, to impose a blunt solicitation ordinance on *every* median—regardless of its size—tells us nothing about whether City dwellers have traditionally used the Challenged Medians to protest, panhandle, and express themselves. In fact, it's undisputed that the 2003 ordinance applied with equal force to medians of *less* than three feet— medians whose status as *non*-public fora McDonald doesn't ever seem to contest. *See generally* Verified Amended Complaint (not challenging § 100.35(C)(1)(a), which makes it unlawful to, "[f]or any period of time, sit or stand, in or on . . . any unpaved median, or any median of less than three feet"); *see also* Nov. 18, 2020 Hr'g (counsel for McDonald responding to the Court's question about whether *all* medians were categorically traditional public fora by noting that McDonald *wasn't challenging* the

---

[19] (codified at § 100.41).

Median Provision as it applies to medians that are less than three feet wide and suggesting that there's a certain line that can be drawn based on common sense and technical expertise). Given the physical characteristics of the Challenged Medians—their narrowness, their proximity to oncoming traffic, and the absence of grass, benches, etc.—it's far more likely that the City reacted in 2003 without nuance to a (perceived) problem that mainly afflicted larger medians. Whatever the case may be, there's simply no evidence that, by regulating *all* medians, the City was recognizing the Challenged Medians as traditional public fora. Nor is there any evidence that, however the 2003 ordinance came about, the foot traffic on these smaller medians was ever substantial, extensive, or consistent. *Cf. Crowder v. Hous. Auth. of City of Atlanta*, 990 F.2d 586, 591 (11th Cir. 1993) ("Irregular and infrequent use does not transform a common facility into a public forum for expressive group meetings."). The 2003 ordinance, in sum, is inapposite here.

McDonald offers an alternative interpretation of the 2003 law: Maybe, he speculates, the law wasn't cracking down on solicitors so much as it was *authorizing* them to use the Challenged Medians. *See* Pl.'s MSJ Opp. at 6 ("[B]y passing § 100.41, the City gave people in Pompano Beach the legal authority to exercise their First Amendment right to ask for donations on medians, including medians between three and five feet in width."). But notice how this argument collapses on itself. Notice how, if McDonald is right—*viz.*, if the City had *invested* solicitors with "the legal authority" to panhandle on these medians—then the City couldn't have been operating in a traditional public forum at all. Instead, it would have been *designating* a public forum for solicitors or creating a limited public forum for their selective use. *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) (holding that the government may create a limited public forum by "reserving" an area "for certain groups or for the discussion of certain topics"). Designated and limited public fora are forged out of *non-public* areas. *See Forbes*, 523 U.S. at 677 (noting that designated public fora are created when the government "intentionally open[s] a nontraditional public forum for public discourse" (citation omitted)); *Barrett*,

872 F.3d at 1224 ("A designated public forum is government property that has not traditionally been regarded as a public forum but is intentionally opened up for that purpose."). When a government does create a designated or limited public forum, moreover, it isn't "required to indefinitely retain the open character of the facility." *Perry*, 460 U.S. at 46. In other words, if the City had "opened up" the Challenged Medians to solicitors, as McDonald contends, then it was free to close them at will—which it effectively did by repealing § 100.41 and enacting § 100.35.

McDonald also contends that there's a long history of panhandling and protests at major intersections in the City. *See* Pl.'s MSJ Opp. at 4–6. Here, he relies on his own affidavit, in which he attests that, "[f]or many years and as long as I can remember, people have stood out at intersections on all the major roads and streets in Pompano Beach and have done so to ask people for money and donations; sold newspapers and water bottles; passed out fliers; and held signs for local businesses." Declaration of Bernard McDonald ¶ 3. We're not sure what to make of this affidavit. The fact that people stand—and for years have stood—"at intersections" doesn't necessarily mean that they stand (or stood) *on medians*. And it certainly doesn't mean that they stood and expressed their messages on the kinds of medians we have here—uninviting concrete blocks, three-to-five feet wide, that divide high-speed traffic lanes. Have these lifeless nubs been used for political rallies? Protests? Food festivals? Debates? Gatherings of any kind? Even accepting McDonald's Declaration as suggesting that he and a few others like him have historically panhandled on these narrow medians, it's well-settled that "[i]rregular and infrequent use does not transform a common facility into a public forum for expressive group meetings." *Crowder*, 990 F.2d at 591. That's because "[t]he Supreme Court has restricted traditional public forum status to its 'historic confines.'" *Keister*, 879 F.3d at 1288 (quoting *Forbes*, 523 U.S. at 678).

