UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-cv-60297-ALTMAN/Hunt

BERNARD MCDONALD,

      *Plaintiff*,

*v*.

CITY OF POMPANO BEACH,
FLORIDA,

      *Defendant*.

_____/

**ORDER**

      Bernard McDonald, our Plaintiff, is a lifelong resident of the City of Pompano Beach, Florida. He was raised there, went to school there, and has lived there for much of his adult life. Since he last returned to Pompano Beach in 2017, McDonald has made ends meet by panhandling. To reach the most traffic—and to make the most money—McDonald prefers to panhandle while standing on the median at major intersections throughout the City.

      But panhandling isn't legal at every median in Pompano Beach. On June 23, 2020, the City passed an ordinance that prohibited anyone from sitting or standing on medians that *both* are narrower than five feet wide *and* divide roads with three or more lanes in any one direction—what we've called the "Median Provision." That ordinance also banned hand-to-hand exchanges between pedestrians and motorists—the so-called "Hand-to-Hand Transmission Provision." McDonald now challenges the constitutionality of both provisions.

      Soon after this lawsuit began, the City repealed the Hand-to-Hand Transmission Provision, mooting McDonald's claim for an injunction against that law's enforcement. And the City has since stipulated that the Hand-to-Hand Transmission Provision was unconstitutional. At summary judgment, we denied both parties' motions on (1) McDonald's challenge to the constitutionality of the

Median Provision and (2) McDonald's request for the damages he claims to have suffered from the City's enforcement of the Hand-to-Hand Transmission Provision. With those questions outstanding, we proceeded to trial.

Now, having held a bench trial on these open questions—and having carefully reviewed the parties' briefs, the record evidence, and the governing law—we now enter **FINAL JUDGMENT** for the City of Pompano Beach on McDonald's challenge to the constitutionality of the Median Provision. And, although we conclude that McDonald is entitled to damages for the City's brief enforcement of the Hand-to-Hand Transmission Provision, we cannot quantify these damages with any reasonable certainty based on the scant and speculative evidence McDonald presented at trial. We therefore award McDonald only nominal damages on that claim.

FINDINGS OF FACT

I.    BACKGROUND

    a.    THE ORDINANCES

Since 2003, the City of Pompano Beach (the "City"), our Defendant, has regulated the practice of solicitation. As originally enacted in Ordinance 2003-71, § 100.41 of the City Code of Ordinances promulgated twenty-one different rules for street solicitors—defined as any "person who stands or goes upon any portion of a public street, roadway, or neutral ground" for the purpose of (1) "soliciting, collecting or accepting donations or contributions of any kind from an occupant or occupants of any vehicle"; (2) "soliciting business or employment from an occupant or occupants of any vehicle"; or (3) "selling any thing or service or distributing any tangible thing or object, to an occupant or occupants of any vehicle." Pl.'s Ex. 2 ("Ordinance 2003-71") [ECF No. 163-1] at 5. The 2003 Ordinance (2003-71) also restricted *who* could solicit, *see id.* at 6 ("No one under 18 years of age may solicit[.]"), *where* they could solicit, *see ibid.* (on "City streets, highways or neutral ground located at, or immediately adjacent to, an intersection controlled by an official traffic control signal"), *when* they

could solicit, *see ibid.* (only "between the hours of 6:00 a.m.–12:00 p.m"), and *how*, *see id.* at 8 (prohibiting soliciting in "an aggressive or intimidating manner"). But, assuming the solicitor otherwise complied with the strictures of § 100.41, the 2003 Ordinance didn't prevent a person from soliciting while standing at "paved or unpaved medians" that "divide[ ] the roadway for vehicles driving in opposite directions[.]" *Id.* at 5.

That's no longer true. On June 23, 2020—after McDonald filed this lawsuit, "alleging that § 100.41 was a content-based restriction that violated the First and Fourteenth Amendments to the U.S. Constitution," *McDonald v. City of Pompano Beach*, 556 F. Supp. 3d 1334, 1339 (S.D. Fla. 2021) (Altman, J.)—the City adopted two new solicitation ordinances. *First*, Ordinance 2020-60 amended § 100.41 to repeal most of its twenty-one restrictions on soliciting. *See* Def.'s Ex. 6 ("Ordinance 2020-60") [ECF No. 164-6] at 3–7. This amendment "rendered § 100.41 content-neutral and (thus) constitutional." *McDonald*, 556 F. Supp. 3d at 1339; *see also* Trial Tr. [ECF No. 170] at 13:21–23 ("[T]he City, to its credit, very quickly realized the content-based nature of [Ordinance 2003-71], and a settlement was reached."). *Second*, Ordinance 2020-59 amended § 100.35 of the City Code to restrict the extent to which pedestrians could use traffic medians adjacent to certain roadways, purportedly to "improve the pedestrian and vehicular safety on the City's streets, highways and sidewalks[.]" Def.'s Ex. 3 ("Ordinance 2020-59") [ECF No. 164-3] at 1. Two of those restrictions are challenged here.

*One*, the Ordinance's amendment to § 100.35(C)(2) of the City Code—the "Hand-to-Hand Transmission Provision"—prohibits "any person" from "hand[ing] or seek[ing] to transmit by hand or receive by hand anything to any person who operates or occupies a motor vehicle of any kind," while the vehicle is "engaged in travel or within any portion of" a "roadway that has three or more vehicular travel lanes in any one direction at the point of intersection (including turning lanes)[.]" *Id.* at 4. The City later repealed the Hand-to-Hand Transmission Provision on October 27, 2020, *see* Pl.'s Ex. 13 ("Ordinance 2021-05") [ECF No. 163-9] at 2 (deleting the language of the Hand-to-Hand

Transmission Provision from CITY OF POMPANO BEACH, FLA. CODE § 100.35(C)(2)), and has since stipulated that it was unconstitutional, *see* Jan. 4, 2022, Notice of Compliance [ECF No. 133] at 1 ("The Defendant City will not defend the constitutionality of and stipulates to the unconstitutionality of repealed City Code Section 100.35(C)(2)."). According to the City, this section was "intended to be deleted upon completion of the final draft of a corresponding Ordinance that amended Section 100.41 of the city's Code, but was inadvertently retained at the time of the passage of the Ordinance, constituting a scrivener's error[.]" Ordinance 2021-05 at 1.

*Two*, Ordinance 2020-59's amendment to § 100.35(C)(1)(b)—the "Median Provision"—makes it "unlawful for any person to[,] . . . [f]or any period of time, sit or stand, in or on . . . any median less than 5 feet where the adjacent roadway has three or more vehicular travel lanes in any one direction at the point of intersection (including turning lanes)," except when lawfully crossing the street. Ordinance 2020-59 at 4. The Median Provision is still in force—with violations punishable by a fine of up to $500 and not more than 60 days in prison. *See* Ordinance 2021-05 at 3 ("Violations of [the Median Provision] . . . shall be punishable under § 10.99."); *see also* CITY OF POMPANO BEACH, FLA. CODE § 10.99(A) (2004) ("[T]he violation of any provision of this code shall be punishable by a fine not exceeding $500, [and/or] imprisonment for a term not exceeding 60 days[.]").

### b.   OUR PLAINTIFF

Bernard McDonald is a homeless man who lives in and around Pompano Beach. *See* Trial Tr. at 42:5 ("I'm homeless. I live in the streets."). Since he last returned to Pompano Beach in 2017, McDonald has panhandled "to survive." *Id.* at 46:2–5. McDonald usually panhandles while standing on medians of "three to four feet" at "four" lane intersections. *Id.* at 46:24–47:5. His "favorite place in Pompano to panhandle is [at the intersection of] Sample Road and Federal Highway[.]" *Id.* at 61:21–24. Usually, he'll "go up in the median," *id.* at 46:16, and wait to "see that someone is apparently willing to provide a donation from one of the vehicles," *id.* at 65:3–7. McDonald "[n]ever" panhandles

without a sign, *id.* at 82:15–16, so he stands on the median holding a sign that reads: "I'm homeless, I'm hungry, and please anything can help," *id.* at 45:25–46:1, to "get the attention of the drivers so they'll give [him] money," *id.* at 82:17–19. Once a motorist "calls [him] and want[s] to give [him] something," *id.* at 46:16–18, McDonald walks "from the median into the roadway and through the lanes of travel . . . to get to . . . the vehicle," *id.* at 65:8–11. He'll then "wait until the person in the vehicle provides [him] with the donation" before moving back to the median. *Id.* at 65:12–16. But, if the light turns green while McDonald is still in the street, he'll move "to the sidewalk in the swale area of the road" or back "to the median," whichever is closer. *Id.* at 66:2–8.

McDonald prefers to return to the median, though. *See id.* at 48:9–11 ("Q. Where do you reach the most people, on the sidewalks or from the medians? A. The medians."). He not only "make[s] the most money"—"[a]t least 95 percent" of his total earnings—from "stand[ing] on the median," *id.* at 48:20–49:15, but he also believes he's "safer on the median" than on the sidewalk, *id.* at 47:6–11. According to McDonald, panhandling from the sidewalk is "harder" because it places him directly adjacent to the "right-hand turn lane," *id.* at 47:19–25, where "some [drivers] don't stop, they just turn," even at a red light, *id.* at 48:1–7. By contrast, McDonald "feel[s] safe by standing" on the median: He's "[n]ever" been hit by a car or fallen off into traffic while doing so. *Id.* at 49:19–50:4.

On a "really good day," McDonald can pull in over $70 from panhandling. *Id.* at 48:24–49:3. When he does well one day, he won't always "panhandle the next day." *Id.* at 49:6–8. But "[i]t ain't always gonna be a good day." *Id.* at 49:12. Other times, McDonald "may make $30" from panhandling—what he considers "a bad day." *Id.* at 49:4–5.

And, since he first started panhandling in Pompano Beach in 2017, McDonald has had two *especially* bad days. The first came on August 10, 2018, when McDonald was arrested while panhandling at the intersection of "Federal Highway and Sample Road," *see id.* at 50:19–23, for "not wearing an . . . approved safety vest," as was required for solicitors under a now-repealed section of the City

Code, *see* Pl.'s Ex. 4 ("2018 Arrest Rpt.") [ECF No. 163-3] at 1–2; *see also* CITY OF POMPANO BEACH, FLA. CODE § 100.41(B)(10) (2003) ("All street solicitors must wear an . . . approved . . . safety vest . . . while engaged in solicitation activities[.]"), *repealed by* City of Pompano Beach, Fla., Ordinance 2020-60 (June 23, 2020). His arrest report also noted that McDonald was "in the roadway [a]ffecting the flow of traffic as vehicles had to move to either side of him to avoid hitting him." 2018 Arrest Rpt. at 1. Since that arrest, McDonald has considered himself "a marked man" in Pompano Beach, as "every time the police [saw him] in Pompano . . . they [would] stalk [him]." Trial Tr. at 53:2–3. He's thus cut back from panhandling "[e]very day" in Pompano Beach to doing so only "[o]nce or twice" per week. *Id.* at 52:14–25. After that arrest, with increased scrutiny from police making it "hard for [McDonald] to go in Pompano and panhandle," *id.* at 53:15–18, he started panhandling more "in Fort Lauderdale, Sunrise, [Oakland Park,] and Andrews," *id.* at 53:4–11.

McDonald was arrested a second time in Pompano Beach on September 26, 2020.[1] Earlier that day, McDonald was panhandling in the City. *See id.* at 54:20–22 ("Q. . . . [W]ere you panhandling the day you were arrested? A. I was[.]"). And, according to the arrest report, he was "walking through moving traffic . . . [and] impeded the flow of traffic by walking in front of the vehicles when the traffic light turned green[.]" Def.'s Ex. 19 ("2020 Arrest Rpt.") [ECF No. 164-7] at 2–3. McDonald disputes this account, insisting that he doesn't "walk in front of the traffic," but instead walks only "on the median" or "*through* some traffic [while vehicles] wait . . . for the light to change." Trial Tr. at 72:16–73:1 (emphasis added). McDonald agrees, however, that he was charged with "obstructing the right-of-way and resisting the officer's arrest," *id.* at 73:2–4; *see also id.* at 73:6–8 ("Q. Is that what the charges

---

[1] The parties have stipulated that "[t]he Plaintiff has not been cited for violating the Median Restriction or the Hand-to-Hand Transmission Restriction since June 23, 2020," the day those provisions were adopted. *See* Joint Pre-Trial Stipulation [ECF No. 139] at 3. And, because "this arrest occurred one day after he filed his Verified Amended Complaint, McDonald hasn't asserted *any* causes of action relating to it." *McDonald*, 556 F. Supp. 3d at 1343 (citing Verified Amnd. Compl. [ECF No. 38]).

were, though? . . . A. Yeah, that [is] what they charged me with.")—and *not* with a violation of the Median Provision, *id.* at 73:9–10 ("Q. You weren't arrested for standing on a median. A. Um-hum.").[2]

Even so, McDonald hasn't panhandled in Pompano Beach since that arrest. *See id.* at 80:8–12 ("Q. Have you been back to panhandle in Pompano at all since September 26, 2020? A. Since I got arrested? . . . No, I haven't."). But that's not because McDonald doesn't *want* to. *Id.* at 55:14–15 ("Q. Do you still want to panhandle in Pompano? A. I do."). McDonald, in fact, prefers to panhandle in Pompano Beach (as opposed to in other neighboring cities) because it's his "hometown" and it's where he makes the most money. *Id.* at 55:11–23. He's only refrained from doing so because he's "[a]fraid of getting arrested." *Id.* at 80:15–16.

c.    THE CHALLENGED MEDIANS

The Median Provision only applies to medians in the City that are (1) unpaved, (2) less than three feet wide, or (3) less than five feet wide *and* set between roads with three or more travel lanes (including turning lanes) in either direction. *See* Ordinance 2020-59 at 4. McDonald isn't challenging the Median Provision's ban on sitting or standing on medians that are unpaved or under *three* feet wide. *See, e.g.*, Trial Tr. at 31:15–18 ("[M]edians, which are paved and less than three feet, or medians that are unpaved, . . . there's a prohibition on them that you may not sit or stand on them. The plaintiff has not challenged that provision."). The "Challenged Medians" here thus comprise only paved medians that are more than three feet (but less than five feet) wide and which divide roadways with at least three travel lanes on either side.[3] Unfortunately, we don't know how many of these medians there are in Pompano Beach. *Id.* at 108:16–18 ("Q. Can you tell us the number of medians that are three to

---

[2] Although McDonald was initially "charged with a felony arrest of resisting [arrest with violence]," that charge was later "reduced to a simple misdemeanor" for resisting arrest without violence. Trial Tr. at 84:1–10.

[3] Like the parties, we'll sometimes refer to these as "three-to-five-foot medians," even though technically the Challenged Medians are, by definition, *less than* five feet wide.

five feet? A. No."). Nor do we know how many total intersections there are in the City. *Id.* at 108:9–12 ("Q. . . . Can you tell us how many intersections there are in the entire City of Pompano Beach? A. No.").

Here's what we do know. At trial, the City's expert, city engineer John Sfiropoulos, presented his analysis of intersections at "the collector and arterial roadways" in Pompano Beach. *Id.* at 98:18–20; *see also id.* at 98:24–99:2 ("[T]he collector and the arterial [roadways] are the ones that have more volume and higher speeds, and as a result . . . typically have medians[.]"). Sfiropolous first determined that the "[t]otal number of intersections [at] collector or arterial roadways . . . is 97." *Id.* at 99:3–12. Of those ninety-seven intersections, "28 . . . have a median that is more than five feet wide"—and which, as a result, are not subject to the Median Provision at all. *Id.* at 99:13–15. An additional twelve medians are independently covered by § 100.41(B)(3)(a)'s prohibition on soliciting within 600 feet of a railroad crossing, *see* Ordinance 2020-60 at 4 ("Pedestrian solicitors may not solicit at an intersection, or any portion thereof, which contains, or is controlled by a railroad crossing, or within 600 feet of any such intersection."); Trial Tr. at 99:17–19 ("Q. Do those 97 total intersections also include some intersections that are within 600 feet of a railroad crossing? A. They do. I want to say approximately 12."). And eight more medians are covered by § 100.41(B)(6)'s ban on soliciting within 400 feet of intersections "with high incidents of accidents[.]" *Id.* at 100:1–2; *see also id.* at 99:23–100:5 ("Q. And do those 97 total intersections also include the specific intersections that are identified in Section 100.41 of the city code as being excluded from panhandling? . . . A. Yes. Yes. I think there's approximately eight, if I'm not mistaken."); Ordinance 2020-60 at 5 (listing these intersections).[4]

Therefore, with "20 of the 97 [identified medians] not being challenged" because soliciting

---

[4] These intersections are: (a) Copans Road and Andrews Avenue; (b) Atlantic Boulevard and Dixie Highway; (c) Sample Road and Powerline Road; (d) Copans Road and Powerline Road; (e) Atlantic Boulevard and Federal Highway; (f) Copans Road and Federal Highway; (g) Atlantic Boulevard and Powerline Road; and (h) Sample Road and Dixie Highway. *See* Ordinance 2020-60 at 5.

would be illegal there *even without* the Median Provision, *id.* at 100:12–14 ("[Q.] . . . So that's 20 of the 97, is it your understanding, Mr. Sfiropoulos, are not being challenged? [A.] That's correct.")—and another twenty-eight medians that aren't being challenged because they are wider than five feet, *id.* at 100:15–17 ("[Q.] And then there's 77 others. Of those 77, 28 are more than five feet. Do I have you correct? [A.] Yes[.]")—the total set of Challenged Medians comprises *at most* forty-nine medians. We say "at most" because Sfiropolous's analysis didn't distinguish between medians that are *between* three and five feet, on the one hand, and medians that are *less than* three feet, on the other. *Id.* at 100:25–101:8 ("Q. Now, of those [49] intersections, you don't know whether the medians at those intersections are between three and five feet or under three feet. . . . A. No, I do not know."). So, very likely, the actual number of Challenged Medians (a sum theoretically knowable, but still unknown to us) is *less* than forty-nine.

Sfiropoulos also testified that the general "purpose" of "three- to five-foot medians" is "to separate traffic and also to accommodate left-hand turn lanes." *Id.* at 94:5–10; *see also id.* at 94:22–23 ("[S]ometimes the medians, they start out wide and then they narrow down to three f[ee]t to accommodate a left-hand turn."). And, while traffic medians *can* be "specifically designed for pedestrian refuge," *id.* at 92:23–24, the Challenged Medians lack many of the characteristics that would indicate they're suitable for pedestrian use.

For starters, the three-to-five-foot width of the Challenged Medians doesn't meet the Florida Department of Transportation's ("FDOT") "minimum standards for medians constructed for pedestrian refuge[.]" *Id.* at 93:8–9. FDOT's *Manual on Uniform Traffic Devices for Streets and Highways*[5]—the regulatory guidance that governs "roadway projects" in Pompano Beach, *see id.* at 89:10–12 ("Q. Has the City of Pompano Beach adopted what's known as the Greenbook? A. Yes, we have."); *id.* at

---

[5] *See* Trial Tr. at 89:3–5 ("[T]he Florida Greenbook . . . [is] also known as the Manual on Uniform Traffic Devices for Streets and Highways.").