That said, in considering the City's motion for summary judgment, we must "resolve all ambiguities and draw reasonable factual inferences from the evidence in the non-movant's favor."

*Travelers Prop. Cas. Co. of Am. v. Moore*, 763 F.3d 1265, 1268 (11th Cir. 2014). And it's worth remembering how often our appellate courts have warned us against deciding these uniquely fact-intensive questions prematurely. *See, e.g., Jacobson v. United States Dep't of Homeland Sec.*, 882 F.3d 878, 883 (9th Cir. 2018) (explaining that the forum "inquiry is, to a large extent, factual" and adding that "it may be difficult to make a forum determination without a full factual record"); *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 343 (2d Cir. 2010) ("[W]e have serious concerns about the forum analysis as apparently conducted by the district court. Especially in light of the sparse record before us on this appeal, we will not attempt to conduct this analysis ourselves. Instead, we remand to the district court which should undertake a comprehensive public forum analysis so the drastic device of summary judgment is not precipitously imposed."); *Ctr. for Bio–Ethical Reform, Inc. v. City & Cnty. of Honolulu*, 455 F.3d 910, 920 (9th Cir. 2006) ("We do not express any opinion as to whether the beaches are public fora because the record is not developed on this point."); *Wandering Dago Inc. v. New York State Off. of Gen. Servs.*, 992 F. Supp. 2d 102, 123 (N.D.N.Y. 2014) ("It is clear that the forum analysis that the Court must undertake is a fact intensive analysis. Given the nature of this inquiry and the lack of a developed factual record, the Court finds that it is premature to classify the forum at this time." (cleaned up)).

There's also no evidence in the record about the areas *around* the Challenged Medians. *See Wright v. Incline Vill. Gen. Improvement Dist.*, 665 F.3d 1128, 1136 (9th Cir. 2011) ("Context matters in forum analysis."). It might make *some* difference if, for example, a Challenged Median were located across from city hall (or some other government building), near the town square, or at the site of annual parades or recurring protests. Such an environment, we think, *could* imbue the surrounding areas with traditional-public-forum status.

Nor is there any evidence about *when* the Challenged Medians were constructed or renovated—other than the tiny bit of evidence the parties have submitted about recent renovations at

the intersection of Sample Road and Federal Highway. *See* Nov. 18, 2020 Hr'g (describing those renovations); Declaration of Bernard McDonald ¶ 6 (same). Of course, the relative *age* of the Challenged Medians may be important to the forum analysis. *See, e.g., Sentinel Comm'ns Co. v. Watts*, 936 F.2d 1189, 1203 (11th Cir. 1991) (holding that public rest areas off the highway weren't traditional public fora, in part, because they were "modern phenomena [that] have never existed independently of the Interstate System; they are optional appendages that are intended, as part of the System, to facilitate safe and efficient travel by motorists along the System's highways"); *Chad v. City of Fort Lauderdale, Fla.*, 861 F. Supp. 1057, 1061–62 (S.D. Fla. 1994) ("The sidewalk is *new* and small; it does not even extend the full length of the beach. It was created to accommodate traffic to and from the beach and, o*nly having been built two years ago, has not been a traditional site for expressive conduct*. Plaintiffs have not established the sidewalk is indistinguishable from others in Fort Lauderdale. Even if the court later determines, upon receipt of additional evidence, that the sidewalk is a public forum, it is doubtful the beach will fall into the same category. The sidewalk, contoured concrete sand barrier wall and *newly constructed* portals demarcate the beach as a special area subject to greater restriction." (emphases added)).

For all these reasons, we'll **DENY** summary judgment and proceed to a bench trial—where the parties should address their evidence to the questions the Court has posed in this Order.