89:15–18 ("Q. Is the expectation, then, that roadway projects within the city are done to those FDOT standards laid out in the Greenbook? A. Correct.")—prescribes that medians "constructed for pedestrian refuge" must be a minimum of six-feet wide, although eight feet is "preferred," *id.* at 93:8–12. The Challenged Medians, by definition, fall short of that standard.

Additionally, none of the Challenged Medians has "a pathway incorporated within [it]," "a cutaway for somebody to stand safely," or a "crosswalk going through [it]" to facilitate pedestrian access, *id.* at 93:15–94:4—features that are "typical[ ]" in medians designed for pedestrian use, *id.* at 93:2–7 (Sfiropoulos testifying that medians designed for pedestrian use "typically incorporate a crosswalk. There's a cutout, and they usually have a crosswalk with a truncated ADA mat, so that way if somebody is disabled, they can -- they know that they're entering into traffic and so forth. But there's usually a cutout in the median for access"). Nor do they "have benches or bus stops in them[.]" *Id.* at 93:20–22.

Beyond Sfiropoulos's testimony on the Challenged Medians' *intended* use, the record provides little evidence on their *actual* use by pedestrians in Pompano Beach. McDonald testified that he remembers seeing people solicit while standing "in the median" at intersections—including the intersections at "Federal Highway and Sample Road, or Copans Road and Federal Highway, and Powerline Road"—at several different points throughout his life, *id.* at 44:4–11; *see also id.* at 43:24–44:5 ("Q. Back then, when you were growing up, did you see people in Pompano Beach . . . hold up a sign? A. I did . . . They would be in the median."); *id.* at 43:10–17 ("Q. When you were a teenager in the late 1970s and '80s in Pompano Beach, do you remember seeing people on the street panhandling and selling things? A. Yes, I did."); *id.* at 44:22–45:2 ("Q. So when you got out of prison in your 20s, and you came back to Pompano, did you see people standing on the medians of the major intersections in Pompano? A. Yes. . . . [They were] [a]sking for donations."); *id.* at 45:7–12 ("Q. And when you got out of prison, and when you were in your 30s and 40s and came back to Pompano, did you see the

10

people standing on the medians at the major intersections? A. I did. . . . [They were] [a]sking for donations."). Solicitation at these intersections (McDonald tells us) took many forms, including people "selling stuff, like newspaper, water, and soda," "panhandling," "flying the sign," and "kids with football helmets . . . asking for donations." *Id.* at 43:16–44:15.

But there's nothing in the record establishing that this activity took place *at* a Challenged Median. Although the median at the intersection of Copans Road and Federal Highway, McDonald says, "is at least three to four feet," *id.* at 74:14–16, that median *isn't* being challenged here, because panhandling at Copans and Federal is independently proscribed by § 100.41(B)(6)(f). *See* Ordinance 2020-60 at 5 ("No pedestrian solicitor shall solicit at or within 400 feet of the . . . intersection[ ] of . . . Copans Road and Federal Highway[.]"); *see also* Trial Tr. at 100:8–14 ("THE COURT: So when we take those eight, which are not challenged, plus the 12 near a railroad crossing . . . that's 20 of the 97, is it your understanding, Mr. Sfiropoulos, are not being challenged? [A.] That's correct."). And we have no evidence (neither testimony from any witnesses nor exhibits offered at trial) from which we might calculate the sizes of the medians at the intersection of Federal Highway and Sample Road. *Cf. id.* at 36:14–21 ("[MR. BURKE:] But the median which is, I believe, [at the intersection of Federal Highway and Sample Road] now, it's probably even less than three feet[.]"). And we have no idea— because McDonald never told us—*where* on Powerline Road he observed people soliciting. And that's extremely important because "Powerline" has "at least one median where it was lawful to stand on[.]" *Id.* at 98:11–17; *see also id.* at 102:9–18 (establishing that the intersection of "Federal Highway" and "Powerline" contains "at least one median where it was lawful to stand on"). Without more, in short, the record tells us next to nothing about the extent to which protected activity has *ever* occurred, with *any* degree of regularity, on the medians at issue here.

## II.   PROCEDURAL HISTORY

11

a.     McDonald's Complaints

McDonald first sued the City on February 12, 2020, approximately eighteen months after he was first arrested for violating the then-operative panhandling restrictions codified at § 100.41 of the City Code. *See* First Verified Complaint [ECF No. 1] ¶¶ 34, 45 ("[O]n August 10, 2018, Plaintiff Bernard McDonald . . . [was charged] with Street Solicitation, in violation of § 100.41 of the Pompano Beach Municipal Code."). In his First Verified Complaint, McDonald challenged only § 100.41, arguing that its "regulations and requirements for street solicitors within the city," *id.* ¶ 17, violated the First Amendment as an "an unconstitutional content-based restriction" on speech, *id.* ¶¶ 55–56, and were "void for vagueness, in violation of the Due Process Clause of the Fourteenth Amendment," *id.* ¶ 67. On those grounds, McDonald requested that we declare § 100.41 unconstitutional, "both facially and as applied to" him, that we issue a "preliminary and permanent injunction prohibiting the City and its agents from enforcing . . . § 100.41," and that we award him damages, *id.* at 14; *see also* First Motion for Preliminary Injunction ("First P.I. Mot.") [ECF No. 4] at 1 ("Plaintiff Bernard McDonald . . .  hereby moves for a preliminary injunction enjoining the Defendant, the City of Pompano Beach, from enforcing the City's Street Solicitation Ordinance, § 100.41 of the Pompano Beach Municipal Code.").

Before we could rule on the merits of § 100.41's constitutionality, though, the City informed us that it intended to temporarily cease enforcing that law, *see* Order on First P.I. Mot. [ECF No. 24] ¶ 2 ("The City Attorney for the City of Pompano Beach shall tender a letter to the Broward Sheriff's Office ("BSO"), directing the BSO to desist from any future enforcement of the Street Solicitation Ordinance, Pompano Beach Municipal Code § 100.41." (cleaned up)); *see also* May 6, 2020, Notice of Compliance [ECF No. 25] at 1 ("City Attorney Mark Berman has in writing notified Broward Sheriff's Office, Pompano Beach Division Chief Major Wayne Adkins that [Broward Sheriff's Office] deputies are to refrain from enforcing the City's current street solicitation ordinance until further notice from

the City attorney." (cleaned up)). So, on May 1, 2022, we denied McDonald's motion for a preliminary injunction against § 100.41. *See* Order on First P.I. Mot. ¶ 1 ("The Motion is denied without prejudice. The Plaintiff may re-raise the Motion, if necessary, at the appropriate time." (cleaned up)).

On June 23, 2020, the City promulgated Ordinance 2020-60, which officially repealed the unconstitutional language of § 100.41. *See* Ordinance 2020-60 at 3–7; *see also McDonald*, 556 F. Supp. 3d at 1339 ("[This amendment] rendered § 100.41 content-neutral and (thus) constitutional."). On that same day, the City adopted Ordinance 2020-59, which included *both* the Hand-to-Hand Transmission Provision, *see* Ordinance 2020-59 at 4 (prohibiting "any person" from "hand[ing] or seek[ing] to transmit by hand or receive by hand anything to any person who operates or occupies a motor vehicle of any kind," while the vehicle is "engaged in travel or within any portion of" a "roadway that has three or more vehicular travel lanes in any one direction at the point of intersection (including turning lanes)"), *and* the Median Provision, *ibid.* (prohibiting "any person. . . [f]or any period of time, [from] sit[ting] or stand[ing], in or on . . . any median less than 5 feet where the adjacent roadway has three or more vehicular travel lanes in any one direction at the point of intersection (including turning lanes)," except when lawfully crossing the street).

McDonald then filed his Verified Amended Complaint [ECF No. 38] on September 25, 2020, in which he reasserted his claim against the pre-amendment § 100.41—now requesting only "a declaratory judgment and damages" for the "irreparable harm and damages" he suffered because of that law while it was still in force. Verified Amnd. Compl. ¶¶ 71–79. McDonald also pled a new count challenging the constitutionality of the Hand-to-Hand Transmission Provision and the Median Provision under the First Amendment. *See id.* ¶ 82 ("The City of Pompano Beach Sidewalk Ordinance, §§ 100.35(C)(1)(b) and (C)(2), both on its face and as applied and enforced, has violated and continues to violate the right of Plaintiff Bernard McDonald to free speech and free expression, in violation of the First Amendment."). In that new count, McDonald sought a declaration that these provisions

13

violated the First Amendment, injunctions prohibiting their enforcement, and damages. *See id.* at 20; *see also* Second Motion for Preliminary Injunction ("Second P.I. Mot.") [ECF No. 42] at 1 ("Plaintiff Bernard McDonald . . . hereby moves for a preliminary injunction enjoining the Defendant, the City of Pompano Beach, from enforcing §§ 100.35(C)(1)(b) and (C)(2) of the City's 'Building or Obstruction on Public Streets, Sidewalks, and Right-of-Way Swale Areas' Ordinance[.]").[6]

On the very next day, September 26, 2020, McDonald was arrested for "walking through moving traffic . . . [and impeding] the flow of traffic by walking in front of the vehicles when the traffic light turned green," 2020 Arrest Rpt. at 2–3, right after he was panhandling "[o]n the median," Trial Tr. at 83:12–22 ("Q. What were you doing right before that? A. I was flying my sign . . . [o]n the median."). McDonald "ultimately pled to a misdemeanor [and received] time served[.]" *Id.* at 83:23–25. McDonald never amended his pleadings to reflect this event. *See McDonald*, 556 F. Supp. 3d at 1343 ("Since this arrest occurred one day after he filed his Verified Amended Complaint, McDonald hasn't asserted any causes of action relating to it." (cleaned up)); *see generally* Docket.

On October 27, 2020, the City enacted Ordinance 2021-05, which repealed the Hand-to-Hand Transmission Provision. *See* Ordinance 2021-05 at 1. According to City, the Hand-to-Hand Transmission Provision "was intended to be deleted upon completion of the final draft of [Ordinance 2020-60], but was inadvertently retained at the time of the passage of the Ordinance, constituting a scrivener's error[.]" *Ibid.* The City has since stipulated that the Hand-to-Hand Transmission Provision was unconstitutional. *See* Jan. 4, 2022, Notice of Compliance ("The Defendant City will not defend the constitutionality of and stipulates to the unconstitutionality of repealed City Code Section

---

[6] We deferred ruling on the Second Motion for Preliminary Injunction and consolidated it with this bench trial, *see* Consolidation Order [ECF No. 72], "as a way of avoiding the unnecessary, confusing, and time-consuming task of ruling twice on the same evidence under different standards," *McDonald*, 556 F. Supp. 3d at 1342 n.9. The parties consented to this procedure. *See* Stipulation as to Waiver of Jury Trial [ECF No. 71].

100.35(C)(2).").  And, on November 20, 2020, McDonald voluntarily dismissed Counts I and II of the Verified Amended Complaint with prejudice, ending this litigation's concern with § 100.41. *See* Notice of Partial Voluntarily Dismissal [ECF No. 70].

The parties then moved for summary judgment on the remaining issues—specifically, (1) whether the Median Provision violated the First Amendment (both facially and as applied to McDonald), *see* Plaintiff's Motion for Partial Summary Judgment ("Pl.'s Partial MSJ") [ECF No. 77] at 5–13; Defendant's Motion for Summary Judgment ("Def.'s MSJ") [ECF No. 95] at 2–4, and (2) whether McDonald's claim under the Hand-to-Hand Transmission Provision was rendered moot by the City's repeal of that law, *see* Pl.'s Partial MSJ at 13–14; Def.'s MSJ at 2.

### b.   OUR SUMMARY JUDGMENT ORDER

#### i.   Article III Standing

We began our Order on the parties' cross-motions for summary judgment, *see McDonald*, 556 F. Supp. 3d at 1334, by considering the City's argument that "McDonald cannot assert an as-applied challenge because the two provisions he attacks haven't been enforced against him—and, therefore, haven't 'chilled' his speech," *id.* at 1344–45. We rejected that argument *both* because "courts universally recognize that plaintiffs can, consistent with Article III, advance pre-enforcement claims," *id.* at 1345 (citing *Robinson v. Att'y Gen.*, 957 F.3d 1171, 1177 (11th Cir. 2020)), *and* because the provision's (alleged) "chilling" of McDonald's speech constituted a "First Amendment injury-in-fact," *id.* at 1346.

To establish that his speech was, in fact, chilled, McDonald was required at summary judgment to "submit evidence of (1) his intent to engage in proscribed speech and (2) a credible threat of prosecution." *Ibid.* (citing *Wilson v. State Bar of Ga.*, 132 F.3d 1422, 1428 (11th Cir. 1998)). McDonald had met that burden, we said. As to the Median Provision, McDonald's undisputed evidence that he "panhandles on the Challenged Medians," *ibid.* (citing Plaintiff's Statement of Material Facts ("Pl.'s SOMF") [ECF No. 76] ¶¶ 16–17), demonstrated his intent to engage in proscribed conduct and

showed that his continued interest in violating the Median Provision exposed him to a credible threat of arrest, *ibid.* (citing *Leverett v. City of Pinellas Park*, 775 F.2d 1536, 1539 (11th Cir. 1985)). We also found that McDonald had standing to "pursue his claim for the months during which [the Hand-to-Hand Transmission Provision] was in effect," since panhandling "required him to engage in precisely the type of hand-to-hand exchange [that Provision] prohibited." *Ibid.* Satisfied that McDonald had "standing to challenge these two subsections of § 100.35 at the summary-judgment stage," *id.* at 1347, we proceeded to the merits.

### ii.  The Median Provision

Both parties sought summary judgment on the question of the Median Provision's constitutionality under the First Amendment. *See* Pl.'s Partial MSJ at 5–13; Def.'s MSJ at 2–4. In McDonald's view, the Median Provision was unconstitutional, both facially and as applied to him, "because (1) the City failed to consider sufficient evidence on the measure's likely effects on public safety, (2) the provision isn't narrowly tailored to advance a significant governmental interest, and (3) the law fails to provide ample alternative channels of communication." *McDonald*, 556 F. Supp. 3d at 1343 (citing Pl.'s Partial MSJ at 5–13). The City, by contrast, argued that the Median Provision was "constitutional on its face as either (1) a reasonable and viewpoint-neutral regulation of a non-public forum or (2) a content-neutral, narrowly tailored regulation that leaves open ample alternative channels of communication[.]" *Id.* at 1343–44 (citing Def.'s MSJ at 2–4).

### 1.      The First Amendment's Application to the Median Provision

Before we could consider the parties' arguments on the Median Provision's constitutional implications, we *sua sponte* raised our concern with the parties' assumption "that the First Amendment applies" at all. *Id.* at 1347. As we explained, although the First Amendment extends to "expressive conduct," *United States v. O'Brien*, 391 U.S. 367, 376–77 (1968), not "all conduct is expressive to the point of triggering the First Amendment's protections," *McDonald*, 556 F. Supp. 3d at 1347. And, while

"neither party ha[d] briefed the issue" at summary judgment, *ibid.*, we were skeptical that McDonald could satisfy his burden of demonstrating that the conduct proscribed by the Median Provision—*viz.*, "sit[ting] or stand[ing], in or on . . . any median less than 5 feet" wide, Ordinance 2020-59 at 4— sufficiently implicated the First Amendment, *see McDonald*, 556 F. Supp. 3d at 1347 ("It's possible . . . that McDonald has failed to satisfy [this burden]."); *see also Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984) ("[I]t is the obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment even applies."). Still, recognizing that the parties *hadn't* briefed this issue—and that determining the extent of the Median Provision's proportionality and "effect" on communicative expression was a question of material fact best left for trial, *McDonald*, 556 F. Supp. 3d at 1349–50 (cleaned up) (quoting *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 708 (1986) (O'Connor, J., concurring))—we declined to pass on this issue prematurely at summary judgment.

## 2. Our Public-Forum Analysis of the Challenged Medians

Assuming that the Median Provision *did* sufficiently implicate the First Amendment, we then considered the extent to which First Amendment protections applied to the Challenged Medians, given "the nature of the forum at issue." *Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n*, 942 F.3d 1215, 1236 (11th Cir. 2019). This analytical step was "critical," *ibid.*, since "the degree of scrutiny we place on a government's restraint of speech is largely governed by the kind of forum the government is attempting to regulate," *Bloedorn v. Grube*, 631 F.2d 1218, 1230 (11th Cir. 2011); *see also United States v. Kokinda*, 497 U.S. 720, 726–27 (1990) (plurality opinion) ("[T]he extent to which the Government can control access [to government property] depends on the nature of the relevant forum."). As we explained, there are four recognized categories of government fora: the traditional public forum, the designated public forum, the limited public forum, and the nonpublic forum. *See McDonald*, 556 F. Supp. 3d at 1351 (citing *Keister v. Bell*, 879 F.3d 1282, 1288 (11th Cir. 2018) (*Keister I*)). To determine which category a particular forum falls into, "we try to understand 'what *purpose* [the

forum] serves,'" *id.* at 1352 (quoting *Boardley v. U.S. Dep't of Interior*, 615 F.3d 508, 515 (D.C. Cir. 2010)), by looking to "extrinsic and contextual clues—things like the property's physical characteristics, its use over time, and its overall compatibility with free expression," *ibid.*

At summary judgment, McDonald argued that the Challenged Medians were a "traditional public forum"—*viz.*, areas that have "'traditionally been available for public expression' and that have as 'a principal purpose . . . the free exchange of ideas[.]'" *Id.* at 1351 (first quoting *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992); and then quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985)). Traditional public fora receive the broadest First Amendment protections. *See ibid.* (citing *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983)). While the government may impose reasonable time, place, and manner restrictions on speech in traditional public fora, those restrictions are constitutional only if they "(1) are content-neutral, (2) are narrowly tailored to serve a significant government interest, and (3) leave open ample alternative channels of communication." *Smith v. City of Fort Lauderdale*, 177 F.3d 954, 956 (11th Cir. 1999).

To support his view that the Challenged Medians qualify as traditional public fora, McDonald offered two arguments—neither of which we found sufficient to establish that a three-to-five-foot median was a traditional public forum as a matter of law. This was especially true given our obligation at summary judgment to "resolve all ambiguities and draw reasonable factual inferences from the evidence in the non-movant's favor." *Travelers Prop. Cas. Co. of Am. v. Moore*, 763 F.3d 1265, 1268 (11th Cir. 2014).

*First*, McDonald argued that, "by enacting Ordinance 2003-71 . . . the City has *already* acknowledged that the Challenged Medians are a kind of traditional public forum." *McDonald*, 556 F. Supp. 3d at 1353–54 (citing Plaintiff's Response to Def.'s MSJ ("Pl.'s Resp. MSJ") [ECF No. 111] at 6); *see also* Pl.'s Resp. MSJ at 6 ("It is undisputed that since at least 2003, the City itself has recognized that people were using medians in Pompano Beach for expressive conduct, given the City's action at

that time to legalize and regulate the solicitation which was occurring on its roadway medians."). But that made little sense to us. A more plausible interpretation of Ordinance 2003-71's purpose, we thought, was that "the City reacted . . . without nuance to a (perceived) problem that mainly afflicted larger medians." *McDonald*, 556 F. Supp. 3d at 1354. Regardless, McDonald submitted "no evidence that, by regulating all medians, the City was recognizing the Challenged Medians as traditional public fora." *Ibid.* (emphasis omitted).