### C.    Intermediate Scrutiny

If McDonald can show that the Challenged Medians qualify as traditional public fora— admittedly, a difficult task given their physical attributes and manifest purpose—we'd still have to resolve several additional fact-laden questions. That's because, in a traditional public forum, "the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided [1] the restrictions are justified without reference to the content of the regulated speech, [2] that they are narrowly tailored to serve a significant governmental interest, and [3] that they leave open

ample alternative channels for communication of the information." *McCullen v. Coakley*, 573 U.S. 464, 477 (2014).[20] Now, McDonald doesn't challenge the first prong: he doesn't argue, in other words, that the Median Provision is content- or viewpoint-based. *See* Pl.'s MSJ Opp. at 9–19. Nor does he contest the second half of the second prong: he doesn't suggest that pedestrian safety doesn't qualify as a significant governmental interest. *Id.* That leaves only two questions for us to decide: (1) whether the Median Provision is narrowly tailored to serve the City's significant interest in traffic safety, and (2) whether the Median Provision leaves open ample alternative channels of communication.

### 1.  Narrow Tailoring

To be narrowly tailored, a content-neutral law must not "burden *substantially* more speech than is necessary to further the government's legitimate interests." *McCullen*, 573 U.S. at 486 (emphasis added & cleaned up). The regulation doesn't need to be "the least restrictive or least intrusive means" of furthering that interest. *See Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989). Instead, a challenged statute is appropriately tailored if it "promotes a substantial government interest that would be achieved less effectively absent the regulation." *Id.* at 799. If the means chosen "are not substantially broader than necessary to achieve the government's interest," the court cannot invalidate a regulation

---

[20] If the Median Provision regulates mainly conduct and affects speech only incidentally—q.v. our discussion of the First Amendment's application, *supra* Section II.A—then the appropriate test would be the one the Supreme Court outlined in *O'Brien. See Indigo Room, Inc. v. City of Fort Myers*, 710 F.3d 1294, 1300 (11th Cir. 2013) ("When legislation incidentally infringes upon protected expression, the court applies the Supreme Court's test set forth in [*O'Brien*]."). Under *O'Brien*, an ordinance is valid if: "(1) it serves a substantial interest within the power of the government; (2) the ordinance furthers that interest; (3) the interest served is unrelated to the suppression of free expression; and (4) there is no less restrictive alternative." *Wise Enters., Inc. v. Unified Gov't of Athens-Clarke Cnty.*, 217 F.3d 1360, 1364 (11th Cir. 2000) (citing *O'Brien*, 391 U.S. at 377). Admittedly, the parties haven't cited or applied *O'Brien. See generally* Def.'s MSJ; Pl.'s Partial MSJ. This omission might not make a difference in the end, *see Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 566 (1991) (noting that the time, place, and manner test "has been interpreted to embody much the same standards as those set forth in [*O'Brien*]"), but we flag the issue anyway.

simply because it "concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Id.*

McDonald questions whether the Median Provision serves the City's legitimate interest in traffic safety. Relying on *Buehrle v. City of Key West*, 813 F.3d 973 (11th Cir. 2015), and its progeny, McDonald argues that the City's pre-enactment evidence was insufficient to justify the Median Provision. *See* Pl.'s MSJ Opp. at 10–13; *see also Buehrle*, 813 F.3d at 979 (holding that, for a law to be narrowly tailored, the government must first demonstrate, with pre-enactment evidence, that "it had a reasonable basis for believing that its regulation would further . . . legitimate interests").

The ordinance in *Buehrle* limited the number of tattoo parlors that were permitted to operate in the city's historic district. *See Buehrle*, 813 F.3d at 975. In the city's view, allowing too many tattoo parlors "would adversely impact the 'character and fabric' of the district and thus the tourism that the district attracts." *Id.* at 978. Although the Eleventh Circuit agreed that the city had a substantial interest in preserving the "character and fabric" of its historic district, it refused "simply [to] take the [c]ity at its word" that the ordinance would further that interest. *Id.* at 978–79. Instead, the city had to show some "reasonable basis" for believing that it would.