*Second*, McDonald pointed to the "long history of panhandling and protests at major intersections in the City" as evidence of the Challenged Medians' status as traditional public fora. *Id.* at 1355 (citing Pl.'s Resp. MSJ at 4–6). At summary judgment, the only evidence McDonald offered in support of this statement was his own declaration that "people have stood out at intersections on all the major roads and streets in Pompano Beach and have done so to ask people for money and donations; sold newspapers and water bottles; passed out fliers; and held signs for local businesses[.]" *Ibid.* (citing Declaration of Bernard McDonald [ECF No. 57-1] ¶ 3). But, even taking this assertion as true, *see, e.g.*, *Wate v. Kubler*, 839 F.3d 1012, 1018 (11th Cir. 2016) ("We do not weigh conflicting evidence or make credibility determinations [at summary judgment.]" (cleaned up)), McDonald's evidence about the historical use of *intersections* in Pompano Beach told us nothing about whether people engaged in First Amendment speech "on the kinds of medians we have here—uninviting concrete blocks, three-to-five feet wide, that divide high-speed traffic lanes." *McDonald*, 556 F. Supp. 3d at 1356.

The City likewise failed to establish that it was entitled to summary judgment on this issue. In the City's view, the Challenged Medians were "non-public forums." Def.'s MSJ at 6. Non-public fora receive the most limited First Amendment Protections, as the government's authority to restrict speech in these spaces is subject only to the requirements of reasonableness and viewpoint neutrality. *Cornelius*, 473 U.S. at 800. While we recognized that the Challenged Medians appeared to bear many

of the indicia of non-public fora—including "their narrowness, their proximity to oncoming traffic, and the absence of grass, benches, etc.," *McDonald*, 556 F. Supp. 3d at 1354—we declined to decide this "uniquely fact-intensive question[ ] prematurely," *id.* at 1355 (cleaned up), and instead chose to defer ruling on the forum analysis until we had a more-developed factual record. In particular, we pointed out that evidence "about the areas around the Challenged Medians," *id.* at 1355 (citing *Wright v. Incline Vill. Gen. Improvement Dist.*, 665 F.3d 1128, 1136 (9th Cir. 2011) ("Context matters in forum analysis."), and "about when the Challenged Medians were constructed or renovated," *id.* at 1356 (cleaned up)—as to which the summary-judgment record was silent—could bear on the proper classification of these fora. We therefore denied both parties' motions for summary judgment on the forum issue and agreed to rule on this question only after the parties had developed the record further at trial.

### 3.        Intermediate Scrutiny

Assuming (again) McDonald could ultimately show that the Challenged Medians qualified as traditional public fora, we recognized that "we'd still have to resolve several additional fact-laden questions" to determine the constitutionality of the Median Provision. *Ibid.* In a traditional public forum, we said, "the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided [1] the restrictions are justified without reference to the content of the regulated speech, [2] that they are narrowly tailored to serve a significant governmental interest, and [3] that they leave open ample alternative channels for communication of the information." *McCullen v. Coakley*, 573 U.S. 464, 477 (2014). McDonald didn't argue that "the Median Provision is content- or viewpoint-based" or that "pedestrian safety doesn't qualify as a significant governmental interest." *McDonald*, 556 F. Supp. 3d at 1356 (citing Pl.'s Resp. MSJ at 9–19)). That left two questions for us to answer: "(1) whether the Median Provision is narrowly tailored to serve the City's significant interest in traffic safety, and (2) whether the Median Provision leaves open ample alternative channels of

communication." *Id.* at 1356–57.

For a law to be narrowly tailored, we explained, "the government must first demonstrate, with pre-enactment evidence, that 'it had a reasonable basis for believing that its regulation would further . . . legitimate interests.'" *Id.* at 1357 (quoting *Buehrle v. City of Key West*, 813 F.3d 973, 979 (11th Cir. 2015)). But the factual record at summary judgment precluded us from determining whether the Median Provision "burden[ed] substantially more speech than is necessary to further the government's legitimate interests." *McCullen*, 573 U.S. at 486 (cleaned up); *see also McDonald*, 556 F. Supp. 3d at 1357 ("[A] challenged statute is appropriately tailored if it 'promotes a substantial government interest that would be achieved less effectively absent the regulation.'" (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989))).

At summary judgment, the City introduced three pieces of pre-enactment evidence to support its "reasonable basis" for believing that the Median Provision would promote traffic safety: "(1) a chart identifying, over a one-year period, 1,394 incidents at 24 intersections—25 of which involved pedestrians; (2) a report by the Florida Highway Safety and Motor Vehicle Department, which showed seven 'cross median' accidents in 2018 alone—along with seventeen-thousand pedestrian accidents; and (3) the City Mayor's description of his own 'close calls' and 'near misses' while driving near pedestrians who were standing on or beside the roadway[.]" *Id.* at 1358 (cleaned up). While we recognized that this evidence was "plainly 'relevant' to public safety," the record contained insufficient material for us to determine "whether the City 'reasonably believed[ ]' that its ordinance was 'relevant' as a remedy for the problems" the City had identified. *Ibid.* (emphasis omitted) (quoting *Buehrle*, 813 F.3d at 979). We were left, in other words, with little information about how this data was related to the City's interest in improving traffic safety *at the Challenged Medians. See ibid.* ("We don't know the answers to these important questions because the City never tells us."). Because our understanding of the "fit" between the pre-enactment evidence and the Median Provision was "crucial to any resolution

of the City's motion," we deferred judgment on this issue, too, and "ask[ed] the parties to answer [these outstanding questions] at a bench trial." *Ibid.*

The record was "no clearer when it [came] to the last part of our analysis: whether the Median Provision leaves open 'ample alternative channels for communication of the information.'" *Id.* at 1359. (quoting *McCullen*, 573 U.S. at 477). Recognizing that "the law is well-settled that the alternative channel 'does not have to be the speaker's first choice,'" *ibid.* (quoting *Weinberg v. City of Chi.*, 310 F.3d 1029, 1041 (7th Cir. 2002)), we determined that McDonald's assertion that he "prefer[s] panhandling on the medians—as opposed to the sidewalks"—wasn't dispositive as to whether the sidewalk was a sufficient alternative to the median, *ibid.* (quoting Pl.'s SOMF ¶ 17). And, because the record contained evidence supporting both sides of that question, *compare id.* at 1360–61 ("McDonald admitted that . . . he—while on the median—only ever has access to cars that stop at the light on one side of him. In these circumstances, then, there may be very little difference between soliciting on the sidewalk and panhandling on the median." (cleaned up)), *with id.* at 1361 ("On the other hand, McDonald was clear that sidewalks often present special visibility problems—especially when they become crowded." (citing Pl.'s SOMF ¶ 17)), there were material issues of fact for trial. We therefore denied both parties' motions for summary judgment on this issue as well.

### iii. McDonald's Hand-to-Hand Transmission Damages

By the time we reached summary judgment, the City had already repealed the Hand-to-Hand Transmission Provision. *See* Ordinance 2021-05 at 1. Still, McDonald sought "a declaration that [the Hand-to-Hand Transmission Provision] was unconstitutional, and [he sought] money damages for the 'chilling effect of this ordinance' on his protected speech." *McDonald*, 556 F. Supp. 3d at 1361 (quoting Pl.'s MSJ at 13–14). The City countered that its repeal of the Hand-to-Hand Transmission Provision mooted any such relief. *Ibid.* (citing Defendant's Response to Pl.'s MSJ [ECF No. 82] at 19).

We agreed with the City that McDonald's claim for declaratory relief was moot. Because the

Hand-to-Hand Transmission Provision was no longer in effect, there was "no ordinance to declare unconstitutional." *Id.* at 1363. And McDonald adduced no evidence to suggest that "the City [would] ever pass this law again," *ibid.* (first citing *Flanigan's Enters., Inc. of Ga. v. City of Sandy Springs*, 868 F.3d 1248, 1261–63 (11th Cir. 2017) (en banc); and then citing *Phelps-Roper v. City of Manchester*, 697 F.3d 678, 687 (8th Cir. 2012) (en banc)), rendering his "claim for declaratory relief . . . indisputably moot," *ibid.* (cleaned up). We therefore granted the City's request for summary judgment on its argument that, "with respect to [the Hand-to-Hand Transmission Provision], McDonald's claim for injunctive relief (in Count III) is moot." *Ibid.*

McDonald's claim for retrospective damages, however, was a different story. That's because "a First Amendment plaintiff whose speech was 'chilled' by an unconstitutional law can sue for money damages . . . provided he can show that the law *caused* his injuries[.]" *Id.* at 1362 (first citing *Finch v. City of Vernon*, 877 F.2d 1497, 1503 (11th Cir. 1989); and then citing *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 308 (1986)). At summary judgment, McDonald put forth sufficient evidence to substantiate his allegation that his speech was, in fact, chilled. *See ibid.* ("[S]ince McDonald has testified that the threat of prosecution under § 100.35(C)(2) 'chilled' his speech—that is, that it prevented him from panhandling as much as he otherwise would have—he can pursue his claim for money damages." (cleaned up)). The only outstanding question, then, was the value of his damages. And, again, we let the parties hash that out at trial.

* * *

Taken together, our Summary Judgment Order left open the following issues for trial: (1) whether the Median Provision burdens speech *enough* to implicate the First Amendment; (2) whether the Challenged Medians are traditional public fora; (3) whether the Median Provision is narrowly tailored to the City's interest in traffic safety; (4) whether the Median Provision leaves open ample alternative means of communication; and (5) the value of McDonald's damages (if any).

23

### III.   THE CITY'S TRIAL EVIDENCE

#### a.   THE RECORDING OF THE MAY 26, 2020, CITY COMMISSION MEETING

Before we get to the City's trial evidence, we must resolve one preliminary matter. At trial, the City sought to introduce a "video recording" of the May 26, 2020, City Commission meeting, at which the ordinance amending § 100.35 "was first presented to the city commission for first reading." Trial Tr. at 109:1–8.[7] This video, the City told us, includes commentary on the ordinance by "the City attorney . . . [and] [t]he mayor." *Id.* at 109:13–17. McDonald objected to this evidence as hearsay, *see id.* at 109:10–13, and the City parried with two responses. *First*, the City argued that the video was not hearsay because it was being "offered for what the . . . legislative record [was] that was considered at the time of the adoption of this ordinance," rather than for the truth of the statements the various individuals made at the hearing. *Id.* at 110:1–11; *see also id.* at 111:16–17 ("Judge, we would just like to present to the Court the full legislative record of what was done."). *Second*, the City argued, in the alternative, that the video was *admissible* hearsay because it was "a public record under [Federal Rule of Evidence] 803(8)[.]" *Id.* at 110:12–16. We deferred ruling on this evidence at trial and told the parties that we would "rule on this particular objection" in our final judgment. *Id.* at 112:9–11. After careful review, we now **OVERRULE** McDonald's objection to this video and **ADMIT** it as Defendant's Ex. 9.

Because the City seeks to offer this evidence for a purpose other than its truth—namely, to establish that the statements were made while the City was considering the amendments to § 100.35— it isn't hearsay. *See* FED. R. EVID. 801(c) ("'Hearsay' means a statement that . . . a party offers in evidence to prove the truth of the matter asserted in the statement."); *see also Klatch-Maynard v. Sugarloaf Twp.*, 2011 WL 3476814, at *1 (M.D. Pa. Aug. 9, 2011) ("Defendants assert that the audio recording

---

[7] A video recording of that meeting (the "City Commission Meeting") is available at: http://pompano.granicus.com/player/clip/1571?meta_id=164034&redirect=true.

is not being offered to establish the truth of what was asserted at the meeting; rather, it is being offered to show what was stated at the meeting. Therefore, the Court must deny Plaintiffs' hearsay objections[.]"); *Madden v. Town of Hempstead*, 2019 WL 1439935, at *8 n.8 (E.D.N.Y. Mar. 29, 2019) ("[T]he audio recordings of the Town Board meetings do not constitute inadmissible hearsay, as they are not proffered to prove the truth of the statements asserted therein." (citing FED. R. EVID. 801(c)(2))). We'll therefore admit the video as evidence of the "legislative record" of the City Commission's May 26, 2020, meeting. Trial Tr. at 101:1–4.

### b. PRE-ENACTMENT EVIDENCE FOR THE MEDIAN PROVISION

At trial, the City offered two documents (it says) it relied on when it promulgated Ordinance 2020-59 (and, therefore, the Median Provision). We'll address each document in turn.

*First* is the data chart on "City Intersections and Occurrences," Pl.'s Ex. 9 ("Occurrence Chart") [ECF No. 163-6],[8] which reports the number of accidents at twenty-four different intersections across Pompano Beach between February 1, 2018, and February 1, 2020, *ibid.*; *see also* City Commission Meeting at 02:09:38–02:10:11 ("[T]he backup that is attached and incorporated into this ordinance [includes] a list for the past two years of accidents at intersections involving vehicles and motorists[.]"). According to that chart, there were 1,394 total traffic accidents in Pompano Beach over this period—with twenty-five of those involving pedestrians. *See* Occurrence Chart at 1. The intersection of Atlantic Boulevard and Powerline Road had eleven pedestrian accidents—the most of all the listed intersections—and half had no pedestrian accidents at all. *Ibid.* Beyond the raw accident totals, the Occurrence Chart doesn't provide any details on the individual accidents (for example, whether the pedestrian was standing on a median at the time of the incident), or on the characteristics

---

[8] At trial, the City introduced this data table, along with the other documents it purportedly relied on, as a composite exhibit titled "Exhibit Backup for Proposed Ordinance 2020-59." Def.'s Ex. 2 [ECF No. 164-2]. For clarity, we'll cite to the Plaintiff's versions of the documents, since each was filed as its own exhibit and docket entry.

of the intersections (for example, whether the intersection had a three-to-five-foot median). *See ibid.*; *see also* Trial Tr. at 16:23–17:1 ("Importantly, that chart tells us nothing as to whether or not any of those accidents at any of those intersections involved a person standing on a median, let alone a three to five-foot median, who was engaged in solicitation and was hurt.").

*Second*, the City relied on findings from the Florida Highway Safety and Motor Vehicles Department's *Traffic Crash Facts Annual Report 2018*, Pl.'s Ex. 12 ("2018 FHSMV Report") [ECF No. 163-8],[9] which provides state- and county-level data on traffic and pedestrian accidents in Florida, *see also* City Commission Meeting at 02:09:38–02:10:11 ("[T]he backup that is attached an incorporated into this ordinance [includes] . . . [data on] statewide accidents involving vehicles for the past several years."). According to that report, there were seven accidents across Florida in 2018 in which the "first harmful event"—defined as "the first action causing injury or damage events in the crash," 2018 FHSMV Rpt. at 5—occurred "cross median," *id.* at 35 (cleaned up). Other first harmful events included "Concrete Traffic Barrier" (6,089 accidents), "Curb" (6,003 accidents), and "Pedestrian" (17,427 accidents). *Id.* at 35–36. As to intersection crashes, the report noted that 873 resulted in fatal injuries, 7,219 in incapacitating injuries, 27,885 in non-incapacitating injuries, 60,002 in possible injuries, and 221,976 in no injuries. *Id.* at 118. And, while the report doesn't provide data on Pompano Beach *specifically*, it does break down pedestrian-traffic data by county, showing that Broward County had 1,086 pedestrian crashes in 2018 (72 of which were fatal), 1,096 in 2017 (63 fatal), and 1,040 in 2016 (64 fatal).[10] *Id.* at 68.

---

[9] Page numbers for this exhibit refer to the page of the docket entry, rather than the page listed in the report itself.

[10] We take judicial notice of the fact that Pompano Beach is in Broward County. *See Weaver v. United States*, 298 F.2d 496, 499 (5th Cir. 1962) ("[C]ourts [may] take judicial notice of the boundaries of the nation, of the location of states and territories, the location of the boundaries of the state in which the court is sitting, of counties, district and townships."); *ibid.* (collecting cases). In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

Armed with this information, *see* Pl.'s Ex. 11 ("City Legistar Report") [ECF No. 163-7] at 1 (noting that the City shared the Backup for Proposed Ordinance 2020-59 [ECF No. 164-3], which included both the Occurrence Chart, *id.* at 1, and the 2018 FHSMV Report, *id.* at 2–119, as an attachment to the proposed ordinance), the City Commission met on May 26, 2020, to discuss the merits of Ordinance 2020-59, which would amend § 100.35 of the City Code to "address street and sidewalk safety, obstructions, and restrictions," City Legistar Rpt. at 1 (cleaned up). At that meeting, City Attorney Mark Berman explained that Ordinance 2020-59 was "all about pedestrian median safety." City Commission Video at 02:09:14–02:09:32. In his view, "there [was] a danger out in the streets, and [through the Ordinance] we are doing what we can to make it safer for pedestrians that use the streets and for motorists as well." *Id.* at 02:10:00–2:10:10. The provisions of the Ordinance (including the Median Provision) sought to accomplish this goal by "limit[ing] some of the interaction between pedestrians . . . and motorists." *Id.* at 02:11:32 –02:11:45.

After introducing Ordinance 2020-59, Berman then walked the City Commission through its prefatory section, *see id.* at 02:10:00–2:11:36, which outlines the underlying premises of the law and reads (in relevant part) as follows:

> **WHEREAS**, the City of Pompano Beach ("City") desires to modify and update regulations for streets and sidewalks to improve safety; and
>
> **WHEREAS**, in order to address changing conditions as the City continues to develop and grow creating increased traffic congestion; and
>
> **WHEREAS**, the City Commission recognizes that as congestion on its streets and sidewalks continues to increase, the need to maintain and improve traffic and pedestrian flow is essential; and . . .
>
> **WHEREAS**, the City Commission intends this Ordinance to improve the pedestrian and vehicular safety on the City's streets, highways and sidewalks; and
>
> **WHEREAS**, Section 316.008, Florida Statutes, provides local municipalities authority to regulate various conduct within the reasonable exercise of police powers with respect to streets and highways under its jurisdiction; and
>
> **WHEREAS**, the opinion of *Evans v. Sandy City*, 944 F.3d 847 (10th Cir. 2019), provided

guidance on the constitutionality of restrictions on the use of medians of a certain size and manner of construction; and

**WHEREAS**, the City Commission recognizes that medians provide a measure of safety to pedestrians in the roadway, but finds that narrow medians and unpaved medians do not offer the same level of safety as larger, paved medians; and

**WHEREAS**, the City Commission finds that medians three feet wide or wider provide sufficient room for the average pedestrian to stand comfortably without intruding into travel lanes; and

**WHEREAS**, the City Commission finds that increasing the number of traffic lanes significantly increases traffic volumes and often, speeds; and

**WHEREAS**, the City Commission finds that pedestrians are at greater risk when the number of traffic lanes increases; and

**WHEREAS**, the City Commission finds that in those areas of greater risk, where there are three or more traffic lanes in any one direction (usually resulting in 5 to 8 total lanes or more), including turn lanes, the increased risk to pedestrians warrants the need to further limit pedestrian occupancy in the medians to reduce the likelihood of interaction with vehicular traffic in the event of a fall; and

**WHEREAS**, the City Commission finds that a median width of five feet would significantly increase the likelihood that should a pedestrian fall on the median, he or she would remain in the median as opposed to in the adjacent roadway itself[.]