Similarly, in *Zibtluda, LLC v. Gwinnett County, Georgia ex rel. Board of Commissioners of Gwinnett County*, 411 F.3d 1278 (11th Cir. 2005), the county passed an ordinance that required adult-entertainment businesses to obtain special licenses, *id.* at 1279–81. In determining whether the ordinance served the government's legitimate interest in limiting the businesses' "secondary effects," the government needed only a "reasonable basis for believing that its policy will indeed further a legitimate interest." *Id.* at 1286 (cleaned up). And, the court went on, the government can rely on any number of things in arriving at its decision. These include: "the experience of other cities, studies done in other cities, caselaw reciting findings on the issue, as well as the officials' own wisdom and common sense." *Id.* (cleaned up). The burden isn't rigorous, and the government's evidence need only be

"reasonably believed to be relevant to the problem that the city addresses." *Id.* (quoting *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 51–52 (1986)).

In our case, the City points to three pieces of evidence for its view that the Median Provision satisfies the "reasonable basis" test set out in *Buerhle*: (1) a chart identifying, over a one-year period, 1,394 incidents at 24 intersections—25 of which involved pedestrians, *see generally* Occurrence Chart; (2) a report by the Florida Highway Safety and Motor Vehicle Department, which showed seven "cross median" accidents in 2018 alone—along with *seventeen-thousand* pedestrian accidents, *see generally* FHSMV Report; and (3) the City Mayor's description of his own "close calls" and "near misses" while driving near pedestrians who were standing on or beside the roadway, *see* May 26, 2020 Meeting. The prefatory clauses of Ordinance 2020-59 also refer to (1) increasing congestion on the City's streets and sidewalks, (2) the dangers heavy traffic can pose to pedestrians on medians, and (3) the Tenth Circuit's opinion in *Evans v. Sandy City*, 944 F.3d 847 (10th Cir. 2019), which upheld a similar ordinance against a First Amendment challenge. The City (now) also points to the Florida Department of Transportation's recommendation that pedestrian medians be eight feet wide—or, at *the very least*, six feet, *see* Def.'s SOMF ¶ 20; *see also* FDOT Manual. This all seems plainly "relevant" to public safety, and McDonald offers no convincing argument that the City's evidence is either "shoddy," *Buehrle*, 813 F.3d at 979, or pretextual, *see* Pl.'s MSJ Opp. at 10–13 (arguing that the pre-enactment evidence was "conclusory" and, taken together, insufficient under *Buehrle*); Pl.'s Partial MSJ at 7–8 (same).

All that said, on the critical question facing us here—whether the City "*reasonably* believed," that its ordinance was "relevant" as a remedy for the problems the prefatory clauses identify—the record contains precious little evidence. It's true that, in making this determination, a city can deploy its collective "wisdom and common sense." *Zibtluda*, 411 F.3d at 1286. And, as we've seen, the City has advanced a compelling case for the wisdom of *this* Ordinance—which, when we assess the evidence in the light most favorable to the City, is reason enough to deny McDonald's Partial MSJ.

33

But, when we shift the burden and—analyzing *the City's* motion—review this evidence in the light most favorable to McDonald, we can begin to see some troubling fissures in the City's proffer. Starting from the top, of the 25 pedestrian-involved "incidents" identified in the Occurrence Chart, how many took place on the Challenged Medians? Are the seven "cross-median" accidents from 2018 a lot or a little (relative to other years)? More importantly, how many of these seven accidents occurred on the Challenged Medians? Did the mayor's "close calls" happen near the Challenged Medians—as opposed to some other medians? And did the City even have before it—which is to say, did it even consider—the Florida Transportation Department's report *before* it enacted the Median Provision? We don't know the answers to these important questions because the City never tells us. And, since these questions are crucial to any resolution of the City's motion, we'll ask the parties to answer them at a bench trial.