Ordinance 2020-59 at 1–2; *see also id.* at 3 ("[T]he preceding 'Whereas' clauses are ratified and incorporated as a record of the legislative intent of this Ordinance.").

Berman then explained that the legislative findings were largely based on the data from the Occurrence Chart and the 2018 FHSMV Report. *See* City Commission Video at 02:12:21–02:12:42 ("We have backup to show the necessity and we are basically trying to make the streets a little bit safer for those who are occupying . . . and utilizing the streets."). After Berman's presentation, Rex Hardin, the Mayor of Pompano Beach, briefly addressed the City Commission to describe his own experience while driving by pedestrians who were standing on (or beside) the roadway, recounting that he "[couldn't] tell you how many times [he's] had to dodge . . . pedestrians out there." City Commission Video at 2:15:44–2:15:54. In his view, Ordinance 2020-59 would "help make [pedestrians] safer and keep our motorists safer as well[.]" *Id.* at 2:15:44–2:15:58.

Based on these findings—especially the City's belief that, in "those areas of greater risk, where there are three or more traffic lanes in any one direction (usually resulting in 5 to 8 total lanes or more), including turn lanes, the increased risk to pedestrians warrants the need to further limit pedestrian occupancy in the medians to reduce the likelihood of interaction with vehicular traffic in the event of a fall," and that "a median width of five feet would significantly increase the likelihood that[,] should a pedestrian fall on the median, he or she would remain in the median as opposed to in the adjacent roadway itself," Ordinance 2020-59 at 2—the City arrived at the Median Provision. That law (as we've said) incorporates both of those findings to make it "unlawful for any person to[,] . . . [f]or any period of time, sit or stand, in or on . . . any median less than 5 feet where the adjacent roadway has three or more vehicular travel lanes in any one direction at the point of intersection (including turning lanes)," except when lawfully crossing the street. *Id.* at 4. The Median Provision, along with the rest of Ordinance 2020-59, was adopted by the City Commission and signed into law by Mayor Hardin on June 23, 2020. *See id.* at 7.

We should note that all this evidence comes from the City's trial exhibits, *see generally* Defendant's Notice of Admitted Exhibits at Trial [ECF No. 164]—and *not* from the testimony of the City's sole trial witness, city engineer John Sfiropolous. In fact, the City didn't consider Sfiropolous's analysis *before* it promulgated the Median Provision, *see, e.g.*, Trial Tr. at 105:10–12 ("Q. . . . Did you present any written analysis or memoranda regarding these issues? A. I did not."), and Sfiropolous played *no* role in formulating that law, *see id.* at 105:13–14 ("Q. Did you testify or appear before the commission? A. I did not."); *see also id.* at 105:23–106:7 ("Q. . . . Prior to the passage of the ordinance [on June 23, 2020], were you consulted in any way regarding the very information you brought us today? . . . A. Not that I recall."). Indeed, while Sfiropolous testified that "roadway projects within the [C]ity are done [in accordance with] those FDOT standards laid out in the Greenbook," *id.* at 89:15–18—which includes the standard that "medians suitable for pedestrian refuge" have a "six-foot

minimum, [ ] eight-foot preferred" width, *id.* at 93:11–12—the legislative record includes no indication that the Commission consulted the Greenbook before adopting the Median Provision, *see generally* Ordinance 2020-59; Backup for Proposed Ordinance 2020-59; *see also* City Commission Video.

CONCLUSIONS OF LAW

## I.   ARTICLE III STANDING

We'll begin, as we must, with McDonald's standing to assert his First Amendment claims. *See Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 974 (11th Cir. 2005) ("Standing is a threshold jurisdictional question which must be addressed prior to and independent of the merits of a party's claims." (cleaned up)). "In the First-Amendment realm, plaintiffs do not have to expose themselves to enforcement in order to challenge a law." *Wilson*, 132 F.3d at 1428 (cleaned up). "Rather, an actual injury can exist when the plaintiff is chilled from exercising her right to free expression or forgoes expression in order to avoid enforcement consequences." *Ibid.* (cleaned up). For "a pre-enforcement constitutional challenge, the injury-in-fact requirement can be satisfied by establishing 'a realistic danger of sustaining direct injury' from 'the statute's operation or enforcement.'" *W. Va. ex rel. Morrisey v. U.S. Dep't of the Treas.*, 59 F.4th 1124, 1137 (11th Cir. 2023) (quoting *Ga. Latino All. for Hum. Rts. v. Governor of Ga.*, 691 F.3d 1250, 1257 (11th Cir. 2012)). To have standing to challenge the Median and Hand-to-Hand Transmission Provisions, therefore, McDonald must prove "(1) that he has an intention to engage in a course of conduct arguably affected with a constitutional interest, (2) that his conduct is arguably proscribed, and (3) that he is subject to a credible threat of enforcement." *Ibid.* (quoting *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1119–20 (11th Cir. 2022)).

"[I]n some cases," though, "the authentic interest of the plaintiff in engaging in the prohibited conduct can establish standing even though the only threat of enforcement comes from the very existence of the statute." *Leverett*, 775 F.2d at 1539; *see also Speech First, Inc.*, 32 F.4th at 1120 ("Accordingly, to determine whether a First Amendment plaintiff has standing, we simply ask whether

the operation or enforcement of the government policy would cause a reasonable would-be speaker to self-censor—even where the policy falls short of a direct prohibition against the exercise of First Amendment rights[.]" (cleaned up)). For this reason, the Eleventh Circuit has described the credible-threat-of-prosecution standard in First Amendment cases as "quite forgiving." *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1305 (11th Cir. 2017). Our Circuit has "stressed that '[w]here the alleged danger of legislation is one of self-censorship, harm can be realized even without an actual prosecution.'" *Speech First, Inc.*, 32 F.4th at 1120 (quoting *Wollschlaeger*, 848 F.3d at 1305); *see also ibid.* ("We have long emphasized that the injury requirement is most loosely applied—particularly in terms of how directly the injury must result from the challenged governmental action—where First Amendment rights are involved, because of the fear that free speech will be chilled even before the law, regulation, or policy is enforced." (cleaned up)).

Under this "forgiving" standard, *Wollschlaeger*, 848 F.3d at 1305, McDonald has standing to challenge both the Hand-to-Hand Transmission Provision and the Median Provision because his testimony establishes that he intends "to engage in a course of conduct arguably affected with a constitutional interest" and that his conduct "is arguably proscribed" by those laws, *Morrisey*, 59 F.4th at 1137.

We'll start with the Hand-to-Hand Transmission Provision. That law makes it "unlawful for any person to . . . hand or seek to transmit by hand or receive by hand anything to any person who operates or occupies a motor vehicle of any kind" at "*any* roadway that has three or more vehicular travel lanes in any one direction[.]" Ordinance 2020-59 at 4 (emphasis added). At trial, McDonald testified that he panhandles at covered locations, *see, e.g.*, Trial Tr. at 47:4–5 ("Q. . . . [H]ow many lanes do those intersections [at which you panhandle] have? A. Four."), and in a manner that's proscribed by the Hand-to-Hand Transmission Provision, *see id.* at 46:16–18 ("[I]f I'm in the median and someone calls me and want to give me something, I have to go get it."); *see also id.* at 47:16–18 ("[P]eople call

me from way over in that lane and whatnot, and by the time I get there to get what they giving me, the light probably [has] change[d.]"). And, while that Provision was in effect—between June 23, 2020, and October 27, 2020, *see* Ordinance 2020-59 at 7 (adopting Hand-to-Hand Transmission Provision); Ordinance 2021-05 at 4 (repealing Hand-to-Hand Transmission Provision)—McDonald decided to *stop* panhandling in Pompano Beach, even though he still wanted to, *id.* at 55:14–15 ("Q. Do you still want to panhandle in Pompano? A. I do."), because he was "[a]fraid of getting arrested," Trial Tr. at 80:8–15 ("Q. Have you been back to panhandle in Pompano at all since September 26, 2020? . . . A. No. Q. And why is that? A. Afraid of getting arrested."). With respect to the Hand-to-Hand Transmission Provision, in short, McDonald has shown that he intends "to engage in a course of conduct arguably affected with a constitutional interest" and that his conduct "is arguably proscribed" by that law. *Morrisey*, 59 F.4th at 1137.

McDonald has also established his standing to challenge the Median Provision, which makes it "unlawful for any person to[,] . . . [f]or any period of time, sit or stand, in or on . . . any median less than 5 feet where the adjacent roadway has three or more vehicular travel lanes in any one direction at the point of intersection (including turning lanes)," except when lawfully crossing the street. Ordinance 2020-59 at 4. McDonald testified that he panhandles at medians that are "three to four feet" wide at "[f]our" lane intersections in Pompano Beach, Trial Tr. at 47:2–5—a practice explicitly prohibited by the Median Provision. And, were it not for this law, he would have panhandled *more* on these medians, *see id.* at 53:12–18 ("Q. . . . Why is it you left panhandling . . . [in] Pompano[?] A. Because it's hard for me to go in Pompano and panhandle, because every time -- the police won't let me. . . . [W]hen the police see me, I leave, I just leave."), since doing so allows him to reach the most people and make the most money, *see id.* at 48:8–13 ("Q. . . . Where do you reach the most people, on the sidewalks or from the medians? A. The medians . . . [b]ecause everybody could see me."); *id.* at 48:20–21 ("Q. Where do you make the most money? A. In the median."); *id.* at 55:19–20 ("Q. Where

do you make the most money? A. In Pompano.").

The City nonetheless contends that McDonald "lacks standing because there is no credible threat of prosecution as a result of the Median Restriction or the Hand-to-Hand Transmission Restriction," since McDonald was never "cited under either ordinance," because the "Hand-to-Hand Transmission Restriction wa[s] quickly repealed and never enforced," and because solicitation is independently "banned at the majority of McDonald's preferred intersections" under CITY OF POMPANO BEACH, FLA., CODE OF ORDINANCES § 100.41(B)(6), which isn't challenged here. Defendant's Proposed Findings of Fact & Conclusions of Law ("Def.'s Br.") [ECF No. 138] at 5. We reject all three arguments.

*First*, it's irrelevant that McDonald hasn't been arrested under either provision. First Amendment plaintiffs "do not have to expose themselves to enforcement in order to challenge a law," *Wilson*, 132 F.3d at 1428 (cleaned up), and a "court can be most certain that a constitutional challenge grows out of a genuine dispute where the allegedly unconstitutional statute interferes with the way the plaintiff would normally conduct his or her affairs," *Leverett*, 775 F.2d at 1536 (citing *Int'l Soc. for Krishna Consciousness v. Eaves*, 601 F.2d 809, 818 (5th Cir. 1979)). As we've said, McDonald panhandled *less* in the City because he feared prosecution under the Ordinance. *See* Trial Tr. at 54:2–4 ("Q. After the lawsuit was filed and after the law changed in Pompano, did you continue to panhandle in Pompano? A. After the law changed? No, I didn't."). And this fear wasn't merely "imaginary" or "speculative," *Steffel v. Thompson*, 415 U.S. 452, 460 (1974), given the extensive harassment McDonald has faced from police officers while panhandling in Pompano Beach, *see* Trial Tr. at 53:2–3 ("I'm a marked man, and every time the police see me in Pompano, they -- they stalk me."); *id.* at 53:15–16 ("[I]t's hard for me to go in Pompano and panhandle, because every time -- the police won't let me."). So, while McDonald has never been *cited* under these laws, he's nonetheless suffered a constitutional injury because he's "been chilled from exercising his right to free expression or for[went] expression in order to avoid

enforcement consequences" under the Median and Hand-to-Hand Transmission Provisions. *Wilson*, 132 F.3d at 1428.

Even if McDonald "received no specific threat of prosecution under the challenged ordinances," he was "arrested and prosecuted not long before the enactment of [Ordinance 2020-59] under [a] similar statute"—*viz.*, the pre-amendment version of § 100.41, *see* 2018 Arrest Rpt. at 1 ("Bernard [McDonald] was not wearing an . . . [approved] safety vest . . . in violation of the City of Pompano Beach's street solicitation ordinance section 100.41.")—and "hence had reason other than the mere existence of the challenged ordinances to fear prosecution," *Leverett*, 775 F.2d at 1539 (cleaned up). Time and again, the City has demonstrated its willingness to enforce its ordinances regulating pedestrians' access to public streets. *See* Pl.'s Ex. 2 ("Pompano Beach Arrest Forms") [ECF No. 163-2] (reporting arrests made under CITY OF POMPANO BEACH, FLA. CODE § 100.41 (2003), *repealed by* City of Pompano Beach, Fla., Ordinance 2020-60 (June 23, 2020)). And, but for these laws, McDonald would be panhandling in Pompano Beach. *See, e.g.*, Trial Tr. at 55:14–15 ("Q. Do you still want to panhandle in Pompano? A. I do."). Accordingly, "[t]hese past arrests, combined with [McDonald's] direct, authentic and continuing interest in engaging in the conduct prohibited by the ordinances, lead us to find that [he has] standing to bring" his constitutional claims. *Leverett*, 775 F.2d at 1539.

*Second*, the City's repeal of the Hand-to-Hand Transmission Provision *doesn't* undermine McDonald's standing to recover damages for injuries he sustained while that law was in effect. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes . . . [an] injury."). As we made clear in our Summary Judgment Order, "a First Amendment plaintiff whose speech was 'chilled' by an unconstitutional law can sue for money damages[,] provided he can show that the law caused his injuries[.]" *McDonald*, 556 F. Supp. 3d at 1363 (cleaned up) (first citing *Finch*, 877 F.2d at 1503; and

then citing *Stachura*, 477 U.S. at 308). Since McDonald would have panhandled in Pompano Beach *more* in the absence of the Hand-to-Hand Transmission Provision, *see* Trial Tr. at 54:2–4 ("Q. [A]fter the law changed in Pompano, did you continue to panhandle in Pompano? A. . . . No, I didn't."), he's established that this law caused his injury.

 *Third*, that the Median Provision didn't affect "the *majority* of McDonald's preferred intersections," Def.'s Br. at 5 (emphasis added), doesn't render his alleged constitutional injury any less actionable, *see, e.g.*, *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 11 F.4th 1266, 1286 (11th Cir. 2021) (*FLFNB II*) ("Every violation of a right imports damage." (quoting *Uzuegbunam v. Preczewski*, 592 U.S. 279, 293 (2021) (cleaned up))). The law obviously applies to *some* medians—else the Median Provision wouldn't have been necessary in the first place. *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 174 (2012) ("[E]very word and every provision is to be given effect . . . . None should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence."). And McDonald plainly wants to panhandle while standing on medians of "three to four feet" at "four" lane intersections in Pompano Beach. Trial Tr. at 46:24–47:5. Since the Median Provision limits the extent to which he can do that, *see id.* at 64:19–20 ("[I]f I couldn't go in the median, I just leave it alone."), the fact that he might *also* want to panhandle at other *unchallenged* medians doesn't somehow mollify his constitutional injury, *see KH Outdoor, L.L.C. v. Fulton County*, 587 F. App'x 608, 616–17 (11th Cir. 2014) (Hinkle, J., concurring in part) ("But if even 1 proposed sign would have survived overlay and state review, . . . the plaintiff has standing."); *see also Leverett*, 775 F.2d at 1539 ("[T]he authentic interest of the plaintiff in engaging in the prohibited conduct can establish standing[.]"). We're thus satisfied that McDonald has also met his burden "of proving standing . . . 'by the evidence adduced at trial'" to challenge the constitutionality of the Median Provision. *Common Cause v. Billups*, 554 F.3d 1340, 1349 (11th Cir. 2009) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

## II.     THE MEDIAN PROVISION

### a.     THE FIRST AMENDMENT'S APPLICATION

Before we can even consider the *extent* to which the Challenged Medians merit First Amendment protections, we must decide whether the Median Provision implicates the First Amendment *at all. See Burns v. Town of Palm Beach*, 999 F.3d 1317, 1336 (11th Cir. 2021) ("In determining whether the government has violated free speech rights, the initial inquiry is whether the speech or conduct affected by the government action comes within the ambit of the First Amendment." (cleaned up)). McDonald's Verified Amended Complaint raised "both facial and as-applied challenges" to the constitutionality of the Median Provision under the First Amendment. *See* Plaintiff's Proposed Findings of Fact & Conclusions of Law ("Pl.'s Br.") [ECF No. 137] at 4 (citing Verified Amnd. Compl. at 20). But McDonald appears to have abandoned his facial challenge. *See id.* at 11 (characterizing the "Plaintiff's challenge to the restrictions on median use in Section 100.35(C)(1)(b) as an *as-applied* challenge to a content-neutral law" (emphasis added)); *see also Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue waives it."); *Sappupo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) ("We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority.").

And for good reason. Facial challenges under the First Amendment arise "only against statutes that, 'by their terms,' [seek] to regulate 'spoken words,' or patently 'expressive or communicative conduct' such as picketing or handbilling." *Roulette v. City of Seattle*, 97 F.3d 300, 303 (9th Cir. 1996) (en banc) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 612–13 (1973)); *see also Sons of Confederate Veterans, Inc. v. Atwater*, 2011 WL 1233091, at *7 n.13 (M.D. Fla. Mar. 30, 2011) (Antoon, J.) ("The Supreme Court has expressed disfavor for facial challenges because they 'often rest on speculation'

and 'raise the risk of premature interpretation of statutes on the basis of factually barebones records.'" (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 451 (2008) (cleaned up))).

The Median Provision, which makes it "unlawful for any person to[,] . . . [f]or any period of time, *sit or stand*, in or on" the Challenged Medians, *see* Ordinance 2020-59 at 4 (emphasis added), makes no mention of verbal speech. And McDonald *isn't* arguing that sitting or standing on the Challenged Medians is *itself* protected expression. *See* Pl.'s Br. at 11 ("Section 100.35(C)(1)(b) impacts Plaintiff's exercise of his First Amendment right, even though on its face it does *not refer to speech or expression*." (emphasis added)); *see also Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1241 (11th Cir. 2018) (*FLFNB I*) ("Context . . . differentiates the act of sitting down—*ordinarily not expressive*—from the sit-in by African Americans at a Louisiana library which was understood as a protest against segregation." (emphasis added) (citing *Brown v. Louisiana*, 383 U.S. 131, 141–42 (1966))). Any "facial freedom of speech attack" on the Median Provision would therefore fail because the Ordinance is not "directed narrowly and specifically at expression or conduct commonly associated with expression." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 760 (1988).