Which brings us to the City's reliance on *Evans*, where the Tenth Circuit held that a categorical ban on sitting or standing on "any median of less than 36 inches for any period of time," regardless of lane size or speed limit, *was* narrowly tailored to serve an important governmental interest. *See Evans*, 944 F.3d at 851. In support of its ordinance, the city in *Evans* offered the testimony of two employees who went to *some* of the affected medians, observed them for a while, and concluded that they weren't safe to stand on—whatever the time of day, the traffic volume, or the speed limit. *Id.* at 858. Beyond that, though, the city didn't submit any accident studies or cite to any incident reports. *Id.* The Tenth Circuit found this evidence sufficient to show that the ordinance was "narrowly tailored to serve a significant governmental interest." *Id.* at 856 ("[T]he Ordinance promotes public safety in a direct and effective way by keeping pedestrians off thin slices of pavement and unpaved traffic dividers where pedestrians could be injured by passing traffic."). This was especially true, the court held, because (consistent with the ordinance) the plaintiff could easily move to other, wider parts of the same median. *Id.* at 857. Given the narrow scope of the ordinance, then, the city wasn't required to analyze

the medians "in a piece-meal fashion, median by median," or to wait for reports of "'close call[s]' on a particular median, or worse, [wait until] someone gets injured." *Id.* at 857–58.

There's admittedly a pretty tight fit between *Evans* and our case. Like the municipality there, our City chose to focus on pedestrian safety—an important governmental interest—and targeted a specific set of extremely narrow, unadorned medians. Our Median Provision, in fact, is arguably *less* aggressive than *Evans*'s was, because it only applies to medians that divide roads with at least three lanes, whereas the ordinance in *Evans* applied regardless of traffic patterns. But there are also differences. For one thing, the medians in *Evans* were narrower than 36 inches—precisely the size McDonald has elected not to challenge here. Those medians also tended to widen in certain parts— thus allowing panhandlers to remain on the safest parts of the medians *without* violating the ordinance. And two city officials had gone out to observe how those medians functioned in the real world. As to these last two points, we simply don't know whether our medians have wider and narrower parts— we understand very little, in fact, about what our medians look like—precisely because we haven't heard from any city officials who, as in *Evans*, went out and inspected them. We don't even know how many Challenged Medians there are.

We thus cannot say whether, in its practical consequences, our Ordinance more closely resembles the ordinance the Tenth Circuit *struck down* in a case McDonald relies on: *McCraw v. City of Oklahoma City*, 973 F.3d 1057, 1063 (10th Cir. 2020). The ordinance there banned sitting or standing on medians on "*all* streets with a speed limit of forty miles per hour or more." *Id.* (emphasis added). In upholding the plaintiff's First Amendment challenge in that case, the Tenth Circuit pointed to the ordinance's broad sweep: it applied to about 400 medians, *id.* at 1064, which were "varied and diverse" in their sizes and characteristics; some even included "trails, sidewalks, benches, art, large signs, landscaping, or wide-open spaces," *id.* at 1062.

Of course, the City is right to note that our inquiry—whether a regulation "burden[s] substantially more speech than is necessary"—poses difficult line-drawing problems that federal judges should be wary of second-guessing. *See, e.g.*, *Lady J. Lingerie, Inc. v. City of Jacksonville*, 176 F.3d 1358, 1365 (11th Cir. 1999) ("That sort of line-drawing is inconsistent with a narrow tailoring requirement that only prohibits regulations that are 'substantially broader than necessary.'" (quoting *Ward*, 491 U.S. at 800)); *Evans*, 944 F.3d at 858 (finding a law narrowly tailored based mostly on the observations and opinions of two city officials); *cf. McCraw*, 973 F.3d at 1083 (Hartz, J., concurring) ("I would be inclined to be quite deferential to an ordinance that prohibits standing or congregating only on narrow medians, or portions of medians, that bordered thoroughfares with relatively high speed limits, since the proximity and exposure to the traffic could lead to tragedy if the pedestrian on the median or a driver on the thoroughfare is distracted or otherwise negligent. Such an ordinance would appear to be narrowly tailored."). And we agree with the City—especially given the Florida Transportation Department's recommendations, *see* Def.'s SOMF ¶ 20; FDOT Manual—that a governmental entity, charged with the well-being of its citizens, shouldn't have to wait for accidents to happen (or for people to die) before it can implement the regulations it believes are necessary to promote the general welfare. This, of course, was the understandable position of the Tenth Circuit in *Evans. See Evans*, 944 F.3d at 858 (noting that the First Amendment "does not require the government to wait for accidents to justify safety regulations").

At the same time, the City has done a poor job of developing the factual record in a way that would justify summary judgment. Since there remain important (and outstanding) factual questions in this case—questions about the evidence the City assessed in enacting the Median Provision and the law's scope and application in the real world—we **DENY** the City's motion for summary judgment.