McDonald, therefore, frames his First Amendment claim as an as-applied challenge, arguing that the Median Provision's "*application* will impact the exercise of [his] First Amendment rights," Pl.'s Br. at 10 (emphasis added)—specifically, his ability to solicit donations from the Challenged Medians, *see* Trial Tr. at 172:11–13 ("[T]he very thing that [McDonald] was doing was panhandling on medians from people in cars[.]"). An "as-applied" First Amendment claim "alleges that the restriction on speech is 'unconstitutional as applied to the litigant's particular speech activity, even though the law may be capable of valid application to others.'" *Kuba v. 1-A Agr. Ass'n*, 387 F.3d 850, 856 (9th Cir. 2004) (quoting *Foti v. City of Menlo Park*, 146 F.3d 629, 635 (9th Cir. 1998)).

It is well-settled that the First Amendment protects "the right to engage not only in 'pure speech,' but [in] 'expressive conduct' as well." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1270

(11th Cir. 2004) (citing *O'Brien*, 391 U.S. at 376–77). And courts have consistently recognized that soliciting donations "is a form of speech protected by the First Amendment." *Homeless Helping Homeless, Inc. v. City of Tampa*, 2016 WL 4162882, at *3 (M.D. Fla. Aug. 5, 2016) (Merryday, J.) (citing *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 632 (1980)); *see also Smith*, 177 F.3d at 956 ("Like other charitable solicitation, begging is speech entitled to First Amendment protection." (first citing *Loper v. N.Y. City Police Dept.*, 999 F.2d 699, 704 (2d Cir. 1993); and then citing *Schaumburg*, 444 U.S. at 632)).

Because the Median Provision "prohibits [McDonald] from communicating with the public in a certain manner, and presumably diminishes the total quantity of [his] communication in the City," *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 803 (1984); *cf.* Trial Tr. at 48:8–11 ("Q. . . . Where do you reach the most people, on the sidewalks or from the medians? A. The medians."), "the application of the ordinance to [McDonald's] expressive activities surely raises the question whether the ordinance abridges [his] 'freedom of speech' within the meaning of the First Amendment," *Taxpayers for Vincent*, 466 U.S. at 803. We're therefore satisfied that McDonald has met his burden of establishing that the Median Provision, as applied to him, triggers First Amendment scrutiny. *See Bar-Navon v. Brevard Cnty. Sch. Bd.*, 290 F. App'x 273, 277 (11th Cir. 2008) ("[The] burden [is] borne by [the] 'person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment even applies[.]'" (quoting *Clark*, 468 U.S. at 293 n.5)).

### b.   FORUM ANALYSIS

"But to say the ordinance presents a First Amendment issue is not necessarily to say that it constitutes a First Amendment violation." *Taxpayers for Vincent*, 466 U.S. at 803–04 (quoting *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 561 (1981) (Burger, C.J., dissenting)). Having found that the Median Provision (as applied to McDonald) triggers First Amendment scrutiny, we must now determine "the degree of scrutiny we place" on that law by considering "the kind of forum the

government is attempting to regulate." *Bloedorn*, 631 F.3d at 1230; *see also Cornelius*, 473 U.S. at 800 ("[T]he extent to which the Government can control access [to public property for speech purposes] depends on the nature of the relevant forum." (quoting *Kokinda*, 497 U.S. at 726)).

"The Supreme Court has recognized four categories of government fora: the traditional public forum; the designated public forum; the limited public forum; and the nonpublic forum." *Keister I*, 879 F.3d at 1288.[11] In classifying the forum, "it is perhaps easier to think of a continuum." *Satawa v. Macomb Cnty. Road Comm'n*, 689 F.3d 506, 518 (6th Cir. 2012). "At one end of the spectrum" are "quintessential" traditional public fora—public spaces that "have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Perry*, 460 U.S. at 45 (cleaned up). In these spaces, the government may enforce content-neutral "regulations of the time, place, and manner of expression" *only* if they are "narrowly tailored to serve a significant government interest[ ] and leave open ample alternative channels of communication." *Ibid.* (cleaned up).[12] According to McDonald, the Challenged Medians are traditional public fora. *See* Trial Tr. at 12:25–13:1 ("[T]hose medians . . . are today a tradition public forum."); Pl.'s Br. at 12 ("[M]edians that are greater than three feet but less than five feet along three lane roadways constitute traditional public fora.").

---

[11] Since neither party argues that the Challenged Medians are "designated public fora" or "limited public fora," *see* Pl.'s Br. at 12 (insisting that they "constitute traditional public fora"); Def.'s Br. at 12 (contending that they "are non-public forums"), we won't engage further with the possibility that the Challenged Medians might fit into one of those other classifications, *see Cosgun v. Seabourn Cruise Line Ltd. Inc.*, 2023 WL 2660243, at *2 (S.D. Fla. Mar. 28, 2023) (Altman, J.) ("It's typically not our role to make the parties' arguments for them."); *see also United States v. Campbell*, 26 F.4th 860, 872 (11th Cir. 2022) ("[I]t is inappropriate for a court to raise an issue *sua sponte* in most situations."); *Hamilton*, 680 F.3d at 1319 ("[T]he failure to make arguments and cite authorities in support of an issue [forfeits] it."); *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented . . . are deemed [forfeited].").

[12] Both parties concede that the Median Provision is content neutral. *See* Pl.'s Br. at 11 (asking us to "address Plaintiff's challenge to the restrictions on median use in Section 100.35(C)(1)(b) as an as-applied challenge to a content-neutral law"); Def.'s Br. at 15 ("100.35(C)(1)(b) Is a Content-Neutral . . . Restriction[.]").

At the other end of the spectrum is the nonpublic forum: "[p]ublic property which is not by tradition or designation a forum for public communication[.]" *Perry*, 560 U.S. at 46. There, "the state may reserve the forum for its intended purposes, communicative or otherwise"—and close that forum off to speech—"as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Ibid.*; *see also Cambridge Christian*, 942 F.3d at 1240 ("[T]he government has 'much more flexibility to craft rules limiting speech' in a nonpublic forum than in any other kind of forum." (quoting *Minn. Voting All. v. Mansky*, 585 U.S. 1, 11–12 (2018))). The City asks us to find that the Challenged Medians are nonpublic fora. *See* Trial Tr. at 143:19 ("What we believe is that it's not a public forum[.]"); Def.'s Br. at 12 ("[A]s a matter of law, . . . the 3 to 5-Foot Medians are non-public forums.").

### i. Problems with the Categorical Approach

In characterizing the "nature" of our forum, *Cornelius*, 473 U.S. at 800, we needn't "determine precisely where on the spectrum the [Challenged Medians lie], only which broad category describes [them] best," *Satawa*, 689 F.3d at 518. We won't, in other words, try to determine *categorically* what type of forum best describes a "median" in the abstract. Instead, we can classify the Challenged Medians only after undertaking "a fact-intensive inquiry," *Keister v. Bell*, 240 F. Supp. 3d 1232, 1238 (N.D. Ala. 2017), *aff'd*, 879 F.3d at 1282, that considers several property-specific factors, including "the traditional uses made of the property, the government's intent and policy concerning the usage, and the presence of any special characteristics," *Bloedorn*, 631 F.3d at 1233 (first citing *Greer v. Spock*, 424 U.S. 828, 837–38 (1976); and then citing *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969)). Put another way, just because *some* road medians qualify as a certain forum category doesn't mean that *all* medians (or, as relevant here, the Challenged Medians) fall into that category. *See Keister I*, 879 F.3d at 1291 ("Neither are we persuaded by [the appellant's] argument that because the intersection is open as a public thoroughfare, it is *per se* a traditional public forum."); *Wright*, 665 F.3d at 1136 ("Context

matters in forum analysis."); *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677 (1998) ("[F]ora are defined by the objective characteristics of the property.").

McDonald is therefore wrong to insist that "all medians"—regardless of the specific characteristics of the *particular* median in question—are *necessarily* traditional public fora. *See* Trial. Tr. at 120:9–13. His counsel advanced this argument at trial:

> THE COURT: So your position is that all medians are traditional public fora. The question of whether the City can regulate on a particular kind of median is a narrow tailoring question.

> MR. TASEFF: Absolutely. That's exactly what we're saying. . . . The question of the suitability under certain conditions, under certain instances is a question of narrow tailoring. It's not a question of public fora, whether it's a public forum. That's the whole thing.

*Id.* at 120:9–25. McDonald thus wants us to classify the Challenged Medians based only on "some Platonic ideal" of a median in the abstract. *Johnson v. United States*, 576 U.S. 591, 633 (2015) (Alito, J., dissenting); *cf.* Trial Tr. at 128:18–19 ("I'm saying medians are traditional public forums.").[13] Only *after* "we ask whether a median is a traditional public forum irrespective of its size," Trial Tr. at 129:18–20, McDonald says, should we "parse" a particular median's "circumstances"—though, even then, only in the context of "narrow tailoring," *id.* at 129:13–14; *see also id.* at 120:21–23 ("The question of the suitability under certain conditions, under certain instances, is a question of narrow tailoring[.]"). This framing of the applicable test rests on the flawed premise that we can "merely identify the area of land covered by the regulation as a [median] open to the public and therefore conclude that it was a public forum[.]" *Kokinda*, 497 U.S. at 728. "That, however, is not our settled doctrine." *Ibid.*

To be fair, McDonald isn't alone in making this error. Federal courts have often classified "medians" as traditional public fora "without question and without particularized analysis," *Martin v.*

---

[13] *See also* PLATO, REPUBLIC bk. VI, at 191 (Allan Bloom trans., 2d ed. 1991) (c. 375 B.C.) ("These things themselves that they mold and draw . . . they now use as images, seeking to see those things themselves, that one can see in no other way than with thought.")

*City of Albuquerque*, 396 F. Supp. 3d 1008, 1020 (D.N.M. 2019) (first citing *Cutting v. City of Portland*, 802 F.3d 79, 83 (1st Cir. 2015); then citing *Reynolds v. Middleton*, 779 F.3d 222, 225 (4th Cir. 2015); and then citing *Petrello v. City of Manchester*, 2017 WL 3972477, at *18 (D.N.H. Sept. 7, 2017)). But that doesn't mean we must make the same mistake here.

Where we think those courts (and McDonald) go wrong is in focusing too much on how a particular space is *generally* classified, *see* Pl.'s Br. at 11 ("Medians generally are found to be traditional public fora." (first citing *McCraw v. City of Okla. City*, 973 F.3d 1057, 1063, 1067–69 (10th Cir. 2020); then citing *Reynolds*, 779 F.3d at 225; then citing *Cutting*, 802 F.3d at 82; then citing *Satawa*, 689 F.3d at 520; and then citing *Martin*, 396 F. Supp. 3d at 1016, 1020–21)), and too little on "the objective characteristics of the property" at issue, *Forbes*, 523 U.S. at 677. For instance, McDonald directed us at trial to the Supreme Court's opinion in *Minnesota Voters Alliance v. Mansky*, where the Court identified "parks, streets, sidewalks, and the like" as paradigmatic examples of the "traditional public forum[.]" 585 U.S. at 11; *see also* Trial Tr. at 118:3–6 ("I quoted a case from the Supreme Court called *Mansky*, where the United States Supreme Court says that parks, streets, and sidewalks, and the like are quintessential traditional public forums."). And courts regularly point to those spaces as the "archetypical examples of traditional public fora," *Warren v. Fairfax County*, 196 F.3d 186, 192 (4th Cir. 1999)—an assertion frequently supported by reference to the "familiar" passage from *Hague v. C.I.O.*, in which the Court observed that "'[w]herever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions,'" *Greer*, 424 U.S. at 835–36 (quoting *Hague v. C.I.O.*, 307 U.S. 496, 515–16 (1939) (plurality op.)); *see also, e.g.*, *Warren*, 196 F.3d at 192 (same); *Berger v. City of Seattle*, 569 F.3d 1020, 1036 (9th Cir. 2009) (same); *Satawa*, 689 F.3d at 520 (same). That may be—but it doesn't even purport to require us to apply a categorical approach to *our* Challenged Medians.

For starters, although "[s]ome spaces—such as public streets, sidewalks, and parks—are *presumptively* public fora," *New Eng. Reg'l Council of Carpenters v. Kinton*, 284 F.3d 9, 20 (1st Cir. 2002) (emphasis added) (citing *Frisby v. Schultz*, 487 U.S. 474, 481 (1988)), that classification isn't absolute, *see Verlo v. Martinez*, 820 F.3d 1113, 1138–39 (10th Cir. 2016) ("The Supreme Court has also cautioned, however, that not all streets and sidewalks are traditional public fora." (first citing *Kokinda*, 497 U.S. at 727; and then citing *Greer*, 424 U.S. at 835–37)); *see also Lee*, 505 U.S. at 710 (O'Connor, J., concurring) ("We need not say that all 'transportation nodes' or all airports are public forums in order to find that certain metropolitan airports are. Thus, the enquiry may and must relate to the particular property at issue[.]" (cleaned up)). Refusing to take a categorical approach to forum analysis, the Supreme Court in *Kokinda* held that a sidewalk "leading to the entry of [a publicly owned] post office"—and "constructed solely to provide for the passage of individuals engaged in postal business"—was *not* a traditional public forum. 497 U.S. at 727. The Court reached that conclusion only *after* considering the extent to which that *particular* sidewalk had been "traditionally open to expressive activity"—as well as "its location and purpose[.]" *Id.* at 727–28 (citing *United States v. Grace*, 461 U.S. 171, 179–80 (1983)); *see also Lee*, 505 U.S. at 710 (O'Connor, J., concurring) (noting that *Kokinda* "implicitly reject[ed] the categorical approach by examining whether '[t]he postal sidewalk at issue . . . [has] the characteristics of public sidewalks traditionally open to expressive activity'" (quoting *Kokinda*, 497 U.S. at 727)).

Similarly, in *Greer*, the Court found that "state and county roads" open for "[c]ivilian vehicular traffic" at the Fort Dix Military Reservation *weren't* public fora. *See* 424 U.S. at 830, 840. While those spaces may have been publicly accessible, the Court reasoned, it did not *necessarily* follow that "whenever members of the public are permitted freely to visit a place owned or operated by the Government, then that place becomes a 'public forum' for purposes of the First Amendment." *Id.* at 836; *see also id.* at 842 (Powell, J., concurring) (considering "the unique character of the Government property upon which the expression is to take place"). In the wake of those rulings, many lower courts

have concluded, after undertaking a "particularized analysis" of a specific property's characteristics, *Martin*, 396 F. Supp. 3d at 1021–22, that *certain* streets (or aspects of streets)[14] and sidewalks[15] are best characterized as nonpublic fora.

At times, McDonald's counsel appeared to acknowledge that his absolute rule *wasn't* actually absolute. Take this exchange from trial:

> THE COURT: . . . I don't know if they're one inch or six inches, whatever they are, these nubs on the corner, are they traditional public fora?
>
> MR. TASEFF: Well, let's put it this way. Here's how I would answer this. Okay? Judge, streets -- all streets are public fora. Okay? That's the starting point. Okay? All streets are and all sidewalks are. Does that mean every street or roadway is? No.

---

[14] *See, e.g.*, *Martin*, 396 F. Supp. 3d at 1021–22 ("'[T]ravel lanes' contained within streets . . . are not traditional public fora."); *Brown v. Cal. Dep't of Transp.*, 321 F.3d 1217, 1222 (9th Cir. 2003) ("The highway overpasses are thus nonpublic fora."); *Preminger v. Sec'y of Veterans Affs.*, 517 F.3d 1299, 1312–13 (Fed. Cir. 2008) ("The government . . . argue[s] that VA campus streets and sidewalks are nonpublic fora because of their location in conjunction with other nonpublic fora and their purpose. . . . We agree[.]"); *Women for Am. First v. de Blasio*, 520 F. Supp. 3d 535, 547 (S.D.N.Y. 2021) ("The surfaces of New York City's streets are nonpublic fora."); *Hale v. Dep't of Energy*, 806 F.3d 910, 915–16 (9th Cir. 1986) ("[T]he three-mile stretch of Mercury Road between the cattle guard and the main guard gate . . . is neither by tradition nor by designation a public forum."); *cf. Acorn v. City of Phoenix*, 798 F.2d 1260, 1266 (9th Cir. 1986) ("To conclude that streets may *generally* be categorized as traditional public fora may not require us to also conclude that the streets at all times and under all circumstances are susceptible to characterization as a perpetual public forum uniquely available for free expression." (emphasis added)).

[15] *See, e.g.*, *Kokinda*, 497 U.S. at 728 ("*Grace* instructs that the dissent is simply incorrect in asserting that every public sidewalk is a public forum." (cleaned up)). *ISKCON Miami, Inc. v. Metro. Dade County*, 147 F.3d 1282, 1289 (11th Cir. 1998) ("[T]he sidewalks and parking lots adjacent to the Miami airport terminals are nonpublic fora; the sidewalks and parking lots are intended by the County to be used for air travel-related purposes, 'not to facilitate the daily commerce and life of the neighborhood or city.'" (quoting *Kokinda*, 497 U.S. at 728)); *United States v. Belsky*, 799 F.2d 1485, 1489 (11th Cir. 1986) ("We conclude that, under applicable Supreme Court precedent, the ingress and egress walkways to the post office buildings are a nonpublic forum." (cleaned up)); *Del Gallo v. Parent*, 557 F.3d 58, 70 (1st Cir. 2009) ("The Postal Service sidewalk here 'does not have the characteristics of public sidewalks traditionally open to expressive activity.'" (quoting *Kokinda*, 497 U.S. at 727)); *McTernan v. City of York*, 577 F.3d 521, 527–28 (3d Cir. 2009) ("The Planned Parenthood ramp bears a striking resemblance to the sidewalk in *Kokinda*. . . . We conclude, as did the District Court, that the ramp is a nonpublic forum." (cleaned up)); *San Antonio Firefighters' Ass'n v. City of San Antonio*, 404 F. Supp. 3d 1045, 1058 (W.D. Tex. 2019) ("With the exterior grounds of the library as the relevant forum, the undisputed facts lead to the conclusion that such grounds are nonpublic forums.").

Trial Tr. at 129:7–13.

In McDonald's view, then, *all* streets are necessarily public fora—though not *every* street is a public forum. That obviously makes no sense. *See Every*, MERRIAM-WEBSTER THESAURUS (listing "all" as a synonym), https://www.merriam-webster.com/thesaurus/every; *see also* ARISTOTLE, METAPHYSICS, at 1005b19–23 (Christopher Kirwan trans., 1971) ("For the same thing to hold good and not to hold good simultaneously of the same thing and in the same respect is impossible."). Either "all" streets and sidewalks are public fora or they're not. The Supreme Court has told us that they're not. *See Greer*, 424 U.S. at 838; *Kokinda*, 497 U.S. at 728; *see also Verlo*, 820 F.3d at 1138–39 ("The Supreme Court has also cautioned, however, that not all streets and sidewalks are traditional public fora. Instead, the particular characteristics of a [forum] are highly relevant to the inquiry." (cleaned up) (first citing *Kokinda*, 497 U.S. at 727, then citing *Greer*, 424 U.S. at 835–37; and then citing *Grace*, 461 U.S. at 179–80)); *Kinton*, 284 F.3d at 20 ("We say 'most' [public streets, sidewalks, and parks can be deemed public fora without particularized inquiry] rather than 'all' because this presumption can be rebutted in specific instances." (citing *Kokinda*, 497 U.S. at 728–29)). And that's the law we're oath-bound to follow.