### 2. Ample Alternatives

The record is no clearer when it comes to the last part of our analysis: whether the Median Provision leaves open "ample alternative channels for communication of the information." *McCullen*, 573 U.S. at 477. McDonald, it's true, has said that he "prefer[s]" panhandling on the medians—as opposed to the sidewalks—of major (as opposed to smaller) intersections, because that's where he thinks he's most visible. *See* Pl.'s SOMF ¶ 17. But the law is well-settled that the alternative channel "does not have to be the speaker's first choice." *Weinberg v. City of Chicago*, 310 F.3d 1029, 1041 (7th Cir. 2002). And so, our inquiry "does not rise or fall on the efficacy of a single medium of expression." *Ross v. Early*, 746 F.3d 546, 559 (4th Cir. 2014). The salient question, rather, is whether requiring McDonald to move to the nearby sidewalk renders his "intended message . . . useless or [ ] seriously burdened," *Weinberg*, 310 F.3d at 1041—that is, whether it "totally foreclose[s] [his] ability to reach one audience," *Gresham v. Peterson*, 225 F.3d 899, 907 (7th Cir. 2000).

McDonald testified that sidewalks limit his visibility. *See* Pl.'s SOMF ¶ 17 (attesting that medians allow more people to see him). But we don't know to what extent the sidewalk *forecloses* his access to motorists or whether it renders his panhandling "useless." In fact, the evidence suggests the opposite—that, while McDonald *prefers* medians, he still sometimes (and of his own volition) uses sidewalks. *See id.* ¶ 15 ("When he asked for donations from motorists in Pompano Beach, Plaintiff would stand on either a median, the sidewalk adjacent the street, or on the shoulder of a city street."). That's probably because, as the City pointed out at the preliminary-injunction hearing, he may well have access to the *same* number of cars—whether he's on the median or on the sidewalk. *See* Nov. 18, 2020 Hr'g. In answering the City's question on this point, McDonald admitted that, because the median divides lanes that face in *opposite* directions, he—while on the median—only ever has access to cars that stop at the light on *one* side of him. *Id.* In these circumstances, then, there may be very little difference between soliciting on the sidewalk and panhandling on the median. On the other hand,

McDonald was clear that sidewalks often present special visibility problems—especially when they become crowded. *Id.* ¶ 17 ("*In many instances*, the sidewalks are not a good spot to ask for donations because there are too many people on the adjacent sidewalk[.]" (emphasis added)).

In short, we (again) know very little about the extent to which the sidewalk truly constitutes an ample alternative location. *See Berger v. City of Seattle*, 569 F.3d 1029, 1050 (9th Cir. 2009) ("Because we must draw all reasonable inferences in favor of the City, and because there is conflicting evidence concerning whether the sixteen dedicated [alternative] locations provide adequate access to the intended audience, summary judgment for [the plaintiff] on the issue of [the law's] constitutionality is not appropriate on the current record."); *Phelps-Roper v. Heineman*, 57 F. Supp. 3d 1146, 1172 (D. Neb. 2014), *aff'd sub nom. Phelps-Roper v. Ricketts*, 867 F.3d 883 (8th Cir. 2017) (holding that "competing evidence [about the plaintiff's need to use a certain medium] creates an issue of fact as to whether the [law] leaves ample alternative channels of communication"). For this separate reason, then, we'll **DENY** the parties' cross-motions and head for trial.

### III.   HAND-TO-HAND TRANSMISSION BAN

Lastly, McDonald wants a declaration that § 100.35(C)(2)—now repealed—was unconstitutional, and he seeks money damages for the "chilling effect of this ordinance" on his protected speech. Pl.'s Partial MSJ at 13–14. Without defending the provision's constitutionality, the City insists that McDonald's claim is moot. *See* Def.'s Partial MSJ Opp. at 19.