### ii.  Medians Are Not Streets

In any event, McDonald isn't seeking access to the City's streets *as such*—but to specific medians situated near *certain* roadways. *See Cornelius*, 473 U.S. at 801 ("[I]n defining the forum we have focused on the access sought by the speaker.").[16] So, it's hardly dispositive here that *streets*, "time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions," *Hague*, 307 U.S. at 515, because "medians" generally—to say nothing of

---

[16] Notably, pedestrian access to the street itself is governed by a different subsection of Ordinance 2019-59, which isn't being challenged here. *See* CITY OF POMPANO BEACH, FLA. CODE § 100.35(C)(3) (making it unlawful for any person to "[o]ccupy a paved travel lane or other portion of a roadway while the traffic is flowing").

the Challenged Medians specifically—simply aren't "prototypical" public fora, *Satawa*, 689 F.3d at 522. And "[t]he [Supreme] Court has rejected the view that traditional public forum status extends beyond its historic confines[.]" *Forbes*, 523 U.S. at 678 (citing *Lee*, 505 U.S. at 680–81).

Unlike many public streets, after all, medians lack homogeneity in function and form. *Cf. Brindley v. City of Memphis*, 934 F.3d 461, 467 (6th Cir. 2019) ("If the street looks and functions like a public street, then it is a traditional public forum[.]" (cleaned up)). We learned at trial that, depending on their design and location, medians can "serve various purposes." Trial Tr. at 92:5. Some medians are meant to "separate opposing lanes of traffic," while others "are designed specifically for drainage, to accommodate storm water runoff," to host "traffic control devices and signage," or "even for pedestrian refuge[.]" *Id.* at 92:17–24. The fact is that courts have slapped the general "median" label onto a broad bundle of physically and purposively dissimilar public spaces. *See, e.g.*, *McCraw*, 973 F.3d at 1062 ("As in many other cities, the medians in Oklahoma City are varied and diverse. They range in length and width: some span an entire city block, others stretch down several car lengths at intersections. Many contain trails, sidewalks, benches, art, large signs, landscaping, or wide-open spaces. One even contains an operating fire station."); *Cutting*, 802 F.2d at 82 ("The ordinance does not specify any other features of a median strip—such as its size or its location[.]"); *Satawa*, 689 F.3d at 511 ("The median . . . is sixty feet wide, and landscaped with grass, trees, and flowers. . . . Behind the pine trees are two park benches, and at least one commemorative plaque, discernable only from the median. Also on the same section of median . . . are several pieces of old farm equipment and wagons[,] . . . a gazebo and small courtyard[.]"). Sometimes, in fact, courts can't even agree on whether a particular space qualifies as a "median." *Compare Warren*, 196 F.3d at 194 ("The Center Island mall is not merely a landscaped median strip. . . . [A]erial photos indicate that it is at least 30 yards wide and approximately two hundred yards long (i.e., it has more square footage than a football field), divided into three sections of roughly equal size by street intersections. Sidewalks circumnavigate the

mall and traverse a center landscaped area, inviting pedestrians to stroll along the mall and explore the landscaping further."), *with id.* at 200 (Niemeyer, J., dissenting) ("The question presented by this appeal is whether Fairfax County can limit to county residents and employees the use, for the purpose of placing displays, of a grassy median within the horseshoe-shaped driveway in front of its Government Center Building.").[17]

Given this diverse understanding of what "medians" are, we can't simply conclude that the Challenged Medians are public fora just because (1) the parties call them "medians" and (2) some courts have classified *other* "medians" as public fora. *See Boardley*, 615 F.3d at 514–15 ("Mount Rushmore does not become a public forum merely by being called a 'national park' any more than it would be transformed into a nonpublic forum if it were labeled a 'museum.' The dispositive question

---

[17] The Supreme Court (it's true) has said that, "*ordinarily*, a determination of the nature of the forum would follow automatically f[or public streets]"—principally because the Court has "repeatedly referred to public streets as the archetype of a traditional public forum." *Frisby*, 487 U.S. at 480 (cleaned up); *see also ibid.* ("[T]ime out of mind public streets and sidewalks have been used for public assembly and debate, the hallmarks of a traditional public forum." (cleaned up)). As we've explained, however, in opinions issued both before and after *Frisby*, the Court has made clear that this general rule isn't absolute. *See Greer*, 424 U.S. at 830 ("[S]tate and county roads" running through Fort Dix, on which "[c]ivilian vehicular traffic" and "civilian pedestrian traffic is permitted," are not public fora); *Kokinda*, 497 U.S. at 727–28 ("Nor is the right of access under consideration in this case the quintessential public sidewalk which we addressed in *Frisby* . . . . The postal sidewalk was constructed solely to assist postal patrons to negotiate the space between the parking lot and the front door of the post office, not to facilitate the daily commerce and life of the neighborhood or city." (citing *Frisby*, 487 U.S. at 474)). The First Circuit has cogently summarized these cases as creating a "presumpti[on]" that "public streets, sidewalks, and parks . . . [are] public fora," *Kinton*, 284 F.3d at 20 (citing *Frisby*, 487 U.S. at 481), which "can be rebutted in specific instances," *ibid.* (citing *Kokinda*, 497 U.S. at 728–29), given "the nature of the locus, as well as its history," *id.* at 20–21 (citing *Lee*, 505 U.S. at 681–82). In any event, that presumption simply doesn't apply here because everyone agrees that the Challenged Medians— and not "streets" generally—are the relevant fora in our case. *See* Pl.'s Br. at 12 ("[M]edians that are greater than three feet but less than five feet along three lane roadways [ ] constitute traditional public fora."); Def.'s Br. at 12 ("3 to 5-Foot Medians . . . are non-public forums[.]"); *see also Satawa*, 689 F.3d at 518 n.12 ("Nor can we dispose of the forum-analysis issue with Satawa's suggestion that, because Michigan law defines the median as part of 'the street,' the Mound Road median is automatically a public forum. Our task is to examine the characteristics of the median, not blindly to follow Michigan's description of a given piece of property." (cleaned up)). And, because "no binding[ ] authority guides our analysis" of *that* forum, a more particularized inquiry into the special characteristics of those medians is required. *Satawa*, 689 F.3d at 518.

is not what the forum is called, but what purpose it serves, either by tradition or specific designation.");

see also *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 650–51 (1981) ("[C]onsideration of a forum's special attributes is relevant to the constitutionality of a regulation since the significance of the governmental interest must be assessed in light of the characteristic nature and function of the particular forum involved."). To see the absurdity of doing otherwise, recall the following colloquy from trial:

> THE COURT: . . . I mean how thinly are we going to slice it? Is the area in question medians writ large of any size for purposes of traditional public forum or the medians you have challenged, three to five feet?
>
> MR. TASEFF: In large part, I would agree with that, Judge, but we're not taking a position that a one inch or a one foot -- we're not saying that.
>
> THE COURT: But you are saying that that's a traditional public forum.
>
> MR. TASEFF: I'm saying medians are traditional public forums.
>
> THE COURT: Of one inch.
>
> MR. TASEFF: That's the starting point.
>
> THE COURT: Wait a second. Of one inch wide would be a traditional public forum.
>
> MR. TASEFF: Well, I don't even know what that means, honestly, Judge.
>
> THE COURT: I don't either.

Trial Tr. at 128:9–129:1.

Although the Plaintiff is "not [expressly] taking [the] position that a one inch or a one foot [median]" is a traditional public forum, that conclusion necessarily follows from his unqualified assertion that "medians are traditional public forums." *Id.* at 128:14–19; *see also id.* at 120:9–14 ("THE COURT: So your position is that all medians are traditional public fora. The question of whether the City can regulate on a particular kind of median is a narrow tailoring question. MR. TASEFF: Absolutely. That's exactly what we're saying."). But, as our shared confusion over what a "one inch wide" median would even look like demonstrates, *see id.* at 128:22–129:1, simply calling something a

"median" doesn't tell us anything about "the traditional uses made of the property, the government intent and policy concerning the usage, and the presence of any special characteristics," *Bloedorn*, 631 F.3d at 1233—and, therefore, isn't sufficient to classify any specific median as one type of forum or another, *see Boardley*, 615 F.3d at 514 ("The protections of the First Amendment do not rise or fall depending on the characterization ascribed to a forum by the government."). So, the fact that a "median" boasting "more square footage than a football field" is "suitable . . . for expressive activity," *Warren*, 196 F.3d at 196, provides little insight into whether Pompano Beach's three-to-five-foot medians are similarly suitable.

Nor can we say (as McDonald does) that a median *must* be a public forum simply because it's "inextricably intertwined with both sidewalks and streets[,] . . . [which] are without question . . . traditional public for[a]." Trial Tr. at 118:8–11. Putting aside the fact that streets and sidewalks are not *always* public fora, *see, e.g., Women for Am. First*, 520 F. Supp. 3d at 547 ("The surfaces of New York City's streets are nonpublic fora."); *ISKCON Miami*, 147 F.3d at 1289 ("[T]he sidewalks . . . adjacent to the Miami airport terminals are nonpublic fora[.]"), we decline to find that the Challenged Medians' proximity to public roads and sidewalks—which may, in some circumstances, qualify as public fora[18]—*necessarily* bestows public-forum status on them as well.

Instructive here is the Supreme Court's ruling in *Taxpayers for Vincent*, which rejected the argument that the "constitutional right to distribute brochures and leaflets on the public streets of Los Angeles [ ] provides equal support for the[ ] asserted right to post temporary signs on [utility poles]

---

[18] *See, e.g., One World One Family Now v. City of Miami Beach*, 990 F. Supp. 1437, 1441 (S.D. Fla. 1997) (Moreno, J.) ("The Supreme Court has repeatedly held that public streets and sidewalks are traditional public fora." (first citing *Boos v. Barry*, 485 U.S. 312, 318 (1988); then citing *Grace*, 461 U.S. at 177; and then citing *Perry*, 460 U.S. at 44)); *but see Martin*, 396 F. Supp. 3d at 1021–22 ("[T]he Court shares the Tenth Circuit's 'serious reservations' when it comes to extending traditional public forum status to travel lanes—a component of modern roadways that similarly 'have hardly been by long tradition . . . devoted to assembly and debate.'" (cleaned up) (quoting *Evans v. Sandy City*, 928 F.3d 1171, 1177 n.2 (10th Cir. 2019), *amended by* 944 F.3d 847 (10th Cir. 2019) (en banc))).

*adjacent to* the streets and sidewalks." 466 U.S. at 809 (emphasis added). Although the Court recognized that "[l]ampposts can of course be used as signposts," it refused to find that the specific lampposts at issue there were traditional public fora, since the petitioners "fail[ed] to demonstrate the existence of a traditional right of access respecting such items as utility poles for purposes of their communication comparable to that recognized for public streets and parks[.]" *Id.* at 814; *see also ibid.* ("[T]he mere fact that government property can be used as a vehicle for communication does not mean that the Constitution requires such uses to be permitted." (citing *U.S. Postal Serv. v. Greenburgh Civic Ass'n*, 453 U.S. 114, 131 (1981))). That these lampposts may have abutted traditional public fora wasn't dispositive to the Court's analysis, which was explicitly limited to "the character of the property at issue." *Ibid.* (citing *Perry*, 460 U.S. at 44).

Also persuasive is now-Chief Judge Altonaga's opinion in *Snowden v. Town of Bay Harbor Islands*, 358 F. Supp. 2d 1178, 1193 (S.D. Fla. 2004) (Altonaga, J.). The forum at issue there was "a rather small green space abutting two roadways," on which the plaintiffs wanted to place a Christmas Nativity scene. *Ibid.* The court concluded that the green space was "not a public forum," since it was "not a traditional park or area where people congregate, gather, and traditionally have a free exchange of ideas and speakers, with appropriate accommodations facilitating such use[,] . . . [had] no buffers such as sidewalks for protection or apparent invitation to the public[,] . . . [and did not] present the physical characteristics of a park beyond the presence of grass[.]" *Ibid.* (cleaned up). Again, the median's proximity to public roads wasn't enough to persuade Chief Judge Altonaga that it was a public forum.[19]

McDonald's argument to the contrary appears to rest on the Tenth Circuit's (non-binding) view that, if "the road that abuts the median on both sides is a public forum, the median itself also

---

[19] *Snowden* also held that lampposts along state roads were not public fora. *See Snowden*, 358 F. Supp. 2d at 1193 ("Plaintiff here has not shown that anyone other than the Town or the State, which control the light poles, ever erected any banners or holiday displays on the lampposts . . . . Thus the light poles and accompanying banners are properly considered a non-public forum.").

qualifies." *McCraw*, 973 F.3d at 1068; *see also* Trial Tr. at 118:7–9 ("As the Tenth Circuit case in *McCraw* explains in great detail, medians are inextricably intertwined with both sidewalks and streets."). The *McCraw* Court derived that rule from the Supreme Court's suggestion in *Grace* that the sidewalks surrounding One First Street were a public forum—which the Supreme Court came to, in part, because there was "no separation, no fence, and no indication whatever to persons stepping from the street to the curb and sidewalks that serve as the perimeter of the Court grounds that they have entered some special type of enclave." *McCraw*, 973 F.3d at 1068 (quoting *Grace*, 461 U.S. at 179–80). Similarly, *McCraw* "decline[d] to carve out a distinction between public streets . . . and the medians that lie in the middle of and are surrounded by those streets." *Ibid.*

But, to the extent the Tenth Circuit arrived at that decision because there was a "lack of a demarcation" between the roads and the medians at issue there, *ibid.*, we don't see how that rule can reasonably apply to our Challenged Medians and the adjacent three-plus-lane roads. Recall that the "sidewalks comprising the outer boundaries of the [Supreme] Court grounds" at issue in *Grace* were "indistinguishable from any other sidewalks in Washington, D.C."—thus preventing the Court from "discern[ing] [a] reason why they should be treated any differently" than D.C.'s public sidewalks. *Grace*, 461 U.S. at 179. That's just not our case.

As McDonald told us at trial, one of the main reasons he stands on the median in the first place is *because* it is set apart from the street and sidewalk. *See* Trial Tr. at 47:6–8 ("Q. Now, why is it you stand on the medians? A. Because I could -- I could be seen -- I could be seen better[.]"); *see also id.* at 21:1–7 ("And he goes to the medians because that's where he can be seen. He is a slight man. He is a small man . . . . Because of the lanes in the major intersections in Pompano Beach, being off to the side -- near bus stops, near people off on the sidewalk -- the point of vision is not the same."). Apparently neither McDonald nor the motorists of Pompano Beach have any problem distinguishing between the road and the median. *See id.* at 21:9–10 ("[H]e panhandles by standing on the median,

because that's where he can be seen, that's where he can reach access."). On the contrary, the main purpose of the Challenged Medians is to serve as a barrier that's distinct from the road and which physically "separate[s] opposing lanes of traffic" on either side. *Id.* at 92:17–19.

Where, as here, the "speaker seeks access only to a limited area of government property," *Bloedorn*, 631 F.3d at 1232—which is clearly "separated from the streets and sidewalks of the city itself," *Grace*, 461 U.S. at 179—the Eleventh Circuit has stressed that "we must tailor our approach to 'the perimeters of a forum within the confines of the government property'" to which the speaker seeks access, *Bloedorn*, 631 F.3d at 1232 (quoting *Cornelius*, 473 U.S. at 801); *see also Cornelius*, 473 U.S. at 801 ("[I]n defining the forum we have focused on the access sought by the speaker."). We'll therefore follow the binding authority of our Circuit—as we must, *see, e.g.*, *Hernandez v. Mayorkas*, 2022 WL 4117073, at *7 (S.D. Fla. Mar. 15, 2022) (Lenard, J.) ("Published opinions of the Eleventh Circuit Court of Appeals are binding upon the district courts within the Eleventh Circuit." (first citing 11TH CIR. R. 36, I.O.P. (2); and then citing *Martin v. Singletary*, 965 F.2d 944, 945 n.1 (11th Cir. 1992)))—over the (un)persuasive precedent from the Tenth.

But there's more than just circuit precedent to recommend our approach. The *McCraw* rule, after all, would only further exacerbate the problems that arise when courts view the forum analysis categorically. As one Court of Appeals has observed, mere "visibility from a quintessential public forum, like a park or street, [cannot] render[ ] a non-public forum public or alter[ ] its status for the purposes of First Amendment analysis; were that the law, then the mere visibility of the Supreme Court plaza from the sidewalk, or of a military installation to passersby, might convey a constitutional obligation to host expression." *Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 323 (D.C. Cir. 2018). Adopting *McCraw*'s broad-sweeping rule that any median "abut[ted]" by a public forum "on both sides" is categorically a public forum, *McCraw*, 973 F.3d at 1068, would illogically require us to ignore "the particular characteristics" of the forum we actually care most about, *Verlo*,

820 F.3d at 1139 (citing *Grace*, 461 U.S. at 179–80), based on considerations beyond "the perimeters of [the] forum," *Cornelius*, 473 U.S. at 801. We won't be doing that. *See United States v. 12 200-ft. Reels of Film*, 413 U.S. 123, 127 (1973) ("The seductive plausibility of single steps in a chain of evolutionary development of a legal rule is often not perceived until a third, fourth, or fifth 'logical' extension occurs. Each step, when taken, appeared a reasonable step in relation to that which preceded it, although the aggregate or end result is one that would never have been seriously considered in the first instance.").[20]

### iii.  The Particular Characteristics of the Forum

Just because a government-owned space is called a "median," in sum, doesn't mean that we should treat it like all other similarly described structures—irrespective of its particularized characteristics. "Instead, the particular characteristics of a [forum] are highly relevant to the inquiry." *Verlo*, 820 F.3d at 1139 (citing *Grace*, 461 U.S. at 179–80). As the Supreme Court noted in *Kokinda*, those characteristics come into play not only in considering the government's reasons for the law, but also in classifying the subject forum. *See* 497 U.S. at 728–29 ("[T]he location and purpose of a publicly owned sidewalk is critical to determining whether such a sidewalk constitutes a public forum." (citing *Grace*, 461 U.S. at 179–80)). Because the Challenged Medians do not fall neatly into an "'archetype' of a traditional public forum," *Frisby*, 487 U.S. 474, 480 (1988); *see also ibid.* ("The relevant forum here may be easily identified: . . . the public streets of Brookfield. Ordinarily, a determination of the nature of the forum would follow automatically from this identification; we have repeatedly referred to public streets as the archetype of a traditional public forum."); *Verlo*, 262 F. Supp. 3d at 1113 ("The vast weight of Supreme Court . . . authority approaches the traditional public forum question simply by

---

[20] We agree that a median's proximity to, for instance, a government building is one of several factors courts should consider in assessing the "particular characteristics" of the forum. But we find nothing to commend *McCraw*'s view that these extra-forum considerations should be *dispositive* of the forum analysis—that is, without regard to any *other* factors.

asking whether the public space in question fits within a pre-existing category declared by the Supreme Court itself: public streets, public sidewalks, and public parks[.]")—or a homogenous typology of public spaces, *cf. Grace*, 461 U.S. at 179 ("The sidewalks comprising the outer boundaries of the Court grounds are indistinguishable from any other sidewalks in Washington, D.C., and we can discern no reason why they should be treated any differently.")—we'll apply a more "particularized analysis" to the Challenged Medians. Specifically, as we've said, to determine where on the continuum of forum types the Challenged Medians fall, we must assess "the traditional uses made of the property, the government's intent and policy concerning the usage, and the presence of any special characteristics." *Bloedorn*, 631 F.3d at 1218 (first citing *Greer*, 424 U.S. at 837–38; and then citing *Tinker*, 393 U.S. at 506).