We begin with McDonald's damages claim. While the City recognizes—as it must—that First Amendment plaintiffs can pursue money damages *retrospectively*, it maintains that McDonald's damages claim is moot because it's no longer "viable." *Id.* at 20. For this position, the City relies on *CMR D.N. Corp. v. City of Philadelphia*, 703 F.3d 612 (3d Cir. 2013). That case involved a zoning ordinance that imposed construction restrictions on the plaintiff's property. *Id.* at 616. After the plaintiff sued for injunctive, declaratory, and monetary relief—all stemming, he alleged, from violations of the Due

Process and Equal Protection Clauses—the city rescinded the restriction and moved to dismiss the plaintiff's constitutional claims as moot. *Id.* at 617. Having determined that the plaintiff lacked "a *viable* claim for damages that would save its case from mootness," *id.* at 623, the district court dismissed the damages claim as moot, and the Third Circuit affirmed, *id.* at 622–27. That decision was almost certainly correct. After all, if the plaintiff's claim were treated as a facial—rather than an as-applied— challenge, then the proper remedy would have been injunctive relief, not money damages. *Id.* at 624 (noting that the plaintiff "has cited to no case awarding compensatory damages to a plaintiff asserting only a facial attack against a zoning law under equal protection or the 'arbitrary and capricious' theory"). And, of course, the law's repeal had indisputably mooted any prospective claim for injunctive relief the plaintiff might've had. *See id.* The court thus construed the complaint as asserting an as-applied claim. *See id.* at 623 (explaining that the plaintiff's "claims do not in any way . . . resemble a facial challenge"). But that as-applied challenge was never ripe to begin with because the plaintiff hadn't applied for a permit while the zoning law was in effect. *See id.* at 625–26 (holding that "[r]ipeness could not occur until the plaintiff challenging the ordinance sought and was denied a variance or a permit under the ordinance"). However designated, in other words, the plaintiff's damages claims were unviable.

Here, by contrast, McDonald's damages claim *is* viable. That's because a First Amendment plaintiff whose speech was "chilled" by an unconstitutional law *can* sue for money damages, *see Finch v. City of Vernon*, 877 F.2d 1497, 1503 (11th Cir. 1989) (holding that a police chief was entitled to money damages where a city's violation of his First Amendment rights caused his loss of employment)— provided he can show that the law *caused* his injuries, *see Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 308 (1986) (declaring that "*no* compensatory damages could be awarded for violation of [a constitutional] right absent proof of actual injury" because "the abstract value of a constitutional right may not form the basis of § 1983 damages"). To sum up, since McDonald has testified that the threat

of prosecution under § 100.35(C)(2) "chilled" his speech—that is, that it prevented him from panhandling as much as he otherwise would have, *see* Pl.'s SOMF ¶ 14—he can pursue his claim for money damages, *see Finch*, 877 F.2d at 1503.

What would these damages look like? Well, McDonald could follow any number of paths — though, in the interest of brevity, we'll cite just a couple: Suppose, for instance, that, before the law was passed, McDonald earned $100 a week soliciting motorists. Suppose, too, that, after the transmission ban took effect, McDonald stopped panhandling for two weeks. In this first scenario, McDonald may be able to show that the now-repealed law caused him $200 in damages. And that's still true, by the way, if (as the City suggests) "the Plaintiff could still solicit from the sidewalk and the roadway while traffic was stopped." Def.'s SOMF Opp. ¶ 14. How? Imagine (again) that, when he panhandled from the median, McDonald earned $100 a week. Imagine, too, that, after the transmission ban, McDonald was restricted to panhandling from the sidewalk—and that, as a result, for each of the next two weeks, he earned only $50. In this second scenario, then, McDonald may be able to prove that the transmission ban damaged him in the amount of $50 per week.[21]