### 1.     The Traditional Uses of the Property

Unfortunately, even after trial, we still know very little about how the community in Pompano Beach has used three-to-five-foot medians in roads with three or more travel lanes on either side. McDonald certainly uses the Challenged Medians. *See, e.g.*, Trial Tr. at 46:24–47:5 ("Q. . . . [H]ow wide are the medians . . . that you were panhandling [on] in Pompano Beach? . . . A. . . . They're three to four feet . . . . Q. Okay. And how many lanes do those intersections have? A. Four."). That alone isn't dispositive, though, since "[i]rregular and infrequent use does not transform a common facility into a public forum[.]" *Crowder v. Housing Auth.*, 990 F.2d 586, 591 (11th Cir. 1993); *see also Grace*, 461 U.S. at 177 ("Publicly owned or operated property does not become a 'public forum' simply because members of the public are permitted to come and go at will.");[21] *Cornelius*, 473 U.S. at 805 ("That [expressive] activity occurs in the context of the forum created does not imply that the forum thereby becomes a

---

[21] Here, of course, members of the public *aren't* permitted "to come and go at will" to the Challenged Medians. *Grace*, 461 U.S. at 177; *see also* Ordinance 2020-59 at 4 (making it unlawful to "sit or stand" on the Challenged Medians "[f]or any period of time").

public forum for First Amendment purposes.").

In his attempt to show that the Challenged Medians have long been "used for the purposes of expressive activity," *Lee*, 505 U.S. at 672–73 (cleaned up), McDonald offers two pieces of evidence—both unconvincing.

*First*, McDonald testified that he's seen people soliciting at intersections in Pompano Beach "[f]orever." Trial Tr. at 44:11. According to McDonald, when he was a teenager "in the late 1970s and '80s in Pompano Beach," he'd see people "selling stuff, like newspaper, water, and soda," *id.* at 43:10–17—and panhandling, *see id.* at 43:18–19 ("Q. Did you see people panhandling? A. Yeah, I did. Definitely I see people fly the sign too.")—on the "medians at the major intersections" in the City, *id.* at 43:14–15. And, "when [he] got out of prison in [his] 20s, and . . . came back to Pompano," he also would "see people standing on the medians of the major intersections in Pompano . . . asking for donations." *Id.* at 44:22–45:2. The same was true when McDonald returned to Pompano in his thirties and forties. *Id.* at 45:7–12 ("Q. And when you got out of prison, and when you were in your 30s and 40s and came back to Pompano, did you see the people standing on the medians at the major intersections? A. I did.").

But McDonald *doesn't* tell us whether these medians were between three and five feet wide or whether they were situated between "three or more vehicular travel lanes in any one direction at the point of intersection," Ordinance 2020-59 at 4, when he saw people panhandling on them. And we have little idea what those medians looked like when McDonald was a teenager (about forty years ago), when he was in his twenties (about thirty years ago), or when he was in his thirties and forties (about ten to twenty years ago). *See id.* at 41:13–14 ("Q. Tell us how old you are. A. I'm 58."); *cf. Sentinel Comm'ns Co. v. Watts*, 936 F.2d 1189, 1203 (11th Cir. 1991) (holding that public rest areas off the highway weren't traditional public fora, in part, because they were "modern phenomena [that] have never existed independently of the Interstate System[.]"); *Chad v. City of Fort Lauderdale*, 861 F. Supp.

1057, 1061–62 (S.D. Fla. 1994) (Roettger, J.) ("The sidewalk is new and small . . . . It was created to accommodate traffic to and from the beach and, only having been built two years ago, has not been a traditional site for expressive conduct."). Nor did he testify that he's seen *other* people soliciting from the Challenged Medians since he last returned to Pompano Beach in 2017—only that he's seen people "panhandling in Pompano[.]" *Id.* at 45:13–16 ("Q. Now, when did you get out of prison the last time? A. May 2017. Q. And did you see people panhandling in Pompano then? A. Yeah, I did.").

Moreover, Copans Road and Federal Highway—the *only* major intersection with a median that (according to the trial evidence) is between three and five feet wide, *id.* at 74:15–16 ("I be at the median on Copans and Federal. That median is at least three to four feet."), *and* on which McDonald said he had long seen people soliciting, *id.* at 44:6–8 ("Q. At what intersections? A. . . . Copans Road and Federal Highway[.]")—is "one of the eight intersections which are not being challenged" here, *id.* at 151:7–9, since soliciting is independently proscribed at that intersection by another Ordinance, *see* Ordinance 2020-60 at 5 ("No pedestrian solicitor shall solicit at or within 400 feet of the . . . intersection[ ] of . . . Copans Road and Federal Highway[.]"). So, while we can infer that people are currently "panhandling in Pompano," Trial Tr. at 45:15–16—and that they have historically panhandled "on the medians at the major intersections" there, *see id.* at 45:8–10—McDonald's testimony leaves us guessing about the extent to which that conduct occurred on the specific medians at issue here.

*Second*, McDonald directs us to the preamble of Ordinance 2003-71—*i.e.*, the since-amended 2003 Ordinance that *used* to regulate the practice of street solicitation in Pompano Beach. *See generally* Ordinance 2003-71. McDonald reads that ordinance as having "recognized the long-standing reality that people stood on medians at major intersections in Pompano Beach and panhandled and solicited for donations and sold items . . . for a long, long time." Trial Tr. at 11:2–7. The preamble, however, makes *no* mention of medians at all. *See* Ordinance 2003-71 at 1–5. Instead, it merely points out that

"right-of-way vendors and solicitors currently operate or may seek to operate within the City of Pompano Beach, often with multiple groups soliciting within one intersection at the same time, collecting donations for various causes, including vendors who sell flowers, newspapers and other products, along with people seeking to distribute information and/or obtain donations[.]" *Id.* at 1–2. But it never tells us *where* that solicitation occurred, and it certainly never says that the solicitation took place at the Challenged Medians.

Nor can we draw that inference from Ordinance 2003-71's operative provisions. Although that Ordinance's restrictions on street solicitation applied to "paved or unpaved medians," *id.* at 5, it did not distinguish between medians of different widths—nor did it (expressly or otherwise) reference narrow medians that separate busy roads of three (or more) lanes on either side. And, even if "the fact that such areas have been frequently utilized by pedestrians is presumably what drove the City to adopt the Ordinance in the first place," *Martin*, 396 F. Supp. 3d at 1021, we *cannot* presume from Ordinance 2003-71's general language (or from anything else in the record) that solicitation was traditionally taking place on the Challenged Medians.[22]

## 2. The Government's Intent and Policy Concerning the Usage

Next, the City's "intent and policy concerning the usage" of the Challenged Medians suggests that they're non-public fora. *Bloedorn*, 631 F.3d at 1233 (cleaned up). The "purpose of th[e] three- to five-foot medians" at issue here is "to separate traffic and also to accommodate left-hand turn lanes." Trial Tr. at 94:5–8. In specifically designing the Challenged Medians to serve that purpose, the City

---

[22] And, as we explained at summary judgment, even "if the City had 'opened up' the Challenged Medians to solicitors" through Ordinance 2003-71, "then it was free to close them at will—which it effectively did by repealing § 100.41 and enacting § 100.35." *McDonald*, 556 F. Supp. 3d at 1355; *see also Perry*, 460 U.S. at 45–46 ("[I]f the state has *opened* [public property that is not by tradition or designation a forum for public communication] for use by the public as a place for expressive activity[,] . . . [it] is not required to indefinitely retain the open character of the facility[.]" (emphasis added)). That's no less true today.

did "*not* intend to open the [Challenged Medians] to the same panoply of activity permitted" on sidewalks or larger medians. *Bloedorn*, 631 F.3d at 1233 (quoting *Sentinel Comm'ns*, 936 F.2d at 1204); *see also* Ordinance 2020-59 at 2 ("[T]he City Commission recognizes that medians provide a measure of safety to pedestrians in the roadway, but finds that narrow medians . . . do not offer the same level of safety as larger, paved medians[.]").

It's also clear that the Challenged Medians aren't exactly conducive to hosting citizens' "assembly, [the] communicat[ion of] thoughts[,] . . . [or] [the] discussi[on of] public questions," *Satawa*, 689 F.3d at 521 (quoting *Hague*, 307 U.S. at 515), even if the City had intended for them to facilitate those activities. The FDOT standards—which the City has adopted as its own policy governing roadway projects, *see* Trial Tr. at 89:10–12 ("Q. Has the City of Pompano Beach adopted what's known as the Greenbook? A. Yes, we have.")—provide that medians suitable for "pedestrian refuge" must have a "six-foot minimum" width, although an "eight-foot [width is] preferred." *Id.* at 93:8–12. So, in addition to not being the kinds of "place[s] where people would ordinarily conduct political discourse"—people also "could not do so" safely (or comfortably) at the Challenged Medians *even if* they wanted to. *Satawa*, 689 F.3d at 521. It makes little sense, then, to conclude that "the overarching concern[ ] attending the government's creation" of the Challenged Medians was to facilitate assembly, *Sentinel Comm'ns*, 936 F.2d at 1204, given that those medians don't even "meet the minimum standards of the Florida Greenbook" to allow *one* person to "stand safely" on them. Trial Tr. at 94:15–16.

The Eleventh Circuit has cautioned "courts [not to] 'infer that the government intended to create a public forum when the nature of the property is inconsistent with expressive activity.'" *Sentinel Comm'ns*, 936 F.2d at 1202 (quoting *Cornelius*, 473 U.S. at 803). Seeing that the Challenged Medians aren't designed for—or remotely conducive to—pedestrians, we conclude that they aren't traditional public fora. *See Kokinda*, 497 U.S. at 727 (holding that a "postal sidewalk" was not a public forum since it "was constructed solely to provide for the passage of individuals engaged in postal business").

### 3.      The Presence of Any Special Characteristics

That the Challenged Medians haven't "by law or tradition been given the status of a public forum," *Cap. Square Rev. & Advisory Bd. v. Pinette*, 515 U.S. 753, 761 (1995), is further evidenced by their "special characteristics," *Bloedorn*, 631 F.3d at 1233 (cleaned up). Although "[t]he physical characteristics of the property alone cannot dictate forum analysis," *ibid.* (citing *Kokinda*, 497 U.S. at 727), they're nonetheless relevant to our assessment, *see Keister*, 240 F. Supp. 3d at 1238 ("[W]hen courts in this circuit conduct a forum analysis, they are tasked with assessing the forum's physical characteristics, as well as the traditional uses made of the property.").

The Challenged Medians lack any "appropriate accommodations facilitating . . . use" by the public. *Snowden*, 358 F. Supp. 2d at 1193. As John Sfiropolous, an expert in "[r]oadway design," Trial Tr. at 90:10–20, explained in his testimony, medians "designed for pedestrian refuge" are "six feet [or] greater" in width and "typically incorporate a crosswalk . . . with a truncated ADA mat, so that way if somebody is disabled, they . . . know that they're entering into traffic," *id.* at 93:2–6; *see also id.* at 93:6–7 ("[T]here's usually a cutout in the median for access."). The Challenged Medians (by definition) are less than six feet wide, and none of them has either "a pathway incorporated within [it]" or a "crosswalk going through [it.]" *Id.* at 93:23–94:4.

The Sixth Circuit's opinion in *Satawa* is especially helpful in understanding how the Challenged Medians' characteristics can influence where they fit on the "continuum" of forum categories. *Satawa*, 689 F.3d at 518. The median at issue there—the "Mound Road median"—displayed "objective characteristics typical of both public and non-public fora[.]" *Id.* at 520. On the one hand, that median was "landscaped," had "benches," and housed a "gazebo," "farm equipment (meant to show the historical nature of the village)," "memorial trees[,] and brass memorial plaques" that were "discernable only from the median[.]" *Id.* at 520–22. It was also "access[ible] from a sidewalk that crosse[d] the median and connect[ed] the two sides of Mound Road." *Id.* at 520. On the other hand,

the Mound Road median was "in the middle of a busy eight-lane road, with a fifty-mile-per-hour speed limit" and lacked a "special parking area" and "dedicated public restrooms." *Ibid.* (cleaned up).

In determining how to "balance" those characteristics, the *Satawa* Court found it useful to contrast the Mound Road median with medians that were more obviously one thing (a public forum) or the other (a non-public forum). *See id.* at 518–22. The court first considered the median at issue in *Snowden*: "a 'grassy area approximately 760 feet long by 140 feet wide, dividing State Road 922," which "had 'no public parking spaces, no sidewalks, no benches, no bathrooms, and no recreational facilities[.]'" *Id.* at 518 (quoting *Snowden*, 358 F. Supp. 3d at 1184). The Mound Road median, the court reasoned, was "more likely than the median in *Snowden* to qualify as a traditional public forum," as it at least had "features that invite the public to spend time there." *Id.* at 519.

For its example of a median that *better* resembled a traditional public forum, by contrast, *Satawa* highlighted the median at issue in *Warren*. That space was "'a large grassy mall, approximately thirty yards wide and spanning about 200 yards,'" which was "close to the seat of government" and "circumnavigated" by sidewalks "along a central landscaped strip." *Id.* at 519 (quoting *Warren*, 196 F.3d at 188–89). Because the "Mound Road median, unlike the mall in [*Warren*], is not 'a part of the grounds of a seat of legislative and executive power,' and contains only one small strip of sidewalk," the *Satawa* Court thought its median was "less likely to qualify as a traditional public forum" than the *Warren* median. *Ibid.* (quoting *Warren*, 196 F.3d at 196).

The Sixth Circuit ultimately held that the Mound Road median, "[o]n balance," *was* "a traditional public forum." *Id.* at 520. That the median was "accessible by public sidewalk and feature[d] benches and memorial plaques" strongly indicated that it "invite[d] visitors" onto the premises for public use. *Ibid.* And, although "the Mound Road median [wa]s not next to a seat of government, nor . . . a place where people discuss politics, in particular," the *Satawa* Court nonetheless found it sufficient that "[a] public sidewalk allow[ed] access to the median, and public benches populate[d] it"—thus

facilitating "assembly, communicat[ion of] thoughts between citizens, and discussi[on of] public questions" on the median. *Ibid.*

While countervailing characteristics made "[t]he Mound Road median . . . difficult to define," *ibid.*, our Challenged Medians bear *none* of the "objective characteristics" of public fora that were present in *Satawa* or *Warren*. The Challenged Medians are not "landscaped." *Id.* at 519; *see also* Ordinance 2020–59 at 4 (prohibiting sitting or standing on "any unpaved median," regardless of size). They have no "benches[.]" *Id.* at 520; *see also* Trial Tr. at 93:19–22 ("Q. . . . With respect to [three-to-five-foot] median[s], are you aware any of the medians in the city that have benches or bus stops in them? A. No."). They, in fact, include no other amenities or exhibits that would suggest they are "a place that welcomes visitors." *Satawa*, 689 F.3d at 522; *see also Snowden*, 358 F. Supp. 2d at 1193 ("It is not a traditional park or area where people congregate, gather, and traditionally have a free exchange of ideas and speakers, with appropriate accommodations facilitating such use, such as public restrooms and public parking."). There's also no evidence to suggest that they're "close to the seat of government." *Satawa*, 689 F.3d at 519 (citing *Warren*, 196 F.3d at 196); *see also Wright*, 665 F.3d at 1136 ("Context matters in forum analysis."); *McDonald*, 556 F. Supp. 3d at 1355–56 ("It might make *some* difference if, for example, a Challenged Median were located across from city hall (or some other government building), near the town square, or at the site of annual parades or recurring protests."). And, unlike the Mound Road median, the Challenged Medians offer no "pedestrian access from a sidewalk," *Satawa*, 689 F.3d at 520; *see also Warren*, 196 F.3d at 188 ("Sidewalks circumnavigate[d] the mall and amble[d] along a central landscaped strip."), to mitigate the barrier to entry posed by the "three or more vehicular travel lanes" surrounding them, *cf. Snowden*, 358 F. Supp. 2d at 1193 ("[A] rather small green space abutting two roadways, with no buffers such as sidewalks for protection or apparent invitation to the public . . . does not function as a traditional or 'quintessential' public forum." (citing *Kokinda*, 497 U.S. at 728–29)). Instead, as the City cogently summed it up at trial: "It's a road

divider"—nothing more. Trial Tr. at 145:11. Having now reviewed all the trial evidence, we agree.

*** 

Given our "fact-intensive inquiry" into the nature of the Challenged Medians, *Keister*, 240 F. Supp. 3d at 1238, we conclude that they are non-public fora. Nothing in the record establishes that *these* medians, in their current forms and dimensions, were "traditional[ly] use[d]" for speech activities. *Bloedorn*, 631 F.3d at 1233 (cleaned up). It's also clear that the City constructed the Challenged Medians to guide traffic patterns—and not "to facilitate the daily commerce and life of the . . . [C]ity[.]" *Ibid.* (quoting *Kokinda*, 631 F.3d at 727). And the fact that the City *once* permitted well-regulated soliciting on medians "does not imply that the forum thereby [became] a public forum for First Amendment purposes," or that the City could not later tighten restrictions on pedestrian use of these "nontraditional for[a.]" *Ibid.* (first quoting *Cornelius*, 473 U.S. at 805; and then quoting *Kokinda*, 631 F.3d at 730). Finally, the Challenged Medians lack *any* special characteristics that might "invite the public to spend time there" or which suggest that they're a "space for people to assemble[.]" *Satawa*, 689 F.3d at 519–20.

As we've said, other courts may have come out differently on the "general" question of how best to classify medians in the abstract. *See* Pl.'s Br. at 11 ("Medians generally are found to be traditional public fora." (first citing *McCraw*, 973 F.3d at 1063, 1067; then citing *Reynolds*, 779 F.3d at 225; then citing *Cutting*, 802 F.3d at 82; then citing *Satawa*, 689 F.3d at 520; and then citing *Martin*, 396 F. Supp. 3d at 1016, 1020–21)). But, in fairness, no other court has been asked to classify the medians in Pompano Beach that are between three and five feet wide and which divide roadways with at least three travel lanes  in any one direction, *see* Ordinance 2020-59 at 4—the "limited area of government property" to which *our* Plaintiff "seeks access[.]" *Bloedorn*, 631 F.3d at 1232 (quoting *Cornelius*, 473 U.S. at 801). Having engaged in that particularized analysis here, we conclude that the Challenged Medians are non-public fora given the evidence the parties presented about their traditional use, their purpose,

and their objective characteristics.