---

[21] The City's separate contention that it's "undisputed [§] 100.35(C)(2) was never applied to the Plaintiff," Def.'s Partial MSJ Opp. at 20, is both wrong and beside the point. It's wrong because the record is entirely unclear about whether McDonald was arrested on September 26, 2020 for violating § 100.35(C)(2) (as he contends) or § 100.35(C)(4) (the City's view). Recall that the arresting officer's Booking Report didn't specify which subsection McDonald (allegedly) violated, *see* Booking Report at 2, but his typewritten notes suggest that McDonald was soliciting donations from temporarily stopped motorists, *id.* at 2–3. If this is true, then McDonald *would have been* arrested for violating § 100.35(C)(2)—the Hand-to-Hand Transmission Ban the City later repealed. *See* Ordinance 2021-05. And, it goes without saying, an arrest under an unconstitutional statute *would be* compensable with money damages. *See* 42 U.S.C. § 1983 ("Every person who, under color of any . . . ordinance . . . of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . ."). But it's beside the point because McDonald *never* bases his damages claim on *this* arrest. *See* Verified Amended Complaint ¶¶ 81–89 (never mentioning the September 26, 2020 arrest). Nor could he have. That arrest, after all, took place one day *after* he filed the now-operative Verified Amended Complaint. *Compare* Verified Amended Complaint (filed September 25, 2020) *with* Booking Report (showing an arrest date of September 26, 2020). Since that claim isn't part of our case, the City's contentions are irrelevant here.

McDonald's request for declaratory relief is a different matter. The City has represented that it promulgated § 100.35(C)(2) by mistake. *See* Response to Second Motion for Preliminary Injunction ¶ 9 (explaining that the City included subsection (C)(2) "inadvertently" and was in the process of deleting it). The City then repealed the law. *See* Ordinance 2021-05 (amending § 100.35 by repealing § 100.35(C)(2) in its entirety). There is, in other words, no ordinance to declare unconstitutional. And, since there's no reason to believe that the City will ever pass this law again, McDonald's claim for declaratory relief is indisputably moot. *See Flanigan's Enters., Inc. of Ga., v. City of Sandy Springs*, 868 F.3d 1248, 1261–63 (11th Cir. 2017) (en banc) (holding that the plaintiff's request for declaratory and injunctive relief became moot when the city repealed the ordinance "unambiguously and unanimously, in open session," with "persuasive reasons for doing so"); *see also Phelps-Roper v. City of Manchester*, 697 F.3d 678, 687 (8th Cir. 2012) (en banc) ("When a law has been amended or repealed, actions seeking declaratory or injunctive relief for earlier versions are generally moot unless the problems are capable of repetition yet evading review."). To his credit, McDonald never suggests otherwise. *See generally* Pl.'s MSJ Opp.; Pl.'s Partial MSJ Reply at 1–2 (arguing only that his *damages* claim isn't moot). He's thus waived any such argument he could've made. *See Messina*, 2021 WL 2567709, at *18 ("Arguments not properly presented in a party's initial brief or raised for the first time in the reply brief are deemed waived." (quoting *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009))).

One more thing. Other than to say that it "failed intermediate scrutiny," McDonald doesn't explain why § 100.35(C)(2) is unconstitutional. *See* Pl.'s Partial MSJ at 13–14. Instead, he simply (1) compares the law to the now-repealed § 100.41 and (2) refers to the "skepticism" we expressed at a hearing about the provision's constitutionality. *See generally id.* The City, admittedly, didn't defend the law's constitutionality. *See generally* Def.'s Partial MSJ Opp. But, without explaining *how* the law was unconstitutional, McDonald hasn't "shown [himself] to be entitled to judgment as a matter of law." *Anchorage Assocs. v. Virgin Islands Bd. of Tax Rev.*, 922 F.2d 168, 175 (3d Cir. 1990). Even putting aside

the ordinance's constitutionality, though, there remain open questions about causation (*i.e.*, was McDonald arrested under § 100.35(C)(2); if not, was his speech "chilled" by it?) and the amount (if any) of his damages (*i.e.*, if he was "chilled," how much did he forego in solicitations?). To resolve these open questions, then, we'll need to hear from the parties at trial.

***

After careful review, the Court hereby **ORDERS AND ADJUDGES** as follows:

1. The City's Motion for Summary Judgment [ECF No. 95] is **GRANTED in part and DENIED in part**. The motion is **GRANTED** as to the City's argument that, with respect to § 100.35(C)(2), McDonald's claim for injunctive relief (in Count III) is moot. The motion is **DENIED** in all other respects.

2. The Plaintiff's Motion for Partial Summary Judgment as to Count III [ECF No. 77] is **DENIED**.

3. The Second Motion for Preliminary Injunction [ECF No. 42] is **DENIED as moot**.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 23rd day of August 2021.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record