###### c.   THE CONSTITUTIONALITY OF THE MEDIAN PROVISION

Having classified the Challenged Medians as non-public fora, we must now decide whether the City's "interest in limiting the use of [the Challenged Medians] to [their] intended purpose outweighs the interest of those wishing to use the property for other purposes." *Cornelius*, 473 U.S. at 800. In non-public fora, the City's interest "to preserve the property under its control for the use to which it is lawfully dedicated" is at its zenith. *Greer*, 424 U.S. at 836. As such, "any time, place, and manner restrictions made on expressive activity need only be viewpoint neutral and reasonable; and the restriction need not 'be the most reasonable or the only reasonable limitation.'" *Bloedorn*, 631 F.3d at 1235 (quoting *Cornelius*, 473 U.S. at 808). The Median Provision satisfies this permissive standard. *See Keister v. Bell*, 29 F.4th 1239, 1257 (11th Cir. 2022) (*Keister II*) ("The reasonableness standard is not demanding[.]").

For starters, McDonald concedes that the Median Provision is "a content-neutral law" that "does not refer to speech or expression," Pl.'s Br. at 11, and he *doesn't* argue that the law discriminates on the basis of viewpoint, *see generally ibid.*; *see also Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) ("Viewpoint discrimination is . . . an egregious form of content discrimination."). Nor is there any evidence that the law could be perceived as viewpoint based. On the contrary, it uniformly bars "any person" from sitting or standing on a Challenged Median, except "in the course of lawfully crossing" the street. Ordinance 2020-59 at 4; *accord* Pl.'s Br. at 6 (quoting Ordinance 2020-59 at 4). We therefore hold that the Median Provision is "reasonable in light of the purpose which the forum at issue serves." *Perry*, 460 U.S. at 49. That purpose, as we've said, is to "separate opposing lanes of traffic," Trial Tr. at 92:17–18, and to "accommodate left-hand turn lanes," *id.* at 94:9–10. Furthering that purpose often requires the median to "narrow down to three [feet]" to safely channel a left-hand turn. *Id.* at 94:21–23. According to the City, "pedestrians are at greater risk when the number of traffic

lanes increases," since more lanes are associated with "increase[d] traffic volumes and often, speeds[.]" Ordinance 2020-59 at 2. Given that FDOT guidelines prescribe that medians suitable for pedestrians have "six-foot minimum" widths, *id.* at 93:8–12—and in light of the City's commonsense finding "that a median width of [at least] five feet would significantly increase the likelihood that should a pedestrian fall on the median, he or she would remain in the median as opposed to in the adjacent roadway"— we think the City acted reasonably in deciding that excluding pedestrians from three-to-five foot medians on high-traffic roads would further the City's legitimate interest in "improv[ing] . . . pedestrian and vehicular safety[.]" Ordinance 2020-59 at 1–2. The First Amendment, therefore, does not prevent the City from enforcing the Median Provision as a legitimate exercise of its police power.

### III.   MCDONALD'S DAMAGES UNDER THE HAND-TO-HAND TRANSMISSION PROVISION

Finally, we must determine the value of the damages McDonald is entitled to for the constitutional injury he suffered from the Hand-to-Hand Transmission Provision while it was still in effect. *See* Trial Tr. at 15:10–14 ("THE COURT: What about -- aren't you seeking damages for the four months . . . of the hand-to-hand transmission bans? MR. TASEFF: Correct.").[23] The City has "stipulate[d] to the unconstitutionality" of this law, *see* Jan. 4, 2022, Notice of Compliance at 1, and McDonald has adequately shown that this law caused him to suffer a constitutional injury by chilling his speech, *see* Trial Tr. at 63:3–4 ("[Y]ou can't hand-to-hand accept nothing from nobody. The law changed."); *id.* at 54:2–4 ("Q. . . . [A]fter the law changed in Pompano, did you continue to panhandle in Pompano? A. After the law changed? No, I didn't."); *see also McDonald*, 556 F. Supp. 3d at 1363 ("[A] First Amendment plaintiff whose speech was 'chilled' by an unconstitutional law can sue for

---

[23] With respect to the Hand-to-Hand Transmission Provision, as we've said, we've already granted the City's request for summary judgment on McDonald's declaratory- and injunctive-relief claim. *See McDonald*, 556 F. Supp. 3d at 1363 ("[W]ith respect to § 100.35(C)(2), McDonald's claim for injunctive relief (in Count III) is moot.").

money damages[,] provided he can show that the law caused his injuries[.]"(cleaned up)). So, while the City is liable for any damages McDonald suffered as a result of the Hand-to-Hand Transmission Provision, McDonald hasn't given us any workable way to calculate these damages.

"[W]hen § 1983 plaintiffs seek damages for violations of constitutional rights, the level of damages is ordinarily determined according to principles derived from the common law of torts." *Stachura*, 477 U.S. at 306; *accord Wright v. Sheppard*, 919 F.2d 665, 669 (11th Cir. 1990). "[T]he Supreme Court [has] held that compensatory damages under § 1983 may be awarded only based on *actual injuries* caused by the defendant and cannot be presumed or based on the abstract value of the constitutional rights that the defendant violated." *Slicker v. Jackson*, 215 F.3d 1225, 1229 (11th Cir. 2000) (first citing *Carey v. Piphus*, 435 U.S. 247, 264 (1978); and then citing *Stachura*, 477 U.S. at 309–10); *cf. id.* at 1230 (calling it error to award damages "based on the value or importance of the constitutional rights that were violated . . . under the rule that . . . § 1983 damages should be based on *actual* injuries suffered and that the abstract value of a constitutional right may not form the basis for § 1983 damages" (citing *Stachura*, 477 U.S. at 310)).

In determining that value, "general compensatory damages, as opposed to special damages, need not be proved with a high degree of specificity." *Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 476 (11th Cir. 1999) (cleaned up). Instead, "compensatory damages may be inferred from the circumstances as well as proved by testimony." *Ibid.* But a plaintiff "must still give the [factfinder] an 'adequate yardstick' by which to calculate [his] 'lost profits.'" *Matrix Health Grp. v. Sowersby*, 2019 WL 4929917, at *8 (S.D. Fla. Oct. 7, 2019) (Altman, J.) (quoting *Nebula Glass Int'l, Inc. v. Reichhold, Inc.*, 454 F.3d 1203, 1218 (11th Cir. 2006)). Damages for constitutional violations must be reasonable "and cannot be based on speculation or guess work[.]" *Aldon Inds., Inc. v. Don Myers & Assocs., Inc.* 517 F.2d 188, 191 (5th Cir. 1975) (cleaned up); *see also Yeager v. Advanced Disposal Servs. Ala. LLC*, 2022 WL 17998532, at *6 (11th Cir. Dec. 30, 2022) ("The jury's assessment of damages cannot be based on

speculation or conjecture[.]" (cleaned up)). When a plaintiff "fails to present evidence of compensable injury," we may award only "nominal damages[.]" *Slicker*, 215 F.3d at 1232; *see also ibid.* ("[A]n award of nominal damages may be appropriate when the plaintiff's injuries have no monetary value or *when they are not quantifiable with reasonable certainty*." (emphasis added)); *KH Outdoor, LLC v. City of Trussville*, 465 F.3d 1256, 1261 (11th Cir. 2006) (*KH Outdoor II*) ("[N]ominal damages are . . . appropriate in the context of a First Amendment violation." (first citing *Familias Unidas v. Briscoe*, 619 F.2d 391, 402 (5th Cir. 1980); and then citing *Risdal v. Halford*, 209 F.3d 1071, 1072 (8th Cir. 2000))).

McDonald offers no workable methodology for us to calculate the "lost profits" the Hand-to-Hand Transmission Provision caused him. *Nebula Glass*, 454 F.3d at 1218. At trial, counsel for the Plaintiff estimated that McDonald's damages equaled "[one] hundred dollars a week for that four-month period" between June and October 2020 in which the Hand-to-Hand Transmission Provision was in effect (or about $1,600 total). *See* Trial Tr. at 24:3–4. He arrived at this figure by recognizing that, at that time, McDonald had cut back from panhandling in Pompano Beach "[f]our or five days a week . . . to one to two times a week" (a minimum difference of two fewer days per week), *id.* at 170:14–171:4; *see also id.* at 66:12 ("Two days a week, that's after the [law] changed[.]"), and "would average about $50 a day," *id.* at 23:25–24:4; *see also id.* at 170:2 (estimating McDonald's damages equaled "[f]ifty bucks, twice a week").

We're not confident that $50 is even a reasonable estimate of McDonald's average daily earnings from panhandling in Pompano Beach. True, McDonald testified that he "may make $70 or better" on "a really good day" and around $30 "[o]n a bad day[.]" *Id.* at 48:24–49:5. But McDonald "never gave us a breakdown between the 'good days' and the 'bad days.'" *Messina*, 2024 WL 301574, at *32. Nonetheless, his counsel estimated that McDonald took in $100 per week when panhandling two days per week, *see id.* at 23:25–24:4, by "us[ing] the average of his best day [$70] versus his worst day [$30]," Trial Tr. at 169:25–170:2. The Plaintiff, therefore, is effectively asking us to infer that (on

average) he'd have one "good" day and one "bad" day per week, yielding a typical payout of "[f]ifty bucks, twice a week[.]" *Id.* at 170:2.

Nothing in McDonald's testimony (or in any of the other trial evidence) allows us to make that inference with anything approaching reasonable certainty. *Cf. Chabad of Nova, Inc. v. City of Cooper City*, 2008 WL 1140806, at *4 (S.D. Fla. Dec. 17, 2008) (Altonaga, J.) (holding that damages may be awarded if the "evidence show[s] the extent of the damage as a matter of just and reasonable inference" (quoting *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931))). McDonald told us at trial that it's "[not] *always* . . . a good day," Trial Tr. at 49:12 (emphasis added), and that on "some days you don't get [any]thing," *id.* at 67:19. But he never broke down how often he enjoyed good (or suffered bad) days, nor did he provide any "yardstick" from which we could reasonably estimate how many high-earning days he typically had for every low-earning day. *Nebula Glass*, 454 F.3d at 1218; *see also Messina*, 2024 WL 301574, at *32 (concluding that there was "no adequate yardstick for computing [the plaintiff's] damages" where he "never gave us a breakdown between the 'good days' and the 'bad days'").

The assumption underlying the estimate that McDonald would earn "[f]ifty bucks, twice a week," *id.* at 170:2—*i.e.*, that his average daily earnings approximate "the average of his best day versus his worst day," *id.* at 169:25–170:2—thus doesn't "rest on adequate data," *G.M. Brod & Co. v. U.S. Home Corp.*, 759 F.2d 1526, 1539 (11th Cir. 1985) ("The proof may be indirect and it may include estimates based on assumptions, so long as the assumptions rest on adequate data." (quoting *Lehrman v. Gulf Oil Corp.*, 500 F.2d 659, 668 (5th Cir. 1974), *cert. denied*, 420 U.S. 929 (1975))); *see also Laurentine, Inc. v. Gen. Motors Corp.*, 1978 WL 6497589, at *1 (S.D. Ala. Apr. 17, 1978) (concluding that the plaintiff "failed to establish its damages stemming from loss of vessel use and commercial losses to a reasonable certainty" where "there was no evidence presented on" the assumptions underlying the calculation). Without more, in other words, McDonald can only speculate about his average earnings over the

relevant period. *Cf.* Trial Tr. at 79:24–80:4 ("Q. . . . Have you ever kept records as to how much money you make when you panhandle from a swale area or a sidewalk or when you panhandle from the median area? Have you ever written down and kept track of that? A. No, I didn't."). And we can't base our damages calculation on speculation. *See Yeager*, 2022 WL 17998532, at *6 ("The jury's assessment of damages cannot be based on speculation or conjecture[.]" (cleaned up)).

But here's the thing: Even if we *were* to accept that McDonald would have made "[f]ifty [dollars], twice a week," from panhandling in Pompano Beach, Trial Tr. at 170:2, that still wouldn't give us an 'adequate yardstick' by which to calculate" his overall damages, *Matrix Health*, 2019 WL 4929917, at *8 (quoting *Nebula Glass*, 454 F.3d at 1218). That's because McDonald's damages equal what he otherwise would have earned from panhandling in Pompano Beach "minus so much of the loss as was averted by reasonable efforts to mitigate damages[.]" *Patterson v. Portch*, 853 F.2d 1399, 1408 (7th Cir. 1988) (first citing *City of Chi. v. U.S. Dep't of Lab.*, 737 F.2d 1466, 1471–72 (7th Cir. 1984); then citing *Patkus v. Sangamon–Cass Consortium*, 769 F.2d 1251, 1265 (7th Cir. 1985); then citing *Kendall v. Bd. of Educ. of Memphis City Schs.*, 627 F.2d 1, 6 (6th Cir. 1980); and then citing *Stein v. Bd. of City of N.Y.*, 792 F.2d 13, 18–19 (2d Cir. 1986)); *see also ibid.* ("The purpose of an award of compensatory damages in a civil rights tort case as in any other tort case is to put the plaintiff in the position he would have occupied had the defendant not committed the tort." (first citing *Carey*, 435 U.S. at 253–54; then citing *Stachura*, 477 U.S. at 299; and then citing *Lossman v. Pekarske*, 707 F.2d 288, 290 (7th Cir. 1983))).

It's undisputed that the lost earnings the Hand-to-Hand Transmission Provision inflicted on McDonald—whatever those are—must be offset by money he earned, or reasonably "could have" earned, by panhandling elsewhere. *In re New River Shipyard, Inc.*, 355 B.R. 894, 907 (S.D. Fla. Bankr. 2006) (Olson, Bankr. J.); *see also ibid.* ("As a general proposition, a plaintiff must take all reasonable steps necessary to avoid further damages, and whether the plaintiff undertook to mitigate damages is

relevant to the damage calculation."). His lawyer conceded as much at trial:

> THE COURT: . . . [L]et's say [McDonald] was going to earn an average of $50 a day. He goes to Fort Lauderdale and people don't know him as well there, so he only earns $30 a day, aren't his damages $20?
>
> MR. TASEFF: Yes.
>
> THE COURT: Okay.
>
> MR. TASEFF: I'm not going to dispute that.

Trial Tr. at 171:18–24.

And McDonald told us that he did, in fact, begin panhandling in other cities after he was arrested in August of 2018. *See id.* at 52:17–53:6 ("Q. . . . As a result of that, okay, did you then start panhandling in other places? A. Yeah, I did."). In other words, to make up for the fewer days he was panhandling in Pompano Beach, *see id.* at 52:22–25 ("Q. . . . Did you cut back? A. Yeah, I did. Q. In Pompano? A. Yeah, I did."), McDonald would panhandle in neighboring cities, including Fort Lauderdale and Oakland Park, *see id.* at 53:7–10 ("Q. Where did you go? A. Here in Fort Lauderdale, [on] Sunrise and Andrews. Q. Did you go to Oakland Park? A. Yeah, Oakland Park."). So, by June 23, 2020, when the Hand-to-Hand Transmission Provision took effect, McDonald was living and primarily panhandling in places *other than* Pompano Beach. *See id.* at 67:20–68:7 ("Q. . . . [B]etween June 23, 2020, and October 27, 2020[,] . . . [y]ou usually did not stay in Pompano, though, is that correct? A. No, I never stayed in Pompano."); *id.* at 54:2–4 ("Q. . . . [A]fter the law changed in Pompano, did you continue to panhandle in Pompano? A. After the law changed? No, I didn't. Q. Did you ever -- would you ever go up there on any occasion? A. No, unless I would go up there to panhandle[.]"). And, after his September 26, 2020, arrest in Pompano Beach, McDonald panhandled *exclusively* in other cities. *See id.* at 81:2–4 ("Q. And so since September 26, 2020, you've been panhandling in the City of Fort Lauderdale and the City of Oakland Park then. A. That's right."); *see also id.* at 80:8–12 ("Q. Have you been back to panhandle in Pompano at all since September 26, 2020?

. . . A. No, I haven't.").

According to McDonald, he made less money in Fort Lauderdale and Oakland Park than he did in Pompano Beach. *See id.* at 55:19–23 ("Q. Where do you make the most money? A. In Pompano. Q. Compared to the other cities? A. Compared to here in Fort Lauderdale [and] Oakland Park, Pompano is where I make my money."). But we have no idea *how much* less—whether one dollar or forty-nine—because McDonald never told us. *See id.* at 67:12–15 ("Q. . . . [Y]ou wouldn't be able to tell me what you had received on a given day that you did panhandle [from June 23, 2020, to October 27, 2020], is that correct? A. That's correct."). Since McDonald's "damages may not be determined by mere speculation or guess," *Terrell v. Household Goods Carriers' Bureau*, 494 F.2d 16, 24 (5th Cir. 1974) (quoting *Story Parchment Co.*, 282 U.S. at 563), he hasn't met his "burden of proving a basis for a determination of the amount of damage" he incurred from having to panhandle outside of Pompano Beach, *Stewart & Stevenson Servs., Inc. v. Pickard*, 749 F.2d 635, 648 (11th Cir. 1984).

Based on the evidence McDonald presented at trial, in short, we cannot quantify—with any reasonable certainty—*either* how much money McDonald would have made from panhandling in Pompano Beach absent the Hand-to-Hand Transmission Provision *or* the extent to which he was able to mitigate those losses by panhandling in other cities. Without a reasonable estimate of those sums— backed by actual evidence, *G.M. Brod & Co.*, 759 F.2d at 1539 (noting that assumptions underlying damages estimates must "rest on adequate data")—we "have no adequate yardstick for computing his damages," *Messina*, 2024 WL 201574, at *32. And where (as here) the Plaintiff's damages "are not quantifiable with reasonable certainty," nominal damages are appropriate. *Slicker*, 215 F.3d at 1232; *see also KH Outdoor II*, 465 F.3d at 1261 ("[N]ominal damages are . . . appropriate in the context of a First Amendment violation."); *Messina*, 2024 WL 201574, at *33 ("In these circumstances, courts haven't hesitated to award a plaintiff only nominal damages." (cleaned up)). We'll therefore allow McDonald to recover only nominal damages here.

CONCLUSION

After a careful review of all the evidence, we hereby **ORDER and ADJUDGE** as follows:

1. With respect to Count III of the Verified Amended Complaint:

   a.   As to CITY OF POMPANO BEACH, FLA. CODE § 100.35(C)(1)(b), Final Judgment is **ENTERED** in favor of the Defendant, the City of Pompano Beach, and against the Plaintiff, Bernard McDonald.

   b.   As to CITY OF POMPANO BEACH, FLA. CODE § 100.35(C)(2), Final Judgment is **ENTERED** in favor of the Plaintiff, Bernard McDonald, and against the Defendant, the City of Pompano Beach. As to CITY OF POMPANO BEACH, FLA. CODE § 100.35(C)(2), the Plaintiff is awarded nominal damages in the amount of $1.00. All other requested relief is **DENIED as moot**.

2. Pursuant to Federal Rule of Civil Procedure 58, the Court will enter final judgment separately.

3. This case shall remain **CLOSED**. All deadlines and hearings are **TERMINATED**, and any pending motions are **DENIED as moot**.

**DONE AND ORDERED** in the Southern District of Florida on July 29, 2024.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:    counsel of record